IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DEMETRIA BROOKS, *et al*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-3322 |
| | § | JURY TRIAL DEMANDED |
| HARRIS COUNTY SHERIFF'S | § | |
| OFFICE, *et al*, | § | |
| Defendants. | § | |

## DECLARATION OF GARRETT HARDIN

My name is Garrett Hardin, a Defendant in the above-entitled cause. I have personal knowledge of all of the facts stated in this declaration, and all such facts are true and correct.

1. From September 2002 until December 2023, I was employed by the Harris County Sheriff's Office. I graduated from Basic Peace Officer Academy in May 2003, and became a certified Deputy Sheriff in November 2003. In October 2004, I was assigned to patrol duties in District 1 and served in that capacity for approximately 10 years. During that time, I was selected to become an FTO, or Field Training Officer, and served in that capacity for approximately 3 years. In February of 2015, I was selected to become a Detective in the Crimes Against Children Division, where I served for 3 ½ years. I ultimately became a "Lead Investigator" and was often assigned to train and mentor new Investigators assigned to the Division, in addition to my own case load. In June 2018, I was promoted to the rank of Sergeant and reassigned from the Child Abuse Division to the Harris County Jail, where I served as a Supervisor from June 2018 through October 2020. I was then reassigned to District 1 Patrol, as a Shift Supervisor, where I served until July 2022.

2. In August 2008, while serving as a Patrol Deputy for the Harris County Sheriff's Office, I became certified by the Texas Commission on Law Enforcement (TCOLE) in the use of the Conducted Electrical Device (CED), or "taser," and began carrying it on duty. Each year after 2008, I attended annual refresher training pursuant to applicable state law, and HCSO policy, regarding the use of the taser device. From such training and experience, by July 2022, I knew that a CED, even in drive-stun mode, could cause serious personal injury if the electrodes were applied to the face, especially the eyes. I was taught in training classes that drive-stunning a person in my eyes could cause permanent blindness, and that drive stunning a person in the neck could cause temporary lockup. From such training and experience I was also aware that drive-stunning a person who is



Hardin MSJ EXHIBIT 1
C.A. No. 4:22-cv-3322

already making physical contact with deployed probes or frayed wires of a CED could experience full or partial body incapacitation, or neuromuscular incapacitation (NMI).

3. I have reviewed the video made by the body worn camera system (BWC) I was wearing at the time of the incident made the basis of this suit, which I understand will be filed in support of my motion for summary judgment as **Exhibit 6**. I have reviewed the copy of that video, with time stamps that have been synchronized with the taser logs analyzed by AXON taser expert, Bryan Chiles, which video I understand will be filed in support of my motion for summary judgment as **Exhibit 7**. I have also reviewed the still time-stamped photographs made from that synchronized body cam video, which will be filed in support of my motion for summary judgment as **Exhibit 8**.

4. Subject to the limitations of the limited perspective of the recording equipment that made these recordings, these video exhibits correctly and accurately depict the events recorded in each. The camera lens of the BWC was mounted in an exterior vest pocket, with the lens looking through an aperture in the pocket, so the camera lens view was situated at the level of my sternum, or approximately 12 to 18 inches below the line of my eyesight. Therefore, the details visible in the video recording are not necessarily the same as what I was able to see from my perspective; or vice versa, some details captured by the camera lens view may be details that I was unable to see. In addition, some things visible to me were not recorded by the BWC system because I was in such close contact with Mr. Brooks at times that the camera lens was covered up, as described below. In my description of the events of this case, I will provide context for each of these exhibits and refer to them by their exhibit numbers.

5. On Friday, July 8, 2022, while acting in the capacity of my employment as a Sergeant Deputy Sheriff for the Harris County Sheriff's Office (HCSO), I was assigned to District 1 Patrol Area in Harris County, Texas, a high crime area. The immediate area had a reputation for drug sales and usage, gang activity, and petty theft. I was operating under the identifier "Unit 41S35" and was operating a white Ford Explorer that had been clearly marked as a patrol vehicle for the HCSO. The vehicle was equipped with large reflective HCSO markings, overhead emergency lighting, audible siren, and in-car camera system. I was wearing the uniform of a Harris County Deputy Sheriff and easily recognizable as such along with my badge and body armor with the word "Sheriff" printed prominently in front. I was further outfitted with a body worn camera system, described above, which was activated during my involvement in the incident in question.

6. At approximately 6:04 PM [1804hrs], a dispatched call for service was broadcasted stating that an assault had occurred at a business commonly known as "Dollar General," located at 2004 W FM 1960 in Harris County, Texas. The call notes, which appeared on the in-car laptop computer, further informed me that a robbery had also occurred, not just an assault. The call notes advised that the suspect had stolen merchandise from the store and "knocked a woman to the ground" while in the commission of that crime. The call notes described the suspect as a black male, wearing a blue or grey shirt and gray shorts. He was reported not to have displayed a weapon while committing

2

the robbery, but the report did not rule out the possibility of a weapon hidden on his person. The call notes further advised that the suspect was observed running westbound through the parking lot located directly across West FM 1960 from the business, on the south side of the road; and the suspect was last seen in an area of the business commonly known as The Scottish Inn.

7. I observed the suspect matching the description provided, walking south on the east side of Kuykendahl Road, immediately south of The Scottish Inn. I notified dispatch that I had located the possible suspect (now known to be Brooks). I then activated my in-car system and BWC. When I turned around, Brooks began to flee the area.

8. I activated my overhead emergency lights and stopped my marked patrol car against the left curb in the #1 lane of northbound travel along Kuykendahl Road. As I did so, Brooks looked directly at me and began evading detention on foot. He ran across the southbound lanes of Kuykendahl, in front of moving vehicles. In the unsynchronized BCV, **Exhibit 6** (Video Time Stamp 0:59-1:01), I can be heard notifying dispatch that "He's running." The vehicles he ran in front of had to brake hard to avoid striking him.

9. Still driving my patrol vehicle, I caught up with Brooks and stopped my vehicle in the #1 lane of Bammelwood Drive. As I exited, Brooks entered the parking lot of the gas station and convenience store known as Faddy's Food Mart, located at 15515 Kuykendahl Road. Brooks turned back and looked directly at me, at which time I yelled for him to come here. In the unsynchronized BCV, **Exhibit 6**, this scene is at Time Counter 1:23-1:25, where Brooks can be seen in the parking lot moving away as I called out to him, "Come here, dude! "Come here!" Because I was in uniform and had just exited a marked patrol vehicle with emergency lights flashing, I assumed he knew I was a law enforcement officer but elected to continue to flee from me and ignore my commands.

10. A foot pursuit through the gas station parking lot ensued. This event can be seen on the unsynchronized BCV, **Exhibit 6**, at 1:26-1:36; and on the time-synchronized BCV, **Exhibit 7** at time stamps 18:20:29-18:20:34. Brooks ran south and then turned east, back toward Kuykendahl. I ran after him. As I entered the parking lot and ran around a mobile food truck located there, I observed him running south along the east side of the gas station. He ran between three vehicles parked there – a red Toyota Tacoma, a maroon Chevrolet Silverado, and a red Ford F-150. I then unholstered and removed my Conducted Energy Device (CED), commonly referred to as a "taser," with my right hand, pointed it in his direction, and loudly called out to him, "Stop dude! I'm gonna tase you! Stop!" Brooks stopped running and turned his body to face me momentarily from a distance of what appeared to be about 20 feet away. I ordered him, "Get on the ground! Get on the ground now!" This is recorded on the synchronized BCV (**Exhibit 7**) at 18:20:35 - 18:20:36. Brooks ignored these commands, however, and resumed his flight, running into the side of a silver/grey four-door vehicle, as seen occurring at 18:20:38 (**Exhibit 7**).

3

11. When Brooks ran into the side of the silver/grey vehicle, I came to appreciate the significant danger he now posed by refusing to stop and submit to my attempt to arrest him. It was immediately apparent that he could have opened the car door and hijacked that vehicle and its passengers. Other vehicles in the immediate vicinity offered him the same opportunity for escape. The vehicular traffic along Kuykendahl Road was moderately heavy, as can be seen in the video recording. Continuing the foot pursuit also put one or both of us at risk of being hit by a moving vehicle, or putting the moving vehicles at risk of collision by taking evasive action to avoid hitting us.

12. To bring a quick end to the foot pursuit, I fired my taser at Brooks's back. One probe appeared to stick in the back of his torso and the other appeared to miss, as seen in the synchronized BCV (**Exhibit 7**), at 18:20:39 - 18:20:40.

13. After deploying the taser, I observed Brooks slow to nearly a stop. But the single probe that hit him, still hanging from his shirt, did not lock up his body (or cause neuromuscular incapacitation), as he continued walking away from me under his own power. In an effort to stop further flight, I took him to the ground by tackling him from behind. The events described in this paragraph are recorded at 18:20:40 - 18:20:43 in the synchronized BCV (**Exhibit 7**). The taser probe that penetrated the suspect's shirt, along with the wire connecting the probe to the CED, can be seen still attached to his shirt in several of the still frames of this event. *See* (**Exhibit 8**) Frames 00382-383 [Video stamps 18:20:42.223, 18:20:42.265].

14. As we both landed on the ground, I positioned myself on top of Brooks, him lying face down in a prone position. As I attempted to keep him pinned, I lost control of my taser, which slid to the ground in front of him and myself. No video recording of this two-second segment (18:20:42-18:20:44) of my hands-on encounter with Brooks is visible in the synchronized BCV, because I was on top of him and the camera eye of my BCV was pressed into his back.

15. At 18:20:45 on the sychronized BCV (**Exhibit 7**), Brooks comes into view beneath me. A still photo of this moment is **Exhibit 8**, Frame 00454, [18:20:45.011]. At 18:20:45.342, my right hand can be seen lifting off of the ground where I had just used the heel of my right hand to brace me from falling forward. I held Brooks pinned with pressure on his shoulders by my left hand. Initially, for a period of about three seconds, he seemed somewhat docile, so I raised my right hand to activate my radio to call for back-up assistance. This movement of my right hand can be seen at **Exhibit 8**, Frames00468 through 00544 [18:20:45.474 through 18:20:48.042]. Brooks then renewed his struggle to break free and knock me off of him. This event is shown in the synchronized BCV (**Exhibit 7**), at 18:20:48 - 18:20:54. With arm strength alone, Brooks showed himself capable of pushing his body weight, with me on top of him, off the ground, as can be seen at **Exhibit 8**, Frames00691 through 00708 [18:20:53.031 through 18:20:53.593]. From this action, I realized that Brooks was surprisingly powerful for his size and that body weight alone could not keep him pinned.

4

16. During this part of the struggle, I threw a punch at Brooks which glanced the right side of his head. This action can be seen at **Exhibit 8**, Frames 00719-00722 [18:20:53.995 through 18:54.067].

17. I then moved to hold Brooks down with both of my hands, grabbing him at the base of his neck and attempting to hold his head low so he could not create space to maneuver his body to face me. However, using his upper body and arm strength, he managed to keep enough space between his body and the ground to reach for my taser. As I saw him reaching for it, I attempted to grab it myself, but he reached it first. This action can be seen at **Exhibit 8**, Frames00758-763 [18:20:55.220 through 18:20:55.387]. I did not know whether he was armed with some other weapon hidden on his person that he might access as he struggled to free himself and ignored my commands. All of these events can be seen on the synchronized BCV recording (**Exhibit 7**), and corresponding still photos at **Exhibit 8**, Frames 00723-00762 [18:20:54.099 through 18:20:55.387].

18. Brooks now was in possession of the taser. During the next approximately five seconds, BCV recording (**Exhibit 7**) from 18:20:55 until 18:21:00, Brooks was facing away from me. During that time, I heard the clicking sound of the taser being activated, and I felt a strong, sustained electrical shock from the taser. When I felt the shock, I drew my firearm from its holster, and warned Brooks loudly, "I'm gonna shoot you. Put that down." The strong electrical current, coupled with Brooks trying to knock me off of him, caused me to lean forward with my firearm and right hand making contact with the back of his right hand. For that moment, my gun was within his immediate reach. I was able to pull back it back, however, and, still feeling the effects of the shock, again warned him: "I will f____g shoot you!" No video recording of this part of my hands-on encounter with Brooks is visible in the synchronized BCV, because the camera eye was pressed into the suspect's body; however, the audio-recording of the taser clicking as it was activated and my warnings to him are audible.

19. Brooks remained in possession of the taser until approximately 18:21:02, which can be seen at **Exhibit 8**, Frames 00878-00989 [18:21:00.143 through 18:21:03.936], when he relinquished control and lifted his hand off of it. When Brooks relinquished control, I can be seen in the video moving the muzzle of my gun away from Brooks. I had decided not to shoot him if he obeyed my command to put the taser down and not threaten me with it.

20. During Brooks's initial possession of the taser, I felt myself and my firearm entangled in the deployed taser wires, which can be seen at **Exhibit 8**, Frames 00968-01031 [18:21:03.238 through 18:21:05.367]. When he shocked me with it, I assumed the shock had been delivered through one or more of the deployed taser probes and/or the frayed wires. He was only able to shock me because I was making contact with enough of the wiring for the current to travel from the CED into my body. Even after the shock ended, I believed I was still making physical contact with the probes or wiring such that another trigger pull could shock me again, perhaps more powerfully than before. Everything was happening in a matter of a few seconds so there was no time or any safe

5

opportunity for me to untangle the wires and separate myself from Brooks. From training and experience, I knew that a CED, even in drive-stun mode, could cause serious personal injury if the electrodes were applied to my face, especially my eyes. I was taught in training classes that drive-stunning a person in the eyes could cause permanent blindness, and that drive stunning a person in the neck could cause temporary lockup. From training and experience I was also aware that because my body was touching the deployed probes and/or frayed wires of the taser, Brooks could have immobilized me merely by drive-stunning my body and thereby completing the incapacitation circuit. Had he done so, I would have been at significant risk of losing my grip on my firearm and dropping it where he could pick it up and use it against me. In other words, if Brooks were to rearm himself with the taser still lying on the ground in easy reach, I would be vulnerable to complete or partial neuromuscular incapacitation or serious physical injury.

21. Less than two seconds after Brooks relinquished control of the taser, he began reaching for it a second time. When this occurred, I attempted to push the taser out of his reach. This movement of mine can be seen in the video, at **Exhibit 8**, Frames 1020-1040 [18:21:05.002 through 18:21:05.672], which depicts me using my right hand, then holding my firearm, attempting to push the taser and managing to move it a few inches. However, I was unable to shove it beyond his reach. Brooks picked it up again, as can first be seen at **Exhibit 8**, Frame 01072 [18:21:06.738]. When he was able to gain control over the device for the second time, he began to move it from his right to left, seen at **Exhibit 8**, Frames 01072-1086 [18:21:06.738 through 18:21:07.194], a movement which I saw as a possible attempt by him to roll onto his back and touch me with the electrodes. I also knew at any instant he could pull the trigger again and deliver another powerful shock to me. To stop this immediate threat, I immediately swept my firearm to my left and discharged one shot at close range into his body.

22. I used deadly force against Brooks solely in self-defense, as a last resort, as I believed that in that split-second that if Brooks used the CED against me again, either in drive-stun mode or simply by pulling the trigger, I could lose control of my firearm. He appeared to me to be of a mind to use all available means to avoid arrest and harm me in the process. All lesser levels of force had proved ineffective. I already had run a considerable distance in full gear, during very hot, mid-Summer conditions. He refused to stop and submit to arrest on command. He appeared unfazed by my taser deployment. He resisted my hands-on struggle to subdue him on the ground, which included a glancing blow to the side of his head with my hand and forearm. I was out of breath from the foot pursuit, from the intense struggle on the ground, and from being tased. I assumed Brooks could possibly be armed. Given his display of extreme strength in pushing his torso off the ground with me on top of him, I also assumed he could be under the influence of a stimulant. He managed to pick the loose taser up, activate it by moving it from the "safe" to "active" setting, and pull the trigger, indicating that he was familiar enough with a taser to know how to use it. After I warned him that I would shoot him if he refused to drop it, he picked it up again a few seconds later and moved in a direction toward me – an act I perceived to pose an immediate threat of serious bodily injury or incapacitation. As he had

6

already shocked me once with the taser, I knew he had the capability of delivering a second shock in a split second with just a trigger pull.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Harris County, State of Texas on __10/28/2025__, 2025.

_____
Garrett Hardin