## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHER DISTRICT OF TEXAS

| | | |
|---|---|---|
| Demetria Brooks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 4:22-cv-03322 |
| HARRIS COUNTY, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPORT OF BRYAN CHILES

I, Bryan Chiles, being of legal age and under the penalties of perjury, state as follows:

1. I am a competent adult and have personal knowledge of the following facts or believe them to be true based on information and belief. Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.

2. Attached is a true and accurate copy of my expert report in the above captioned litigation.

3. The report summarizes my analysis and findings and includes a statement of my opinions. The report also includes data and other information considered by me in forming my opinions and outlines my qualifications (including my Curriculum Vitae).

4. My opinions are expressed to a reasonable, or higher, degree of professional certainty and/or probability.

5. I affirm under the penalties of perjury that the foregoing statements are true and correct.


_____        09-AUG-2025
Bryan Chiles                   Date



Hardin MSJ
EXHIBIT

2

C.A. No. 4:22-cv-3322

**FRCP 26(a)(2)(B)(iv) Witness's Qualifications Include[1]**

I am a test engineering professional with an Associates of Science (AS) degree in Electronics. I have invested over 20 years of my career in the testing and troubleshooting of electronic devices in a variety of industries, including test equipment calibration and repair, industrial power electronics, high power electrical distribution and conditioning, energy weapons, cameras, radio frequency (RF) devices, and network information technology equipment (ITE).

After spending 8 years in the calibration & repair and high-power electrical distribution and conditioning industries, I began my career at Axon Enterprise, Inc. (Axon), (then TASER International, Inc. (TASER)), in the summer of 2005 in the Research and Development (R&D) department as an electronics technician. Within 1 year, I began to develop TASER's validation department, designing test methods and managing the validation testing processes. This was a very unique position, as there were no generally accepted standards for validating energy weapons at the time. Using my testing expertise and working closely with the design engineers, I developed and executed the test plans and methods for TASER® energy weapons and Axon cameras. In the process of testing energy weapons and cameras, I became intimately familiar with their operation, behavior, and capabilities.

Beginning in 2013, I assumed increased responsibilities and began conducting investigation analysis of energy weapons and cameras involved in field use. Using my expertise in the TASER energy weapon and Axon camera's behavior and logging, I began to analyze specific incidents and generate analysis and expert reports, explaining energy weapon functionality and logging in reference to cases submitted to me.

I was promoted to TASER's Technical Compliance Manager in 2014, where I continued working in and managing the validation department and conducting investigation analysis, and also assumed responsibilities for product compliance to domestic and international technical standards and regulations (i.e., wireless and electromagnetic compatibility (EMC) regulatory compliance, product safety, etc.). In 2016, my position was re-named Product Compliance Manager (which was the same position as Technical Compliance Manager, but with a clarified title), however I relinquished my validation responsibilities to concentrate and focus solely on investigation analysis and product compliance.

In January 2020, I was promoted to Senior Investigations Engineer, where my sole focus is conducting forensic testing and analysis, expert services, and testimony, energy weapon/camera research testing, and advanced level customer service. In January 2022, I was promoted to the position I currently hold, Sr. Manager of Axon Forensics, and continue

---

[1] See current Curriculum Vitae for further details and specifics. My curriculum vitae containing details of my relevant formal education, training, experience, publications authored, and a listing of any cases in which testimony (deposition and/or trial) as an expert has been taken is attached hereto and made an integral part hereof.

to conduct forensic analysis, expert services and testimony, Axon product research and testing, as well as managing the Axon Forensics team and processes.

I have presented on energy weapon forensics at the AFTE (Association of Firearm and Tool Mark Examiners) Annual Training Conference (May 2017 in Denver CO) as well as presenting on trial testimony at the Axon Accelerate certification conferences (June 2017 and 2018) and the TASER Master Instructor Schools in 2018 (Sanford, FL, Toronto ON, and Mesa AZ) and 2023 (Las Vegas, NV); as well as teaching the interpretation of X2 and X26P energy weapon Pulse Graphs at the TASER Master Instructor School (Sanford, FL 2018). I delivered four presentations at the Axon Accelerate 2018 conference June 5–7, 2018, including a deep dive into energy weapon Pulse Graphs, "Drop 'em, Soak 'em - How we test our energy weapons", "Understanding your energy weapon data", and "Testifying on Axon Video Evidence". I presented in Axon's Legal Track at TASERCON 2023 and Axon Week 2024 on the basics of energy weapons and the forensic evidence that can be analyzed. I presented in Axon's Legal Track at Axon Week 2025 on TASER energy weapon and body worn camera forensic evidence and how they can together impact a case. I also designed and have taught certification classes on the analysis of X2, X26P, TASER 7, and TASER 10 Pulse Graphs at Axon's Master Instructor Schools beginning in 2021 to the present day. 8. I have taught classes on TASER energy weapon and BWC forensic evidence analysis methods for several Force Investigation Division (FID), Serious Incident Response Teams (SIRT), Critical Incident Review Division (CIRD), Crime Scene Investigators (CSI), Independent Investigations Offices (IIO) and District Attorney's Office Investigators in the US and Canada, starting in 2024 to the present day.

I have personally deployed and discharged energy weapons, including the TASER M26, X26E, C2 (a.k.a.- Bolt), Shockwave, X3, XREP, X2, X26P, Pulse, TASER 7, TASER 10, and experimental (in development) energy weapons, hundreds to thousands of times, including deploying energy weapon cartridges thousands of times. I have downloaded TASER energy weapons and reviewed, analyzed, interpreted, and explained the data thousands of times. I have personally experienced the effects of the X26E, XREP, C2, X26P, and X2 energy weapons. I have personally operated, downloaded/uploaded, tested, and analyzed Axon Body Worn Cameras (BWCs) and their recorded videos thousands of times. I have also provided expert testimony on Axon BWCs and TASER energy weapon technology in US federal, state, and foreign courts, as outlined in my attached Curriculum Vitae (CV). I am a current member of the USNC (United States National Committee) experts to the International Electrotechnical Commission (IEC), participating in a workgroup (TS85 WG22) reviewing and revising IEC 62792; an international standard on energy weapon output measurement methods.

**FRCP 26(a)(2)(B)(ii) case specific facts or data considered:**

- *HardinTASER_X26P_X1300A2HP_offline(1).pdf* – TASER X26P Event Log
- *Xerox Scan_10122022154307.pdf* - TASER X26P Event Log
- *TASER_X26P_638_pulse_graphs.pdf* – Pulse Graph Sequence #638
- *TASER_X26P_643_pulse_graphs.pdf* – Pulse Graph Sequence #643

- *07_08_2022_18_19_00_GARRETT_HARDIN.mp4* – BWC footage of Sgt. Hardin
- Sync History X1300A2HP.xlsx – TASER X26P clock sync history
- June 18, 2025 probe & wire analysis still and microscope photos

**FRCP 26(a)(2)(B)(ii) non-case specific facts or data considered** (including referenced documents/materials), also, these documents are the FRCP 26(a)(2)(B)(iii) exhibits**:**

- X26P Specification Sheet, version 6.0 (May 2019)
- X26P User Manual, Rev L (Aug 2020)
- X26P Users Course, Version 22 (2020)

**FRCP 26(a)(2)(B)(vi) Compensation for Study/Testimony in the Case:**

The expert compensation that is expected to be paid in this case to Axon is as follows:

1. **Initial Retainer** - $0
2. **Report** - $5,000
3. **Testimony, On-Site Visit/Research, Extraordinary Services** - $300 / hr

To date no invoice has been sent and no payment has been received for this report. No compensation is contingent upon the outcome of this case or the opinions expressed.

### REPORT AND PROFESSIONAL OPINIONS OF BRYAN CHILES
### Axon Enterprise, Inc. (Axon)

**Request and Scope of Work:**

On July 8, 2022, Sergeant (Sgt.) Garrett Hardin with the Harris County Sheriff's Office (HCSO) was attempting to apprehend Roderick Brooks, but Mr. Brooks fled. Sgt. Hardin deployed his agency-issued TASER X26P energy weapon toward Mr. Brook, but although he stopped running, it did not appear effective on Mr. Brooks. Sgt. Hardin took Mr. Brooks to the ground to apprehend him, however when attempting to key his radio, Mr. Brooks acquired control of Sgt. Hardin's TASER energy weapon. After Mr. Brooks armed the weapon twice, including one trigger activation, Sgt. Hardin discharged his firearm at Mr. Brooks. I was asked to conduct a forensic analysis of the TASER energy weapon's logs, video footage of the incident, and physical evidence of the wires and probes from the incident.

The subject X26P energy weapon with serial number X1300A2HP ("the X26P energy weapon") was manufactured by Axon on September 25, 2019. The X26P energy weapon's Event Log and pulse graphs associated with the activation on July 8, 2022, as well as the footage of the incident were sent to me digitally. The wires and probes were analyzed in-person on June 18, 2025 at the HCSO Property Room in Houston, TX. This report details the general operation, my analysis, and my analysis findings for the X26P energy weapon, footage, and wire & probe analysis.

## 1. X26P Energy Weapon Generally:

The TASER X26P energy weapon (first available in January 2013), pictured below in Figure 1.1, is a single-cartridge energy weapon in the Axon Smart Weapons line, available in black or yellow.



*Figure 1.1 – The X26P Energy Weapon Anatomy*

***Standard Cartridges:*** The X26P energy weapon uses standard TASER energy weapon cartridges, which are deployed by the electrical arc of the energy weapon when the trigger is pulled.

A cartridge can only be deployed one time and cannot be reloaded. However, a successfully deployed cartridge with probes remaining in a conductive target can be reenergized by pulling the trigger again.

***Safety Switch:*** The X26P features an ambidextrous safety switch. When the safety switch is placed in the up (ARMED) position, the weapon is ready to activate. The X26P will arm anytime the safety switch is placed in the ARMED position, except when in Universal Serial Bus (USB) mode. The X26P enters power-down mode when the safety switch is placed in the down (SAFE) position.

***Power Magazine:*** The X26P is powered by 3 series CR123 lithium-metal primary batteries contained in a power magazine (battery pack). Axon has several options available, each with unique features:

- **PPM** (Performance Power Magazine) – This power magazine features internal memory that the X26P energy weapon will read to log the power magazine serial number and the calculated remaining battery life and perform programmed protective functions in the case of low battery power.

- **TPPM** (Tactical Performance Power Magazine) – This power magazine has all of the features of the PPM with an added chassis extension for extra grip when installed in the energy weapon.

- **APPM** (Automatic Shutoff Performance Power Magazine) - This power magazine has all of the features of the PPM with the addition of automatically limiting trigger activations to 5-seconds. The APPM also features a piezo (beeper) that sounds a beeping warning tone at the 4th second of an activation to alert the user that the activation will be ending. Released in 2011, the APPM has been available as an optional safety feature for the entire life cycle of the X26P energy weapon (released in 2013).

- **SPPM** (Signal Performance Power Magazine) – This power magazine has all of the features of the APPM with the addition of wireless technology that sends a 2.4 GHz signal when the X26P energy weapon is armed and/or trigger activated. When configured properly, the wireless signal can automatically activate recordings of nearby Axon cameras. The automatic shutoff feature can be enabled or disabled to the agency's policy within their Axon Evidence account settings.

- **XPPM (**also available as an XAPPM with auto-shutdown) provides 2nd cartridge storage in a forward-facing position for faster reloading of the X26P, protecting the blast doors, and containing the probes in the event of a static discharge.

*Trigger:* When the X26P is armed and the trigger is pulled, it will activate the high voltage pulses, deploying a live cartridge in the cartridge bay, remaining active for 5 seconds at 19 ± 1 pulses per second. If the trigger is pulled and then released, after 5 seconds the activation will automatically stop. Once an activation stops, the trigger can be pulled again to start a new 5-second cycle, if necessary. With a standard PPM battery pack, if the trigger is held beyond 5 seconds, the electrical charge will remain active as long as the trigger is held or until the battery is depleted, whichever occurs first. If the safety is placed in the down (SAFE) position during any active cycle, the energy weapon will immediately end the discharge and power down. Using the APPM, XAPPM, or configured SPPM will limit each activation to 5 seconds even if the trigger is held. The APPM, XAPPM, and SPPM also give an audible beeping warning tone at the 4th second of the activation to signal the impending end of the activation. With the APPM, another 5-second activation can only be initiated by pulling the trigger again and starting a new activation cycle.

*Path Sense and "Skip Pulse":* Beginning in firmware version 04.032, when the X26P is trigger activated it will pulse at 19 pulses per second (PPS). If the energy weapon senses at any time that it cannot discharge due to a lack of electrical path (i.e., a missed probe on a

deployment), it will automatically reduce the pulse rate to 8 PPS to reduce stress on the high voltage components. If it senses a change in the path at any time, it will automatically increase the pulse rate again to 19 PPS.

***Menu and Selector Button:*** The X26P menu is used to read or change the LASER (Light Amplification by Stimulated Emission of Radiation) and flashlight illumination settings. The illumination menu can be selected by pressing the Selector Button on the top of the weapon while in safe mode. Note that the X26P can be armed with the safety switch and activated at any time, even when the weapon is in the illumination settings. When the X26P is armed, the Selector Button will put the weapon in "stealth" mode, which will dim the Central Information Display (CID) and turn off the LASER and flashlight.

***Trilogy Logs:*** The X26P records information into the Trilogy Logs, which consist of the Event Log, the Pulse Logs, and the Engineering Logs. It is not possible for a user to delete or alter the Trilogy Logs. The Trilogy Logs can only be downloaded by the proprietary USB pack and software described above.

**Event Log:** The Event Log is a recording of the date, time, and details of each event that occurs with the X26P energy weapon, including the timestamp[2] for every time the weapon is armed, the trigger is pulled,[3] the illumination menu is accessed, the time is changed, the safety switch is placed in the safe position, USB mode is entered, the firmware is updated, and more. Relevant events also include the internal temperature of the weapon, the duration of the event (rounded up to the nearest second), and the battery percentage remaining at the time of the event. The Event Log will record approximately 16,000 entries before it will "wrap" and begin to overwrite the oldest entries.

**Pulse Logs:** The Pulse Logs are a recording of every pulse that is generated by the X26P. There are 3 measurements recorded for each pulse: (1) the voltage across the stimulation capacitor; (2) the voltage across the arc capacitor; and (3) the charge delivered from the X26P output. The Pulse Log is an allocated part of memory and records each pulse from each activation, regardless of the duration of the activation. Therefore, the number of activations stored in the Pulse Log is variable and dependent on the duration of the activations. Based on 5-second activations only, the Pulse Log will store 422 activations before the memory fills up. Once the memory is full it will delete the oldest sector of memory to free up space, which will delete the oldest 40 (5-second) activations. However, based on specific usage, the number of activations stored in the Pulse Log could be more or less.

---

[2] The internal Real Time Clock of the X26P Energy Weapon is set in reference to Universal Time Constant (UTC). Any conversions to local time are calculated by Evidence Sync software and Axon Evidence based on the user's location settings.
[3] Note, the X26P energy weapon's trigger pull timestamp is when the trigger is pulled, not at the end of the cycle as the popular X26E energy weapon records.

**Engineering Logs:** The Engineering Logs are a recording of all activity in the X26P. The Engineering Log records, along with a timestamp, every button push, microprocessor command, circuit status, reported errors, faults and more. The Engineering Logs are only accessible by Axon Engineering and are used for troubleshooting purposes or acquiring deeper information about a specific activation or incident.

***Clock Drift:*** All clocks, other than reference atomic clocks, whether digital or analog, are subject to some inherent clock drift. "Clock drift" is defined simply as the phenomenon where a clock runs at a different rate than a reference clock. In relation to an atomic clock, for instance on which the United States bases the "official" time (www.time.gov), all non-atomic clocks will experience some amount of drift. Without "synchronizing" clocks periodically (setting them to the same time reference with known tolerances), clocks lose accuracy over time. This is why you may notice that two clocks that had been set to the same time can show a different time at a later date.

Because of this natural clock drift, the internal clock of the X26P energy weapon can drift approximately up to ± 2 minutes per month. When the X26P energy weapon is connected to Evidence Sync software, the weapon's real time clock (RTC) is synchronized. If Evidence Sync is in Online Mode and logged in, the RTC is synchronized to the NTP (network time protocol) server's timestamp. If Evidence Sync is run in Offline mode, the RTC is synchronized to the computer's clock timestamp. Regardless of the mode, each clock synchronization is recorded on the Event log, and therefore the drift of the clock can be calculated. The amount of drift observed in the Trilogy Logs will vary depending on the physical tolerances of the energy weapon's components, remaining battery capacity, environmental conditions, and how long the energy weapon's RTC has been running since its last synchronization. The amount of potential clock drift on a specific date can be calculated by using the clock synchronization records in the Activation Log and determining how far the clock drifted in the latest synchronization and how much time had passed since the last synchronization before the date of the incident.

The only potential impact of significance for clock drift of an energy weapon is on the time of day that an event occurred. Clock drift's impact on subjects like the duration between events or the duration of an activation is insignificant. For example, if we consider a weapon's clock drift is + 2 minutes per month; that is equal to 4 seconds per day over 30 days. 4 seconds per day is 0.167 seconds per hour, which is 0.0028 seconds per minute, which is 0.000046 seconds per second. The impact over a 5-second activation is only 0.00023 seconds.

***USB:*** The X26P is downloaded by connecting the energy weapon to a proprietary USB pack that inserts into the energy weapon's battery pack compartment. Once connected to USB, the X26P will enter USB mode and the energy weapon's Trilogy Logs can be downloaded to a

local Personal Computer (PC) or network or uploaded to Axon Evidence (Evidence.com) using Evidence Sync software. USB mode also allows the synchronization of the X26P clock, firmware updates, and configuration setting.

***Pulse Graphs:*** The Pulse Graphs available on Evidence.com are created from the Pulse Logs in the energy weapon, which contain electrical information about every pulse that the energy weapon discharges. Durations in the Event Log are rounded up to the second, while the durations in the Pulse Graphs are accurate to 1/10th (or 0.1) of a second.

The X26P records information in the Pulse Logs, which includes the (1) arc voltage, (2) stimulation (stim) voltage, and (3) output charge.

- The arc voltage is the voltage across the arc capacitors in the X26P energy weapon's high voltage module. This voltage gives indication of what level the capacitors needed to be in order to produce an electrical arc.
- The stim voltage is the voltage across the stimulation capacitor in the X26P energy weapon's high voltage module. The stim voltage indicates the voltage that the stimulation capacitor charged up to when an electrical pulse was generated.
- The output charge is the value of the charge (electrical current over time) delivered from the weapon, measured in microcoulombs (μC). One (1) coulomb is equal to one (1) ampere over one (1) second, so one (1) microcoulomb is equal to 0.000001 amperes per second.

The Arc and Stim voltages give an indication of the load impedance (high or low) and whether the load was stable or not. Impedance is a measure of opposition to electric current flow and is denoted in ohms (Ω). The human body is made up of tissues with varying impedances, from lower impedance muscle tissue to very high impedance skin and fat tissues. In addition, if an energy weapon's probes do not have a connection with a target, it may arc across the front of the cartridge or wires, which depending on the arc distance, may a very low and variable impedance load. By analyzing the energy weapon's pulse data, a determination can be made if there was a connection or not, and into what level of load, if any, the weapon discharged into[4].

>  **No Connection**: There is no connection when one or both probes do not penetrate a conductive target, does not have an electrical path to arc through the air to the target, and does not have an electrical path to arc across the front of the cartridge (or cartridge bay).

>  **Connection: Low to Medium Impedance Load**: The load impedance can be low or medium level when, but not limited to; probes penetrate flesh and discharge directly

---

[4] Chiles B, Nerheim M, Markle R, Brave M, Panescu D, Kroll MW Estimation of Physiological Impedance from Neuromuscular Pulse Data. IEEE Engineering in Medicine & Biology Society (EMBC) 2021

into higher conductive tissue[5], when arcing across the front of the cartridge or cartridge bay[6], discharging into conductive fluid (i.e., water or sweat), or shorted across metal.

**Connection: High Impedance Load**: The load impedance can be high when the cartridge probes partially connect and arc through air plus skin and/or fat, drive-stun applications, or with probes discharging in a subject with high adipose fat tissue content in the area of the probe.

The output charge indicates whether the capacitors discharged. Based on the extreme variation of loads that the X26P output can arc across, the pulse graphs alone cannot determine the exact situation of an energy weapon discharge, but rather can be combined with other incident-specific information/reports to imply the type of load, if any, the X26P energy weapon discharged into. The only definite indications the output charge can provide is when no charge is delivered (0 microcoulombs) or if the charge is within specification when the charge is delivered.

The X26P energy weapon uses Charge Metering to attempt to regulate the output charge to a target level. When the X26P energy weapon is trigger activated, it charges the arc and stimulation capacitors to a nominal voltage. When the capacitors are signaled to discharge, the output charge is measured. If the charge is lower than the target value (high impedance load), the charge voltage of the arc and stim capacitors is increased. If the charge is higher than the target value, the charge voltage of the arc and stim capacitors is lowered. The charge is measured again on the next pulse and the voltage is again adjusted accordingly. This algorithm is constantly metering and adjusting the output to keep the charge regulated. If the load impedance is very high, resulting in a low charge, the arc and stim voltages are increased up to a threshold value where it reaches the maximum voltage allowed for the capacitors. The X26P energy weapon will continue at this maximum value until the charge value is increased to the target value. Once the capacitors are at their maximum permitted voltage, it is impossible to increase the charge unless the load impedance drops. If the load impedance drops and the charge increases above the target value, the X26P energy weapon will lower the charge voltage on the arc and stim capacitors until the charge drops to the target value.

Because the effectiveness of an energy weapon is dependent on a variety of factors, including, among others, having a closed circuit, probe spread, and location of the probes, the Pulse Logs alone do not indicate whether an activation was effective or not. The Pulse Logs alone can only determine if there was potential for effectiveness, given the conditions for

---

[5] Dawes D, Ho J, Miner, J, Kroll, MW Electrical Characteristics of an Electronic Control Device Under a Physiologic Load. *PACE*. Dec 2009
[6] Chiles B, Nerheim M, Markle R, Brave M, Panescu D, Kroll MW Detection of Arcing and High Impedance with Electrical Weapons. IEEE Engineering in Medicine & Biology Society (EMBC) 2021

effectiveness are met.

Although the Pulse Logs give confirmational indication of the type of load the energy weapon discharged into (or did not discharge), the logs alone cannot indicate with certainty if a trigger activation was initiated with a cartridge or not, nor can it indicate with certainty whether a discharge was through probes of the cartridge or directly to the load in a drive-stun (contact or touch) method.

**Effectiveness:** If a fresh, unexpended, cartridge is installed in the X26P energy weapon and the trigger is activated (when armed), the X26P energy weapon will deploy the cartridge, launching the probes tethered to wires and activate the high voltage pulses on the electrodes. If both probes contact a conductive target forming a completed (intact) circuit, the electrical charge from the weapon will be delivered through the wires and probes into the target.

In human subjects, the delivered electrical charge can cause neuro-muscular incapacitation (NMI) when certain conditions are met. These required conditions include, but are not limited to:

- There is a completed and maintained circuit between the electrodes (or probes) to allow electrical current to flow;
- There is sufficient spread, or distance, between the probes; and
- There is sufficient motor-nerve mediated muscle mass between the probes.

The amount of NMI achieved is generally proportionate to the spread between the probes and varies dependent upon numerous factors, including both probes electrically contacting the subject, the motor-nerves captured in the electric field relative to the probes, amount of muscle between the probes, the amount of skin and fat tissue that the electrical charge has to travel though, and other factors. A wide probe spread to the back of a subject, capturing large muscle groups can result in full body muscle "lockup" of a subject.[7] However, if both probes contact the subject, but there is not enough muscle between the probes, the energy weapon will only cause potential pain and potentially localized NMI of only the muscle between or close to the probes without full body lockup.

If only one probe makes contact with the subject and the other probe is sufficiently close to the subject's skin (within ≈ 1.6 centimeters) with enough spread between the probes, NMI may be achieved by the electricity arcing through the air to the skin.[8] If only one probe makes contact with the subject and the other probe is not close enough to the subject's skin to arc,

---

[7] "Incapacitation by all measures was found to be a function of spread; generally increasing in effectiveness up to spreads between 9 and 12 in. There were notable differences between front and back exposures, with front exposures not leading to full incapacitation of the upper extremities regardless of probe spread." Ho J, Dawes D, Miner, J, Kunz S, Nelson R, Sweeney J. Conducted electrical weapon incapacitation during a goal-directed task as a function of probe spread. *Forensic Sci Med Pathol*. Apr 2012.

[8] Chiles, B.D., Nerheim, M.H., Brave, M.A., Panescu, D., Kroll, M.W. Electrical Weapon Charge Delivery with Arcing. *Conf Proc IEEE Eng Med Biol Soc,* vol. 40, Jul 2018, pp. 2234-2239 (2018).

no NMI will be achieved.

When the X26P energy weapon is trigger activated and all required conditions are simultaneously met, the subject will likely experience some degree of NMI, in which some of his/her/their muscles will contract and the subject loses at least some volitional muscle control of the affected muscles. The effectiveness of an energy weapon to cause NMI is not always either 100% or 0%. Depending upon the factors described above, among other factors, the amount of NMI caused by an energy weapon deployment can vary.

***Safety and Effectiveness:*** The X26P energy weapon was designed with safety and effectiveness as balanced priorities. The output of the X26P energy weapon meets the requirements of ANSI-CPLSO-17:2022 for both safety and effectiveness on human subjects.

***Probe Deployment vs. Drive-Stun:*** The X26P energy weapon can be deployed using differing tactical methods, including probe deployment and drive-stun application. Neither are "modes" of the energy weapon; however, they are commonly called "modes" in the law enforcement field.

When an X26P energy weapon is trigger activated with a cartridge installed, it will deploy probes from the cartridge, giving an opportunity for NMI if all requirements are met as described above. When an X26P energy weapon is trigger activated without a cartridge installed, the electrodes in the front of the cartridge bay must be close enough to a subject's body to conduct the electricity through the skin. This tactical method is known as "drive-stun" application, as the user typically will "drive" the energy weapon towards the subject.

A drive-stun application that has sufficient contact with the subject can deliver the weapon's output charge into the subject's body, however the electricity does not travel down into the muscle tissue, as demonstrated in Figure 1.2 below. Because of the lack of criteria being met, this method does not produce NMI, and only the sensory nerves can be affected. If the subject is in a mental state to be receptive to pain, a drive-stun application would only cause a pain response reaction.

There are no known significant medical complications associated with drive stuns. The American Academy of Emergency Medicine has the following guideline on drive-stun applications: "*For patients who have undergone drive stun or touch stun ... exposure, medical screening should focus on local skin effects at the exposure site, which may include local skin irritation or minor contact burns. This recommendation is based on a literature review in which thousands of volunteers and individuals in police custody have had drive stun ... used with no untoward effects beyond local skin effects.*" [9]

---

[9] VilkeGM, BozemanWP, Chan TC (2011) Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. J Emerg Med 40(5):598–604.



*Figure 1.2 – Drive-Stun Application Current Path*

There are other tactical methods in which a drive-stun application could be used where a cartridge is installed into the energy weapon. A "follow-up" drive-stun is typically applied if a probe deployment results in one missed probe or a probe that does not puncture the subject's skin, while the other probe did impact and puncture the skin. In this case, the energy weapon can be pressed against the subject to complete the circuit and give the potential for NMI if all criteria for NMI are met. Another tactical method is called "3-point drive-stun", in which probes are deployed at a subject and the weapon is applied to another area of the body to attempt to increase the amount of muscle mass affected by the energy weapon.

***Lack of Connection:*** If the X26P energy weapon does not have a connection with a subject, either via drive-stun or a physical or arcing probe connection, there will be no effect on the subject. Similar to how a therapeutic muscle stimulator must be connected to the user's skin in order to provide the muscle stimulating benefit, a TASER energy weapon must have an electrical connection to the subject in order to have the potential to stimulate the subject's motor and/or sensory nerves. The Event Log of an X26P energy weapon may indicate the weapon was activated, but it cannot be assumed that the subject was affected by the activation. Further analysis of the pulse graphs is required to determine if the energy weapon discharged to the subject.

## 2. Energy Weapon Probes and Wire Analysis Generally

When an X26P energy weapon cartridge is deployed, both probes must come in contact, or be sufficiently close to a conductive surface in order for the energy weapon to discharge through the probes. In an ideal deployment on a subject or volunteer, both probes will reach

the subject and the barbed ends (also frequently called the "spear") will penetrate their flesh and embed into the muscle tissues. The barb on the probe is designed to assist probe retention in the flesh. As part of the design and benefit of TASER energy weapons, contact and penetration of the flesh is not necessary for the energy weapon to discharge through the probes. The energy weapon's high voltage output, when sufficiently close to the skin on both probes, allows the electricity to "jump" through the air to the skin (or a conductive surface), also known as "arcing".

When the probe pair either make contact with the subject or conductive surface or are sufficiently close to arc to the subject or conductive surface, the electricity travels from the energy weapon's electrodes into the cartridge wires, then arcs from the wire end to the probe body, through the probe body to the subject or conductive surface. Evidence of the electric arc that occurs from the wire end to the probe can be found in the form of melted & burnt insulation on the wire ends.

If no connection is made with the probes, however there is an electrical path through a wire-to-wire connection, there could be evidence of discharge on the wires, but no evidence at the probe end. The amount of evidence left is dependent on how many pulses conduct through the probes or wires. If there is no electrical connection and therefore no discharge through the probes or cartridge wire ends, there will be no evidence of discharge to examine, as shown in the examples in Figure 2.2 below.



*Figure 2.1 – "SP" Probe*



*Figure 2.2 – Wire damage examples*

## 3. Analysis of the X26P Energy Weapon X1300A2HP:

I was asked to conduct a data analysis of the Trilogy Logs for the X26P energy weapon with serial number X1300A2HP, manufactured on September 25, 2019; in reference to the incident on July 8, 2022 at approximately 18:20 Central Daylight Time (CDT).

The X26P energy weapon's Event Log *HardinTASER_X26P_X1300A2HP_offline(1).pdf* (filtered to July 8, 2022 15:00 to 23:00) and *Xerox Scan_10122022154307.pdf* (full history), the relevant pulse graphs from the incident, along with body worn video footage of the incident in question, *07_08_2022_18_19_00_GARRETT_HARDIN.mp4* were shared with Axon for this analysis.

The Event Log, *Xerox Scan_10122022154307.pdf* indicates that prior to the incident in question on July 8, 2022, the X26P energy weapon's clock was last synchronized on July 1, 2022 (Seq 631). Because the clock was running without synchronization for just over 7 days, the potential clock drift on July 8, 2022, would be expected to be up to ± 30 seconds.

The best way to acquire the most accurate clock drift is to download the energy weapon and synchronize the clock as soon as possible after a reported incident. In this instance, the energy weapon clock was synchronized just hours after the incident on July 8, 2022 (Seq 649). At that time, the clock was recorded to be running 9 seconds fast (ahead).

The Event Log indicates the clock in the X26P energy weapon experienced an average drift of 1.17 seconds per day (00:00:09 / 7.67 days = 1.17 seconds per day). Because the X26P energy weapon's clock was synchronized 4 hours after the reported incident in question, the clock would have drifted only a fraction of a second during that time. Therefore, the most accurate time of the events is calculated by subtracting 9 seconds from the events recorded during the incident on July 8, 2022.

### 3.1. Event Log Analysis:

The Event Log indicates the X26P energy weapon was activated by the trigger switch 2 times on July 8, 2022.

The relevant events on July 8, 2022, with the original and clock drift corrected times as explained above, are shown in Table 3.1 below.

*Table 3.1- X26P Energy Weapon Event Log Details*

| Seq | Recorded Time (CDT) | Corrected Time (CDT) | Event | Duration (seconds) |
|-----|---------------------|----------------------|-------|--------------------|
| 637 | 08 Jul 2022 18:20:44 | 08 Jul 2022 18:20:35 | Armed | N/A |
| 638 | 08 Jul 2022 18:20:48 | 08 Jul 2022 18:20:39 | Trigger | 5 |
| 639 | 08 Jul 2022 18:20:52 | 08 Jul 2022 18:20:43 | Safe | 8 |
| 640 | 08 Jul 2022 18:20:53 | 08 Jul 2022 18:20:44 | Armed | N/A |
| 641 | 08 Jul 2022 18:20:53 | 08 Jul 2022 18:20:44 | Safe | 0 |
| 642 | 08 Jul 2022 18:21:06 | 08 Jul 2022 18:20:57 | Armed | N/A |
| 643 | 08 Jul 2022 18:21:06 | 08 Jul 2022 18:20:57 | Trigger | 5 |
| 644 | 08 Jul 2022 18:21:12 | 08 Jul 2022 18:21:03 | Safe | 6 |
| 645 | 08 Jul 2022 18:21:15 | 08 Jul 2022 18:21:06 | Armed | N/A |
| 646 | 08 Jul 2022 18:41:22 | 08 Jul 2022 18:41:13 | PowerSave Enter | N/A |
| 647 | 08 Jul 2022 22:07:22 | 08 Jul 2022 22:07:13 | Powersave Exit | N/A |
| 648 | 08 Jul 2022 22:35:38 | 08 Jul 2022 22:35:29 | USB | N/A |
| 649 | 08 Jul 2022 22:35:40 | 08 Jul 2022 22:35:31 | TimeSync | NA |

### 3.2. X1300A2HP Pulse Graph Analysis:

The times displayed in the Pulse Graphs in this report are referenced to CDT. Based on the above Event Log entries and Pulse Graph information; details of each of the X26P energy weapon activation on July 8, 2022, and the associated Pulse Graphs, are below. The times listed in the pulse graph analysis below are shown with the clock drift corrected time in parenthesis, i.e., original time (corrected time).

**Activation Sequence #638**

The X26P energy weapon was armed via the safety switch at 18:20:44 (18:20:35) CDT, as indicated on Sequence 637. Four (4) seconds later, the trigger was pulled at 18:20:48 (18:20:39) CDT, activating the high voltage pulses on the output, as indicated on Sequence 638. The pulse graph in Figure 3.1 below indicates the X26P energy weapon was active for 4.75 seconds, indicating the activation was stopped before the default 5-seconds. The X26P energy weapon did not have an electrical connection and could not discharge for the majority of the activation cycle. There were several pulses that were able to discharge that appear to have discharged into a very high impedance load consistent with arcing a long distance (i.e., when a probe misses the conductive target and the energy weapon periodically finds a path in front of the weapon across the wires) or discharging into skin and fat tissue (i.e., drive-stun application). 5 of those pulses at approximately 2.3 seconds into the activation were successive and consistent with discharging into skin and fat tissue. This activation would have had no potential for NMI due to lack of connection for most of the cycle, and only brief potential for NMI, given all criteria for NMI were met, for 5 pulses (0.26 seconds) at approximately 2.3 seconds into the cycle.

As mentioned above, 4.75 seconds into Sequence 638 while it was still active, the X26P energy weapon was placed in powered down mode via the safety switch at 18:20:52 (18:20:43) CDT, as indicated on Sequence 639.



*Figure 3.1 –Activation Sequence 638 Pulse Graph*

One second after Sequence 638 ended, the X26P energy weapon was armed and immediately returned to powered down mode at 18:20:53 (18:20:44) CDT, as indicated on Sequences 640 and 641.

**Activation Sequence #643**

Thirteen seconds later, the X26P energy weapon was armed again at 18:21:06 (18:20:57) CDT, as indicated on Sequence 642. In the same second that it was armed, the trigger was pulled again at 18:21:06 (18:20:57) CDT, activating the high voltage pulses on the output, as indicated on Sequence 643. The pulse graph in Figure 3.2 below indicates the X26P energy weapon was active for 5 seconds. Aside from 9 pulses that discharged into open air in front of the cartridge bay, the X26P energy weapon did not have an electrical connection and could not discharge for the first 3.75 seconds of the activation cycle. After 3.75 seconds, the X26P energy weapon discharged into a medium-high impedance load consistent with discharging into human flesh for the final 1.25 seconds, evident due to the output charge being at target value and having little variation, as well as the Stim voltage being adjusted down. This activation would have had no potential for NMI for the first 3.75 seconds due to lack of connection, but would have had potential for NMI, given all criteria for NMI were met, in the last 1.25 seconds.

The X26P energy weapon was placed in powered down mode via the safety switch one second after Sequence 643 ended, at 18:21:12 (18:21:03) CDT, then armed again via the safety switch three (3) seconds later at 18:21:15 (18:21:06) CDT with no further trigger activity. The X26P energy weapon automatically entered "Power-Save" mode after over 20 minutes of inactivity at 18:41:22 (18:41:13) CDT.



*Figure 3.2 –Activation Sequence 643 Pulse Graph*

The X26P energy weapon's Pulse Logs indicate the X26P energy weapon was active for 9.75 seconds across 2 activations. In those 9.75 seconds, it discharged into the following types of loads:

- No electrical connection, cannot discharge        8.5 seconds
- Medium-high Impedance (i.e., discharge into flesh)    1.25 seconds

### 3.3.  Footage and Incident Analysis:

The body worn video *07_08_2022_18_19_00_GARRETT_HARDIN.mp4* was analyzed using Axon Investigate software version 4.1.2 along with the Event Log and Pulse Grahs from the X26P energy weapon. Below is a summary of my analysis of the succession of events.

Using Axon Investigate version 4.1.2, I created a clip of the incident, *Brooks-Hardin_Incident_Timestamped.mp4*, with a running timestamp in the bottom-right corner based on the X26P energy weapon's clock drift analysis and correction, with Frame 2744 as an anchor point.

**X26P Cartridge Deployment (Activation Sequence #638)**
Analysis of the body worn video *07_08_2022_18_19_00_GARRETT_HARDIN.mp4* shows that Activation Sequence 638 was initiated by Sergeant (Sgt.) Hardin and occurred at Frame 2744, or 01:39.5 into the video file, just after Mr. Brooks' progress was stopped by a passing vehicle and he was beginning to run. Frame 2744 (cropped screenshot) is shown below in Figure 3.3. After the deployment, frame 2768 (01:40.3 into the video file) shows one of the cartridge probes can be seen on Mr. Brooks's shirt near his right shoulder, as shown in the cropped screenshot (circled in yellow) in Figure 3.4. Frame 2774 (01:40.5 into the file and 1 second after the cartridge deployment) shows both wires in front of the cartridge, as shown in the cropped screenshot in Figure 3.5. As shown in the image, the wire on the right has

retained its "accordion" shape, while the wire on the left has been straightened and lost its accordion shape, which is a common occurrence when one probe misses the target and stretches the wire[10]. At frame 2789 (or 01:41.06 into the video file), what appears to be the other cartridge probe can be seen on the ground, as shown in the cropped screenshot in Figure 3.6 below.

The expert report of Nicolas Bloomfield dated March 20, 2024 included an image labeled "0010130.bmp" that had two probes labeled on Mr. Brooks, however it is my opinion that this was a mistake, as the report also described that only one probe contacted Mr. Brooks.



*Figure 3.3 –BWC footage- Frame 2744 - Activation 638 deployment*

---

[10] Ho J, Dawes D, Kroll, MW; Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis. *Springer.* 2012



*Figure 3.4 - BWC footage – single probe*



*Figure 3.5 –BWC footage- cartridge wires*



*Figure 3.6 – BWC footage – potential cartridge probe on the ground*

**Activation Sequence #638 Effect on Mr. Brooks:**
Consistent with the pulse graph analysis of Activation Sequence #638 and the analysis described above, the deployment of the cartridge did not result in effective NMI on Mr. Brooks. Interestingly though, he stopped running and stood in place after the top probe hit him. At frame 2809 (01:41.7 seconds into the video file) Sgt. Hardin made contact with Mr. Brooks and took him to the ground. This occurred 2.2 seconds into Activation Sequence #638, which if the X26P energy weapon touched Mr. Brooks during the takedown, explains the pulses that discharged into a high impedance load consistent with discharging into skin and fat tissue at 2.3 seconds into the activation. At that point in the footage, Mr. Brooks makes a sound that I would describe as either surprise, pain, or both. As described above, only 5 pulses were delivered during the 5-second cycle, equaling only 0.26 seconds in which Mr. Brooks would have had potential to feel any effect from the brief exposure.

**Mr. Brooks grabs the X26P energy weapon:**
Once on the ground, Sgt. Hardin placed the X26P energy weapon down and attempted to key his radio. The view from the camera's lens becomes blocked for periods of time, however Frame 3216 shows that 01:55.8 into the video; less than 2 seconds before Sequence 643 started (and 16 seconds after the deployment of the cartridge in Sequence 638); Mr. Brooks has his hands on the X26P energy weapon, as shown in the cropped screenshot in Figure 3.7 below.



*Figure 3.7 – Frame 3216- subject with hands on the X26P energy weapon*

**Activation Sequence #643:**

The X26P energy weapon's trigger is then pulled and Activation Sequence #643 begins at 18:20:57 CDT, or 01:57 into the video[11] (18 seconds after the deployment of the cartridge in Activation Sequence #638).

During Sequence #643, Frame 3339 shows at 02:00.8 (3.8 seconds after Sequence 643 started) Mr. Brooks's hand is still gripping the X26P energy weapon, as shown in the cropped screenshot in Figure 3.8 below. In the last 1.25 seconds of Activation 643, the pulse graphs show that the X26P energy weapon discharged into a medium-high impedance load while Mr. Brooks was still holding the X26P energy weapon in front of him and therefore was not in a physical position to be able to apply a drive-stun application at that moment in time. With no electrical path at the probes or in front of the weapon's electrodes, the only other path the electric energy could take into a conductive load would be through contact with the wires or probes.

In his July 20, 2022 prepared statement, Sgt. Hardin stated that during this activation cycle, he had felt pain consistent with the effects of the TASER, and because the Pulse Graph for Activation Sequence #643 shows that the last 1.25 seconds discharged into a medium-high impedance load consistent with discharging into flesh, I believe the discharge was going into Sgt. Hardin. It is also technically possible that the discharge could have gone to Mr. Brooks or even both Sgt. Hardin and Mr. Brooks, however; during the last 1.25 seconds of the activation cycle, Mr. Brooks says a sentence that is difficult to understand but sounds similar to "just let me go", twice. Then after the activation cycle ends, Mr. Brooks, in the same tone

---

[11] The lens of the camera is blocked by Mr. Brooks' head at this point, so the location of this event in the video is calculated by the timing in the Event Log between Sequences #638 and #643.

of voice, says several other words that sound like "shoot, shoot bitch, shoot ho, shoot" between 02:04 and 02:08 into the video file. It is highly unlikely that a person would be able to speak in the same tone of voice during and after feeling the pain from a TASER energy weapon, so, although technically possible, I do not believe Mr. Brooks was experiencing any of the effects of the TASER weapon, and Sgt. Hardin was solely receiving the 1.25 seconds of discharge.



*Figure 3.8 – Frame 3339- Mr. Brooks with grip on the X26P energy weapon*

**Sequences #644 and #645, X26P safe then armed again:**
After Activation Sequence #643, the Event Log shows safety of the X26P energy weapon was placed down (Safe) and then, as shown in Frame 3442 (Figure 3.9 below), or 02:04.3 into the video file, Mr. Brooks let go of the weapon. At this point, Sgt. Hardin moved his firearm away from Mr. Brooks' head and moved it toward his hand.

From Frames 3503 to 3511, or 02:06.4 to 02:06.6 in the video file, although partially obstructed by Mr. Brooks' head in front of the lens, the X26P moves from the right-side of Mr. Brooks to being completely obscured from view by his head. Frame 3508 is shown in the cropped screenshot below in Figure 3.10 just before the weapon moves out of view. Frame 3529 (02:07.23 into the video file), shown in the cropped screenshot in Figure 3.11 below, shows the yellow plastic of the X26P energy weapon coming into view on the left side of Mr. Brooks' head (circled in yellow), so the weapon had moved from his right side to his left side. Frames 3530 and 3531 (02:07.27 and 02:07.29 into the video file), shown in Figure 3.12 and Figure 3.13 below, show the X26P energy weapon with its red laser dot pointed at the ground

(enlarged within the image) just in front and to the left of Mr. Brooks' head, which indicates that he had the weapon in his hand and the weapon was armed again. The Event Log confirms that the weapon was armed again at 18:21:06 CDT on Sequence #645.



*Figure 3.9 – Frame 3442- Mr. Brooks let go of the X26P energy weapon*



*Figure 3.10 – Frame 3508- X26P on right side of Mr. Brooks*



*Figure 3.11 – Frame 3529- X26P coming into view on left side of Mr. Brooks*



*Figure 3.12 – Frame 3530 - X26P armed on right side of Mr. Brooks*



*Figure 3.13 - Frame 3531 - X26P armed on right side of Mr. Brooks*

**Shooting of Mr. Brooks:**

Frame 3566 (02:08.5 into the video file), just over 1 second after the above Frames 3530 and 3531 were shown, and 2 seconds after the X26P energy weapon was armed, shows Sgt. Hardin remove his hand from Mr. Brooks' head, which is within a few frames of when the discharge of his firearm can he heard.

**Evidence of wires and probe:**

Frame 4076, 02:25.9 into the video file, shows the probe from Mr. Brooks's shirt had dislodged and was laying on the ground to the right to Mr. Brooks, wire is wrapped around Sgt. Hardin's firearm, and wire is draped across Mr. Brooks's back where Sgt. Hardin was laying on him, as shown in Figure 3.14 below. It is more likely than not that the probe on the ground is the probe that was in Mr. Brooks's shirt but had dislodged during the struggle.

The wire across Mr. Brooks' back, the wire wrapped around Sgt. Hardin's firearm, and the probe on the ground to the right of Mr. Brooks were each a potential point from where the pulses that discharged into a medium-high impedance load in the last 1.25 seconds of Activation Sequence #643 could have made a connection from. Each of them were also potential points in which a connection could have been made with potential for NMI if the X26P energy weapon's trigger was to have been pulled again. Because the X26P energy weapon was armed when Mr. Brooks held the weapon for the second time, a pull of the

trigger would have only taken a small fraction of a second to occur. In addition, just because Sgt. Hardin only felt pain during Activation Sequence #643 does not mean another activation would have only resulted in pain. Any shift in position of his body in relation to the wires and probes would result in a new risk of NMI that could have caused incapacitation of Sgt. Hardin, including loss of control of his firearm or any of his equipment that could be converted into a weapon.



*Figure 3.14 – BWC Footage – Probe on the ground*

### 3.4. Probe and Wire Analysis:

On June 18, 2025, I conducted an analysis of the probes and wire from the cartridge deployed by Sgt. Hardin during the incident. The analysis was conducted at the Harris County Sheriff's Office Property Room in Houston, Texas. I used a Dinoscope® AM7915MZT portable digital microscope and Axon Capture™ on a Motorola® Moto G Stylus™ cellular phone to magnify and capture images of the probes and sections of the attached wires. The evidence was sealed in a "Staples" brand office supply box with labels identifying case number 220702922 and Desc #6 ("TASER") and Desc # 6A ("TASER CART W/ PRONGS"). Inside the box was a poly bag containing the X26P energy weapon with serial number X1300A2HP with a sticker labeled "State's Exhibit 144", an XPPM with the serial number covered by a with a sticker labeled "State's Exhibit 145", a spent TASER Standard cartridge with serial number C3106F8W4 with a sticker labeled "State's Exhibit 148", and two poly bags each containing a probe and a bundle of wire, labeled "State's Exhibit 146" and "State's Exhibit 147". Each

probe was secured in a small hard plastic container to prevent accidental puncture. Each of the probe and wire poly bags were contaminated inside and out with a sticky substance consistent with liquid laundry detergent. Below is a summary of my analysis of the wire and probe analysis.



*Figure 3.15 - Desc #6 and Desc # 6A*



*Figure 3.16 - "State's Exhibit 146" and "State's Exhibit 147"*

**Poly Bag #146:**

Poly Bag labeled #146 contained one probe, herein named "Probe 146", and a length of TASER wire, herein named "Wire 146". The barbed end of Probe 146 was straight and appeared clean with no evidence of blood or body tissues, dirt, or other contaminants. The tip of the barbed end appeared to have damage to the stainless-steel tip, as shown in Figure 3.17 below, indicating it has struck a hard object. The probe's wire end had no evidence of electrical discharge through the probe, as shown in Figure 3.18 below, evident by the lack of melting or burning of the insulation, consistent with having no electrical connection at the probe.

Wire 146 had several points where the insulation was damaged, some with dark markings that could be evidence of burnt insulation; which could allow high voltage electricity to arc through, as shown in Figure 3.19 to Figure 3.21 below.



*Figure 3.17 – Probe 146 barbed end damage*



*Figure 3.18 – Probe 146 wire end*



*Figure 3.19 – Wire 146 insulation damage (labeled with tape Marker A)*



*Figure 3.20 – Wire 146 insultation damage (section labeled with tape Marker C)*



*Figure 3.21 – Wire 146 insultation damage (section labeled with tape Marker A)*

**Poly Bag #147:**

Poly Bag labeled #147 contained one probe, herein named "Probe 147", and a length of TASER wire, herein named "Wire 147". The barbed end of Probe 147 was straight and appeared to have a small spot of a dried dark substance on the opposite side of the rear barb, as shown in Figure 3.22 below. The tip of the barbed end appeared undamaged. Probe 147's body had a small spot of a dried dark substance on the front of the probe body, as shown in Figure 3.23 below. The body of the probe appeared undamaged. The probe's wire end had no evidence of electrical discharge through the probe, as shown in Figure 3.24 below, evident by the lack of melting or burning of the insulation, consistent with having no electrical connection at the probe.

Wire 147 had two areas of interest. One had the wire twisted several times and knotted, with the end of the twist in a loop, as shown in Figure 3.25 below. This twisting of the wire does not occur on deployment and may have been done for an unknown reason during the investigation. Another point of interest was a damaged area of the wire, as shown in Figure 3.26 and Figure 3.27 below. At this point, the copper wire has been broken and is only held together by the insulation. The wire ends of the break are exposed and could have discharged electricity through them. The damage to the insulation is too great to identify if there is evidence of electrical discharge through the wire.



*Figure 3.22 – Probe 147 barbed end substance*



*Figure 3.23 – Probe 147 body substance*



*Figure 3.24 – Probe 147 wire end*



*Figure 3.25 – Wire 147 twist/knot*



*Figure 3.26 – Wire 147 break in wire (labeled mark B)*



*Figure 3.27 – Wire 147 break in wire (labeled mark B)*

## 4. Conclusion and opinions:

I completed an analysis of the X26P energy weapon's Event Logs, Pulse Graphs, and associated evidence files for the deployment of the X26P energy weapons X1300A2HP on March 5, 2023. Based on my training, experience and education, and consideration of the evidence presented, research, investigations, related testing and findings, I have the following opinions, all to a reasonable, or higher, degree of professional and scientific certainty and/or probability:

1. The X26P energy weapon's Event Log indicates the clock was running 9 seconds fast on July 8, 2022, so the most accurate time of the incident events is calculated by subtracting 9 seconds from the recorded times in the logs.

2. The X26P energy weapon's Event Log indicates it was trigger activated 2 times on July 8, 2022.

3. The X26P energy weapon's pulse graphs indicate the X26P energy weapon was active for 9.75 seconds across 2 activations. In those 9.75 seconds, it discharged into the following types of loads:

   o No electrical connection, cannot discharge        8.5 seconds
   o Medium-high Impedance (i.e., discharge into flesh)    1.25 seconds

4. The second trigger activation was initiated while the X26P energy weapon was in Mr. Brooks's hands. The last 1.25 seconds of this activation discharged to Sgt. Hardin.

5. After releasing the X26P energy weapon briefly, Mr. Brooks picked the weapon up again and armed it, putting Sgt. Hardin in danger of the weapon being activated again. Mr. Brooks began making a movement with the weapon from his right side to his left side.

6. At the moment Mr. Brooks armed the weapon again (Sequence 645), Sgt. Hardin was in immediate danger of serious injury or death, as only a fraction of a second would have been needed to pull the trigger and immediately incapacitate Sgt. Hardin.

## 5. General Comments:

**Report Focus** – This report is focused solely on the incident captioned and related concerns and/or issues.

**This Case Specific Limitation** – Any actions, statements, writings, this report, information, any testimony, etc. are specifically limited to this case.

**Expert Capacity** – This report and any subsequent reports, testimony, opinions, etc. are within my capacity as a Sr. Manager, Axon Forensics for Axon Enterprise, Inc. (Axon), a Delaware corporation, with its principal place of business in Scottsdale, Arizona.

**Right to Amend** – The opinions in this report are living opinions. That is, should additional discovery material be received, and/or additional research be completed, and then reviewed, these opinions may be altered and/or reinforced depending upon what information is obtained, reviewed, considered, and/or studied.

**Further Development** – The opinions expressed in this report are not necessarily final in nature. Rather, they are listed to comply with current report requests. Each opinion may be further developed through research, investigation, during deposition, and/or trial testimony.

**Specific References** – Some of the opinions in this report may list specific references to some of the documents reviewed and/or considered or specific references. These listings are not intended to be all inclusive. I specifically reserve the right to supplement the support for each of the opinions in this report.

**Newly Identified Issues** – If new issues are opined, identified, and/or developed subsequent to submission of this report, I reserve the right to supplement this report.

**Degree of Certainty** – All opinions stated in this report are in direct regard to the case captioned, and the underlying incident or events leading to this case, and are expressed to a reasonable, or higher, degree of professional certainty and/or probability.

**Credibility Determinations** – Credibility determinations are solely and exclusively within the province of the trier of fact.

This report is based on information that is known to me at the present time. I may therefore be apprised of additional information which may cause revision or supplementation of this report, and I expressly reserve the right to do so. In addition, I reserve the right to revise and supplement this report based upon information that may hereafter be provided to me, or which becomes available to me through continued investigation research or study.

I reserve the right to revise and supplement this report in order to clarify, add, or complete questions or statements at deposition, or at the request of counsel for clarification, organization or completeness of any matters pertaining to this investigation or report.

The opinions provided in this case were developed based upon my education, training, experience, and specialized knowledge.

## 6. Prior Expert Testimony (4 years)

I have testified as an expert at trial or by deposition within the last four years in the following cases:

*R. vs. Lindsay,* Court of Queen's Bench of Alberta, Case No. 170015663Q1.
- Hearing Testimony on July 5, 2021 in Calgary, Alberta, Canada (via video stream from Scottsdale AZ)

*Grand Jury Hearing, State of Texas vs. Juan Ramos*, 337th Judicial District Court of Harris County, Texas.
- Hearing Testimony on July 12, 2021 in Houston Texas (via video stream from Scottsdale AZ)

*Edward O'Brien vs. Stephen Murphy, et al*, United States District Court, Eastern District of Missouri, Southeastern Division, Case No 1:20-CV-00153-SEP.
- Deposition Testimony on October 22, 2021 in St. Louis, MO (via video stream from Scottsdale, AZ).

*The State of Oklahoma vs. Joshua Taylor, et al*, District Court of Carter County, State of Oklahoma, Case No CF-2020-221 and CF-2020-222.
- Trial Testimony on November 4, 2021 in Ardmore, OK

*Ryan A. O'Neal vs. City of Phoenix, et al*, United States District Court for the District of Arizona, Case No CV-20-01732-PHX-SPL.
- Deposition Testimony on February 23, 2022 in Phoenix, AZ

*Kimberly Beck, et al, vs. The United States of America, et al*, United States District Court for the District of New Mexico, Case No 20-cv-1280-MV-SMV.
- Deposition Testimony on March 21, 2022 via video stream from Scottsdale, AZ

*Nunis, et al, vs. City of Chula Vista, et al*, United States District Court for the Southern District of California, Case No 21-cv-1627-AJB-DEB.
- 30 (b) (6) Deposition Testimony on May 6, 2022 from Phoenix, AZ

*Underwood, et al, vs. Axon Enterprise, et al*, United States District Court for the Middle District of Georgia, Case No 7:21-cv-00040-WLS.
- Deposition Testimony on May 31, 2022 via video stream from Scottsdale, AZ

*State of Louisiana, vs. McCarter, Johnson, et al*, Caddo Parish First Judicial District Court, Docket Nos 378,599 & 378,600.
- Trial Testimony on June 14, 2022 via video stream from Scottsdale, AZ

*Axon Enterprise, vs. Luxury Home Buyers*, United States District Court for the District of Nevada, Case No 2:20-cv-01344-JAD-VCF.
- Deposition Testimony on October 4, 2022 via video stream from Scottsdale, AZ

*The People, vs. Juan Delacruz*, 183rd Judicial District Court, Harris County, Texas, Case No 169001.
- Trial Testimony on October 7, 2022 in Houston, TX

*Apollo vs. Forest Park, et al*, United States District Court for the Northern District of Illinois, Case No 1:18-cv-06475.
- Deposition Testimony on October 25, 2022 via video stream from Scottsdale, AZ

*People vs. Christopher Schurr*, 61st District Court of the State of Michigan, Case No 41 22 006265 99.
- Preliminary Hearing Testimony on October 27, 2022 in Grand Rapids Michigan, via video stream from Scottsdale, AZ

*Burke vs. Bartlesville, et al*, United States District Court for the Northern District of Oklahoma, Case No 20-cv-244-JED-SH.
- Deposition Testimony on October 28, 2022 via video stream from Scottsdale, AZ

*State of Florida vs. Sergio Perez*
- Deposition Testimony on February 9, 2023 via video stream from Scottsdale, AZ

*United States of America vs. Corey Posey,* United States District Court, Southern District of Indiana, Case No 1:20-CR-00094-TWP-TAB
- Trial Testimony on June 21, 2023 in Indianapolis, IN

*State of Florida vs. Othal Wallace,* Circuit Court, Seventh Judicial Circuit, in and for Volusia County, Florida, Case No 2021-303347-CFDB
- Deposition Testimony on August 28, 2023 via video stream from Scottsdale, AZ

*United States of America vs. Corey Posey,* United States District Court, Southern District of Indiana, Case No 1:20-CR-00094-TWP-TAB (re-trial)
- Trial Testimony on September 11, 2023 in Indianapolis, IN

*State of Florida vs. Othal Wallace,* Circuit Court, Seventh Judicial Circuit, in and for Volusia County, Florida, Case No 2021-303347-CFDB
- Trial Testimony on September 13, 2023 in Green Coves Springs, FL

*State of California vs. Mary Jean O'Connor,* Superior Court of Los Angeles County, California, Case No GA104900
- Trial Testimony on October 24, 2023 via video stream from Scottsdale, AZ

*Grand Jury Hearing, State of Texas vs. Garrett Hardin*, 183rd Judicial District Court, Harris County, Texas.
- Grand Jury Hearing Testimony on October 25, 2023 in Houston Texas

*Nunis, et al, vs. City of Chula Vista, et al*, United States District Court for the Southern District of California, Case No 21-cv-1627-AJB-DEB.
- Trial Testimony on April 19, 2024 in San Diego, CA

*The People of the State of New York vs Tyrese Haspil*, Supreme Court of New York
- Trial Testimony on May 29, 2024 in New York, NY

*Grand Jury Hearing, East Baton Rouge*, File#23-96962, Baton Rouge, Louisiana.
- Grand Jury Hearing Testimony on June 4, 2024 in Baton Rouge, Louisiana

*The State of Florida vs. David Crawford*, Circuit Court of the Ninth Judicial Circuit, in and for Orange County Florida, Case No 2023-MM-003655-A-O.
- Deposition Testimony on September 17, 2024 via video stream from Scottsdale, AZ

*Toledo vs. The City of Chicago*, Circuit Court of Cook County, Illinois, Case No 2022-L-002499.
- Deposition Testimony on September 25, 2024 via video stream from Scottsdale, AZ

*United States vs. Zuberi*, United States District Court, District of Oregon, Medford Division, Case No. 24-CR-00254.
- Trial Testimony on October 16, 2024 in Medford, OR.

*The State of Alabama vs. Blackstone*, 37th Circuit Court of Alabama, Case No. CC 2023 995.
- Trial Testimony on October 30, 2024 in Opelika, AL.

*State of Texas vs. Garrett Hardin*, 262nd Judicial District Court of Texas, Case No. 184158401010.
- Trial Testimony on October 31, 2024 in Houston Texas

*The State of Florida vs. David Crawford*, Circuit Court of the Ninth Judicial Circuit, in and for Orange County Florida, Case No. 2023-MM-003655-A-O.
- Trial Testimony on November 20, 2024 in Orlando, FL

*Inquest in the Death of Sali Byberi,* In the Essex Coroner's Service, Chelmsford, United Kingdom
- Inquest Expert Testimony on December 11, 2024 via Microsoft TEAMS from Scottsdale, AZ.

*Wilmouth Bray vs. Anthony McCollum,* Circuit Court of Pulaski County, Kentucky, Case No. 23:CI:501
- Deposition Testimony on December 16, 2024 via video stream from Scottsdale, AZ.

*The State of Florida vs. Christopher Rolle*, Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County Florida, Case No. F23019187.
- Trial Testimony on January 23, 2025 in Miami, FL

*United States vs. Saffell*, United States District Court, District of New Mexico, Case No. 24-CR-00062.
- Trial Testimony on February 12 and 13, 2025 in Las Cruces, NM.

*Gilmore vs. Cape Girardeau,* United States District Court, Eastern District of Missouri, Southeast Division, Case No. 1:22-CV-00022-AGF
- Deposition Testimony on March 12, 2025 via video stream from Scottsdale, AZ.

*Lulgjuraj vs. Huron-Clinton Metropolitan Authority,* United States District Court, Eastern District of Michigan, Southern Division, Case No. 2:23-cv-12931-SFC-DRG
- Deposition Testimony on March 19, 2025 via video stream from Scottsdale, AZ.

*State of Michigan vs. Christopher Paul Schurr,* Seventeenth Circuit Court in and for Kent County, Case No. *41 22 006265 99*
- Trial Testimony on April 29, 2025 in Grand Rapids, MI.