## United States District Court
## Southern District of Texas

| | |
|---|---|
| Demetria Brooks<br>                    Plaintiffs,<br><br>                    v.<br><br>Harris County & Hardin<br>                    Defendants. | No. 4:22-cv-03322 |

### Declaration of Mark Kroll, PhD, FACC, FHRS, FIEEE, FAIMBE

My name is Mark Kroll.  I have personal knowledge of the evidence in this case as presented to me and identified herein, and experts in my field would reasonably rely on such evidence in forming the opinions I have submitted through this declaration.  All of the opinions I have herein offered are reasonably certain and correct .

<mark>This Declaration has numerous important color pictures and must be printed only in color.</mark>



Hardin MSJ
EXHIBIT
3
C.A. No. 4:22-cv-3322

# Table of Contents:

Figures..........................................................................................................2

*Brief Summary of Qualifications*.............................................................3

*Mr. Brooks Could Control Sgt. Hardin With the X26P CEW.* ..................6

1. Drive-stun Control by Pain Distraction .....................................6

2. Drive-stun Control by Shocking to the Neck..............................6

3. 3-point Control with CEW...........................................................7

4. Policy regarding loss of electrical weapon control.....................8

*A CEW Can Cause Serious Injury Even Without the Probes.* ...................9

*TASER Training Warns Officers of Drive-stun Dangers*.......................10

*References:*..............................................................................................14

## Figures

*Figure 1. X26P warning of startle response.*......................................................6
*Figure 2. Carotid baroreceptors.* ......................................................................6
*Figure 3. Trainer pointing out carotid drive-stun area.*......................................7
*Figure 4. Demonstrating carotid drive-stun.* .....................................................7
*Figure 5. HCSO policy mention of "3-point" control.*..........................................8
*Figure 6. Use of drive-stun in 3-point mode to control the body.* .......................8
*Figure 7. HCSO policy mention of risk of loss of electrical weapon.* ...................8
*Figure 8. Left-eye damage from drive-stun near the right eye.*............................9
*Figure 9. Retro-illumination of the left lens showing significant anterior* ..........9
*Figure 10. User manual warning against drive-stuns to the neck.* .....................10
*Figure 11. User manual warning of eye damage from laser pointer.* ..................10
*Figure 12. TASER® warning of eye damage from laser.* ....................................11
*Figure 13. HCSO policy prohibiting pointing the electrical weapon at someone's eyes.*..............11

# Brief Summary of Qualifications

I am a Biomedical scientist who has specialized in areas that include but are not limited to bioelectricity and prone restraint. * Bioelectricity is the interaction of electricity and the body. My early career was focused on researching and developing electrical devices to diagnose and treat disease. Because of this work — on the effect of electrical shocks on the human body — I became involved with handheld electrical weapons in 2003. Later on in my career (2013), I began studying and publishing findings regarding the related Biomedical issue of prone restraint and breathing issues. That led to numerous publications beginning in 2016.[1-8]

Biomedical Science analyzes the human body as a physics problem. The largest areas are Bioelectricity (e.g. effects of shocks and stimulation) and Biomechanics (e.g. strength of bones and ribs).[9]

My work as a biomedical scientist involves researching, lecturing, and publishing and includes lectures throughout Europe, South America, and Asia (in 35 countries) as well as at many of the major universities and medical centers of the United States (U.S.). Usually, the typical audience member is a cardiologist electrophysiologist, medical examiner, or forensic pathologist. With over 380 issued U. S. patents and numerous pending and international patents, I currently hold the most patents on implantable medical devices of anyone in the world. Over 2 million people have had devices with some of these patented features in their chest. http://bme.umn.edu/people/adjunct/kroll.html.

In 2010 was awarded the Career Achievement Award by the Engineering in Medicine and Biology Society (EMBS) of the Institute of Electrical and Electronics Engineers (IEEE) which is the most prestigious award given internationally in Biomedical Engineering.
https://www.embs.org/awards/previous-award-winners/past-professional-career-achievement-award-recipients/

Believed to be the only individual to receive the high "Fellow" honor from both Cardiology and Biomedical societies. To wit:

1997 Fellow, American College of Cardiology
2009 Fellow, Heart Rhythm Society
2011 Fellow, IEEE Engineering in Medicine and Biology Society
2013 Fellow, American Institute for Medical and Biological Engineering

Author of over 200 abstracts, papers, and book chapters and also the co-editor of 4 books including the only 2 scientific treatises on Conducted Electrical Weapons (CEW):

---

*See current CV for further details and specifics. My curriculum vitae containing details of my relevant formal education, experience, and publications authored is attached and made an integral part of this report.

1. TASER® Conducted Electrical Weapons: Physiology, Pathology and Law. Springer-Kluwer 2009.
2. Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis: Springer-Kluwer 2012.

Directly relevant paper publications include about 100 papers, books, book chapters, indexed letters on CEWs, prone restraint, and arrest-related death (ARD), and numerous scientific meeting abstracts.[1-8,10-101] For more details please see CV at:
https://www.dropbox.com/sh/wju0hu6q3ca62xx/AAAlzTlLbKbxu5m34AsMfCrYa?dl=0
    There have also been many presentations on CEWs and prone restraint to scientific, medical, pathology, as well as law enforcement, audiences. These include: 2007 American Academy of Forensic Science (AAFS) conference major presentation in San Antonio, Texas and the 2007 BEMS (Bio-electromagnetic Society) meeting Plenary Address in Kanazawa, Japan.

1. Major invited lecture at the 2006 NAME (National Association of Medical Examiners) conference in San Antonio, Texas.
2. Advanced Death Investigation Course of St. Louis University (2007) as faculty lecturer to full audience.
3. Faculty lecturer to full audience at Institute for the Prevention of In-Custody Death Conferences (2006 and 2007), Las Vegas, Nevada.
4. Chair of special session on TASER CEW at 2006 Cardiostim meeting in Nice, France.
5. Guest lecture to U.S. Military on CEW in 2006.
6. "Presenting Rhythm in Sudden Custodial Deaths After Use of TASER® Electronic Control Device," was presented at the 2008 scientific conference of the Heart Rhythm Society.
7. "Can Electrical-Conductive Weapons (TASER®) alter the functional integrity of pacemakers and defibrillators and cause rapid myocardial capture?" was presented at the 2008 scientific conference of the Heart Rhythm Society.
8. "Weight-Adjusted Meta-Analysis of Fibrillation Risk From TASER® Conducted Electrical Weapons" presented at the 2009 AAFS conference.
9. "Meta-Analysis of Fibrillation Risk From TASER® Conducted Electrical Weapons as a Function of Body Mass" presented at the 2009 scientific conference of the Heart Rhythm Society.
10. Oral presentation at the 2014 NAME (National Association of Medical Examiners) conference in Portland, Oregon.
11. Pathophysiological Aspects of Electroshock Weapons. University of Salzburg Electroshock Weapon Symposium. Salzburg, Austria. July 2015.
12. Real and Imagined Risk of Electrical Weapons. University of Salzburg Electroshock Weapon Symposium. Salzburg, Austria. Dec 2016.

In addition to the major addresses above, there have been lectures and presentations at the U.S. Department of Justice (2007), AAFS (2006), and BEMS (2006).

I have deployed and discharged TASER CEWs numerous times and have personally experienced a TASER® X26 CEW probe deployment discharge to the center of my chest.

Relevant Committees and Boards:

1. International Electrotechnical Commission (IEC) (Geneva, Switzerland) TC64 MT4 Committee. This committee is the top international authority for setting the international electrical safety limits for electrocution and other electrical dangers.
2. American Society for Testing and Materials) ASTM, Committee: E54 Homeland Security Applications, Subcommittee: E54.08 Operational Equipment, including Less-Lethal Task Group, including: ASTM (draft) Standard WK61808 New Test Method for Correct Performance of Less-Lethal Electroshock Weapons Used by Law Enforcement and Corrections.
3. Axon Enterprise, Inc. (Axon né TASER), corporate (2003-2024) and also Scientific and Medical Advisory Board (2004-2024).
4. ANSI (American National Standards Institute) standards committee on electrical weapons.

Courtroom testimony in U.S., Australia, and Canada, and retained expert in the United Kingdom and France. I also have significant research, publications, and testimony in the areas of resuscitation, ARDs (arrest-related death), prone restraint, and biomechanics.

# Mr. Brooks Could Control Sgt. Hardin With the X26P CEW.

### 1. Drive-stun Control by Pain Distraction

A drive-stun alone can be so painful and alarming that it causes a person to focus on the pain, which would then allow an adversary to take their firearm. The X26P warnings specifically warn of the dangerous "startle" effects from the pain of an electrical weapon application as shown in Figure 1.

> **Stress and Pain.** CEW use, anticipation of use, or response to use can cause startle, panic, fear, anger, rage, temporary discomfort, pain or stress which may be injurious or fatal to some people.

**Figure 1. X26P warning of startle response.**

### 2. Drive-stun Control by Shocking to the Neck

In addition, a drive-stun into a nerve area can cause a loss of control leading to the same outcome.



**Figure 2. Carotid baroreceptors.**

The carotid baroreceptors measure the blood pressure supplying the brain. See Figure 2. If someone stands up, these baroreceptors will call for more pressure to be delivered upwards into the head. If the person is laying down, they will call for less blood pressure. Electrical stimulation of the baroreceptors will significantly drop the blood pressure.[102] A drive-stun to this carotid area could cause the blood pressure to be reduced enough to cause fainting and loss of control.

The use of a drive-stun to the carotid sinus area in older TASER® electrical weapon training is depicted in Figure 3 and Figure 4. This is no longer trained due to the danger associated with applications to the neck. It has been replaced with a warning to never drive-stun the neck. Nevertheless, this risk exists, especially in the hands of an untrained operator or an adversary.


**Figure 3. Trainer pointing out carotid drive-stun area.**


**Figure 4. Demonstrating carotid drive-stun.**

There are several other nerve areas that are taught for drive-stuns.

## 3.    3-point Control with CEW

It is true that a drive-stun will not directly cause muscle lockup alone but when used in conjunction with a connected probe it can.[79] This was a real risk in the mind of Sgt. Hardin as he had already experienced a shock during the struggle so he knew there was already a connection to his body. This is specifically covered in the Harris County policy manual as shown in Figure 5. An example is depicted in the sketch of Figure 6.

> **Completing the Incapacitation Circuit** – When there is not adequate spread between probes attached to a subject, or one probe misses the subject or dislodges, the CED may be used in drive stun mode to temporarily incapacitate the subject. This allows the electrical pulse to travel between the attached probe(s) and the point where the front of the CED makes contact with the subject. This tactic is sometimes referred to as a three-point contact.

**Figure 5. HCSO policy mention of "3-point" control.**



**Figure 6. Use of drive-stun in 3-point mode to control the body.**

## 4. Policy regarding loss of electrical weapon control

As shown in Figure 7, the Harris County policy warns of the possible use of the electrical weapon by an adversarial subject to take control of the officer's firearm. It also specifically states, that in that case, the officer is expected to defend himself.

> P. If a combative subject disarms the CED from a deputy who is alone and threatens or attempts to use the CED against the deputy, the deputy must defend himself or herself or take actions to avoid becoming incapacitated and risking the possibility that the subject could gain control of the deputy's firearm. However, if multiple deputies are present, a subject's attack with a CED against one deputy should not in and of itself cause a deadly-force response by other deputies. The deputy should evaluate the totality of the circumstances.

**Figure 7. HCSO policy mention of risk of loss of electrical weapon.**

This is consistent with national practice. In a recent peer-reviewed paper, the authors reported on 131 incidents of subjects attempting to or gaining control of an officer's electrical weapon from 2004 to 2020, 53 of which resulting in a shooting.[19] These shootings resulted in 48 fatalities. Several of the cases involved drive-stun attempts by the resistant subject.

# A CEW Can Cause Serious Injury Even Without the Probes.

A drive-stun near the eyes could result in significant damage to 1 or 2 eyes, including the possibility of permanent blindness.[103]

In 1985, Saffle published a peer-reviewed study of 7 patients with 13 cataract injuries from mostly industrial electrical shocks.[103] In 2007, Seth reported a case of serious eye injury from a drive-stun to the right eye.[104] The right eye suffered traumatic iritis, angle-recession glaucoma, and a retinal dialysis. The left eye had an electrical cataract. See Figure 8 and Figure 9.



**Figure 8. Left-eye damage from drive-stun near the right eye.**



**Figure 9. Retro-illumination of the left lens showing significant anterior and posterior cortical changes with a posterior subcapsular component.**

# TASER Training Warns Officers of Drive-stun Dangers

The TASER® X26P manual specifically warns against applications to the neck as shown in Figure 10.



**Figure 10. User manual warning against drive-stuns to the neck.**

The TASER® X26P manual also warns of the possibility of eye damage from the laser sight as shown in Figure 11. Note that the X26P uses the more powerful level 3R laser for good visibility in sunlight.



**Figure 11. User manual warning of eye damage from laser pointer.**

The TASER® X26P warnings also warn of the possibility of eye damage from the laser sight as shown in Figure 12.

> ⚠ **LASER Light Hazard.** CEWs use LASER targeting aids. LASERs can cause serious eye injury, including permanent vision loss. **NEVER** aim a LASER at an aircraft or the operator of an aircraft or moving vehicle.

**Figure 12. TASER® warning of eye damage from laser.**

Finally, the Harris County policy manual prohibits pointing the weapon at the eyes as shown in Figure 13.

> I. Deputies shall not intentionally display the CED or red dot a subject as a practical joke, in the eyes, or as a form of harassment.

**Figure 13. HCSO policy prohibiting pointing the electrical weapon at someone's eyes.**

This is not an excessively conservative concern. Numerous medical papers have documented temporary to permanent eye damage from laser pointers. [105-108]

Most importantly, law-enforcement officers are well aware of this risk as lasers have been used to attack them while on duty.

On July 16, 2020, Los Angeles Police Department (LAPD) Officer Kyle Rice, a 15-year veteran and father of two, responded to a non-emergency call involving a dispute between a business owner and a homeless individual in the Little Tokyo area of downtown Los Angeles. While on scene, an unknown individual on a nearby balcony deliberately targeted him with a high-powered green laser pointer for several seconds. Rice described feeling his right eye "on fire" immediately upon impact.

Injuries:

- Permanent Vision Loss: Rice suffered irreversible damage to the retina in his right eye, resulting in partial blindness and a permanent central scotoma (blind spot). He lost the ability to drive and experienced ongoing visual distortions, including blurred peripheral vision and difficulty with depth perception. Ophthalmologists confirmed the damage as a classic laser-induced macular burn, akin to "staring at the sun," with no surgical reversal possible.
- Permanent Migraines: He developed debilitating, chronic migraines that he described as "bringing me to tears," severe enough to force him to lie down frequently. These headaches, linked to the retinal injury and optic nerve irritation, persisted beyond the acute phase and impacted his daily life, including parenting and work duties.
- Additional Effects: Rice also reported balance issues (vestibular disruption from visual impairment) and emotional distress, leading to partial medical retirement considerations.

Medical and Legal Follow-Up: Rice was evaluated by ophthalmologists specializing in laser injuries, who documented the retinal scarring via optical coherence tomography (OCT) scans. The case prompted LAPD Chief Michel Moore to issue a department-wide memo on laser threats and distribute specialized protective eyewear. It contributed to Los Angeles' 2020 ordinance banning laser pointers at protests, citing 24 eye injury reports (20 involving officers) in the prior year. Rice's ordeal was covered in investigative reports and helped fuel federal discussions on laser weaponization.

Portland Protests (2020): Over 113 federal officers (Federal Protective Service) reported eye injuries from lasers during protests, including temporary flash blindness, dark spots, blurred vision, and headaches. Three cases initially raised concerns for permanent blindness, but follow-up confirmed recovery; however, some officers experienced lingering migraines and photophobia. There were 3 cases of permanent blindness.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 4, 2025.


Mark Kroll, PhD, FACC, FHRS, FAIMBE

# References:

1. Kroll MW, Brave MA, Hail SL, Kroll RM, Williams HE. Pneumatic Impedance of Spit Socks and N95 Masks: The Applicability to Death Investigation. *Am J Forensic Med Pathol*. Mar 1 2022;43(1):7-10.

2. Kroll MW, Hall CA, Bozeman WP, Luceri RM. The prone position paradox. *Med Sci Law*. Nov 3 2021:258024211051436.

3. Kroll MW. The Dying Gasps of the Prone Asphyxia Hypothesis. 2021:https://www.researchgate.net/publication/356267668_The_Dying_Gasps_of_the_Prone_Asphyxia_Hypothesis.

4. Kroll MW, Brave MA, Kleist SR, Ritter MB, Ross DL, Karch SB. Prolonging the Prone Postulate. *Am J Forensic Med Pathol*. Mar 2020;41(1):81-82.

5. Kroll MW, Brave MA, Kleist SR, Ritter MB, Ross DL, Karch SB. Applied Force During Prone Restraint: Is Officer Weight a Factor? *Am J Forensic Med Pathol*. Mar 2019;40(1):1-7.

6. Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV. Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons. *Med Sci Law*. Apr 2017;57(2):61-68.

7. Karch SB, Brave MA, Kroll MW. On positional asphyxia and death in custody. *Med Sci Law*. Jan 2016;56(1):74-5.

8. Kroll MW, Hail SL, Brave MA. Do Saliva-Saturated Spit Hoods Interfere With Ventilation? *Am J Forensic Med Pathol*. Aug 15 2023;

9. Christensen DA. Introduction to Biomedical Engineering: Biomechanics and Bioelectricity-Part II. *Synthesis Lectures on Biomedical Engineering*. 2009;4(1):1-144.

10. Kroll MW, Wolf DA, Hail SL, Zemrus TL, Kunz S, Williams HE. Sickle cell trait in non-firearm arrest-related deaths of Black persons. *J Forensic Sci*. Nov 14 2024;doi:10.1111/1556-4029.15668

11. Kroll MW, Wolf DA, Cobb JC, et al. Homicide Manner-of-Death Classification in Arrest-Related Death. *Am J Forensic Med Pathol*. Jun 1 2024;45(2):103-110. doi:10.1097/PAF.0000000000000921

12. Kroll MW, Luceri RM, Efimov IR, Calkins H. The Mechanism of Death in Electrocution: A Historical Review of the Literature. *Am J Forensic Med Pathol*. Aug 2 2024;doi:10.1097/PAF.0000000000000980

13. Kroll MW. Defending Non-firearm Arrest-related Death Litigation: Litigation Spotlight: The Science of Use-of-Force. *Defense Research Institute: Civil Rights and Governmental Tort Liability*. 1-27 2024:https://www.researchgate.net/publication/380862057.

14. Kroll M, Pratt H, Witte K, et al. Civilian "Stun" Guns: Neural or Aural Stimulation? *IEEE Eng Med Biol Mag*. 2024:in press.

15. Kroll MW, Luceri RM, Efimov IR, Calkins H. The electrophysiology of electrocution. *Heart Rhythm O2*. Jul 2023;4(7):457-462. doi:10.1016/j.hroo.2023.06.004

16. Kroll MW. Ground Restraint: The Puzzle of Proning Paranoia. *Researchgate*. 2023:1-11. doi:10.13140/RG.2.2.31937.12640

17. Kroll MW, Melinek J, Martin JA, Brave MA, Williams HE. Confusion between firearms and electrical weapons as a factor in police shootings. *Forensic Sci Med Pathol*. Sep 2022;18(3):280-287. doi:10.1007/s12024-022-00457-6

18. Kroll MW, Witte KK, Ritter MB, Kunz SN, Luceri RM, Criscione JC. Electrical weapons and rhabdomyolysis. *Forensic Sci Med Pathol*. Mar 2021;17(1):58-63. doi:10.1007/s12024-020-00311-7

19. Kroll MW, Ross DL, Brave MA, Williams HE. Police shootings after electrical weapon seizure: homicide or suicide-by-cop. *Int J Legal Med*. Nov 2021;135(6):2547-2554. doi:10.1007/s00414-021-02648-2

20. Kroll M, Perkins P, Chiles BD, et al. Output of Electronic Muscle Stimulators: Physical Therapy and Police Models Compared. *Conf Proc IEEE Eng Med Biol Soc*. 2021;43:1264-1268.

21. Kroll M. Basics of Electrocution. *ResearchGate*. 2021:https://www.researchgate.net/publication/356194079_Electrocution_Primer. doi:DOI: 10.13140/RG.2.2.17175.29608

22. Chiles BD, Nerheim MH, Markle RC, Brave MA, Panescu D, Kroll MW. Estimation of Physiological Impedance from Neuromuscular Pulse Data. *Annu Int Conf IEEE Eng Med Biol Soc*. Nov 2021;2021:1246-1251. doi:10.1109/embc46164.2021.9630202

23. Chiles BD, Nerheim MH, Markle RC, Brave MA, Panescu D, Kroll MW. Detection of Arcing and High Impedance with Electrical Weapons.

*Annu Int Conf IEEE Eng Med Biol Soc.* Nov 2021;2021:1252-1256. doi:10.1109/embc46164.2021.9629836

24. Kroll MW, Witte KK, Kunz SN, Luceri RM, Criscione JC. Electrical weapons, hematocytes, and ischemic cardiovascular accidents. *J Forensic Leg Med.* Jul 2020;73:101990. doi:10.1016/j.jflm.2020.101990

25. Kroll MW, Brave MA. Defending Non-Firearm Arrest-Related Death Incidents. *International Municipal Lawyers Association.* 2020: https://www.researchgate.net/publication/342064787.

26. Chiles BD, Nerheim MH, Brave MA, Panescu D, Kroll MW. Feed-forward Controlled Electrical Weapon Charge Delivery. *IEEE Eng Med Biol Soc.* 2020:poster presentation.

27. Kroll MW, Ritter MB, Kennedy EA, et al. Eye injury from electrical weapon probes: Mechanisms and treatment. *Am J Emerg Med.* Mar 2019;37(3):427-432. doi:10.1016/j.ajem.2018.06.004

28. Kroll MW, Ho JD, Vilke GM. 8 facts about excited delirium syndrome (ExDS) we learned in 2018. *PoliceONE.* 11 March 2019 2019;

29. Kroll M, Brave M, Pratt H, Witte K, Kunz S, Luceri R. Benefits, Risks, and Myths of TASER® Handheld Electrical Weapons. *Human Factors and Mechanical Engineering for Defense and Safety.* 2019;3(1):7.

30. Kunz SN, Calkins HG, Adamec J, Kroll MW. Adrenergic and metabolic effects of electrical weapons: review and meta-analysis of human data. *Int J Legal Med.* Sep 2018;132(5):1469-1475.

31. Kunz SN, Calkins H, Adamec J, Kroll MW. Cardiac and skeletal muscle effects of electrical weapons : A review of human and animal studies. *Forensic Sci Med Pathol.* Sep 2018;14(3):358-366. doi:10.1007/s12024-018-9997-3

32. Kroll MW, Ritter MB, Kennedy EA, et al. Eye injuries from electrical weapon probes: Incidents, prevalence, and legal implications. *J Forensic Leg Med.* Apr 2018;55:52-57. doi:10.1016/j.jflm.2018.02.013

33. Kroll MW, Hail SL, Kroll RM, Wetli CV, Criscione JC. Electrical weapons and excited delirium: shocks, stress, and serum serotonin. *Forensic Sci Med Pathol.* Dec 2018;14(4):478-483. doi:10.1007/s12024-018-0005-8

34. Kroll M. A new study looks at the cognitive effects of electronic control vs. physical exertion and alcohol.: Invited Review. *PoliceOne.* Jan 2018;

35. Kroll M. Cause-Of-Death Challenges in Arrest-Related Deaths. *PoliceOne.* June 2018;

36. Kroll M. Arrest Related Death Investigation Checklist. In: Vilke Ra, ed. *Guidlines for Investigating Officer Involved Shootings, Arrest-Related Deaths, and Deaths in Custody.* Taylor and Francis; 2018:259-264.

37. Chiles BD, Nerheim MH, Brave MA, Panescu D, Kroll MW. Electrical Weapon Charge Delivery With Arcing. *Annu Int Conf IEEE Eng Med Biol Soc.* Jul 2018;2018:2234-2239. doi:10.1109/embc.2018.8512753

38. Ross DL, Brave M, Kroll M. Arrest-Related Deaths, Emerging Questions, and Competing Expectations in Investigations. *Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths, and Deaths in Custody.* Routledge; 2017:1-18.

39. Panescu D, Nerheim M, Kroll MW, Brave MA. New conducted electrical weapons: Electrical safety relative to relevant standards. *Annu Int Conf IEEE Eng Med Biol Soc.* Jul 2017;2017:2185-2190. doi:10.1109/embc.2017.8037288

40. Panescu D, Kroll MW, Brave MA. New conducted electrical weapons: Finite element modeling of safety margins. *Annu Int Conf IEEE Eng Med Biol Soc.* Jul 2017;2017:2170-2176. doi:10.1109/embc.2017.8037285

41. Panescu D, Kroll MW, Brave MA. New conducted electrical weapons: Thoracic cage shielding effects. *Annu Int Conf IEEE Eng Med Biol Soc.* Jul 2017;2017:2191-2196. doi:10.1109/embc.2017.8037289

42. Kroll MW, Ritter MB, Williams HE. Fatal and non-fatal burn injuries with electrical weapons and explosive fumes. *J Forensic Leg Med.* Aug 2017;50:6-11. doi:10.1016/j.jflm.2017.06.001

43. Kroll M, Brave M. TASER® Conducted Electrical Weapons. In: Vilke Ra, ed. *Guidlines for Investigating Officer Involved Shootings, Arrest-Related Deaths, and Deaths in Custody.* Taylor and Francis; 2017:246-271:chap 13.

44. Kroll M. Positional, Compression, and Restraint Asphyxia: A Brief Review. Technical Report. https://www.researchgate.net/publication/313205063_Positional_Compression_and_Restraint_Asphyxia_A_Brief_Review

45. Brave M, Kroll M, Karch S, et al. Medical Examiner Collection of Comprehensive, Objective Medical Evidence for Conducted

Electrical Weapons and Their Temporal Relationship to Sudden Arrest *International Conference on Forensic Science and Crime, London*. 19 Jan 2017;

46. Panescu D, Kroll MW, Brave M. Current distribution in tissues with conducted electrical weapons operated in drive-stun mode. *Annu Int Conf IEEE Eng Med Biol Soc*. Aug 2016;2016:5241-5245. doi:10.1109/embc.2016.7591909

47. Kroll MW, Ritter MB, Guilbault RA, Panescu D. Infection Risk From Conducted Electrical Weapon Probes: What Do We Know? *J Forensic Sci*. Nov 2016;61(6):1556-1562. doi:10.1111/1556-4029.13148

48. Kroll MW, Luceri RM, Lakireddy D, Calkins H. Do TASER Electrical Weapons Actually Electrocute? *Can J Cardiol*. Oct 2016;32(10):1261.e11. doi:10.1016/j.cjca.2015.12.030

49. Kroll MW, Adamec J, Wetli CV, Williams HE. Fatal traumatic brain injury with electrical weapon falls. *J Forensic Leg Med*. Oct 2016;43:12-19. doi:10.1016/j.jflm.2016.07.001

50. Kroll M. Misunderstanding the Trigger-pull Download. Technical Report. https://www.researchgate.net/publication/321339912_Misunderstanding_the_Trigger-pull_Download

51. Brave MA, Lakkireddy DR, Kroll MW, Panescu D. Validity of the small swine model for human electrical safety risks. *Annu Int Conf IEEE Eng Med Biol Soc*. Aug 2016;2016:2343-2348. doi:10.1109/embc.2016.7591200

52. Walcott GP, Kroll MW, Ideker RE. Ventricular fibrillation: are swine a sensitive species? *J Interv Card Electrophysiol*. Mar 2015;42(2):83-9. doi:10.1007/s10840-014-9964-1

53. Panescu D, Kroll MW, Andrews CJ, Pratt H. Transthoracic Ventricular Fibrillation Charge Thresholds. *Conf Proc IEEE EMBC*. Aug 26 2015;37:7208-7213.

54. Panescu D, Kroll MK, Brave MA. Cardiac fibrillation risks with TASER conducted electrical weapons. *Conf Proc IEEE EMBC*. 2015;37:323-9. doi:10.1109/EMBC.2015.7318365

55. Kroll M. A Brief Primer on Cardiac Arrest Rhythms Technical Report. https://www.researchgate.net/publication/316524318_A_Brief_Primer_on_Cardiac_Arrest_Rhythms

56. Kroll M. Significance of Sound During CEW Application. Technical Report. https://www.researchgate.net/publication/275024090_Significance_of_Sound_During_CEW_Application

57. Kroll M. Conducted Electrical Weapon Drive-Stun Mode: Skin Rub vs. Injection. Technical Report. https://www.researchgate.net/publication/275035976_Conducted_Electrical_Weapon_Drive-Stun_Mode_Skin_Rub_vs_Injection

58. Kroll M. Baseball, Poison, and Soup Recipes: The TASER Trio of Popular Myths. Technical Report. *ResearchGatenet*. 2015:1-3. doi:10.13140/RG.2.1.3348.4320

59. Panescu D, Kroll M, Iverson C, Brave M. The sternum as an electrical shield. *Annu Int Conf IEEE Eng Med Biol Soc*. 2014;2014:4464-70. doi:10.1109/embc.2014.6944615

60. Kroll MW, Lakkireddy DR, Stone JR, Luceri RM. TASER electronic control devices and cardiac arrests: coincidental or causal? *Circulation*. Jan 7 2014;129(1):93-100. doi:10.1161/circulationaha.113.004401

61. Kroll MW, Lakkireddy DR, Stone JR, Luceri RM. Response to letter regarding article, "TASER electronic control devices and cardiac arrests: coincidental or causal?". *Circulation*. Nov 4 2014;130(19):e168. doi:10.1161/circulationaha.114.010923

62. Kroll MW, Lakkireddy DR, Stone JR, Luceri RM. TASER electronic control devices and cardiac arrests: coincidental or causal? Supplement. Case Reports. *Circulation*. Jan 7 2014;129(1):On Line Supplement. doi:10.1161/CIRCULATIONAHA.113.004401

63. Graham M, Karch S, Wetli C, Kroll M, Brave M. Medical Examiner Collection of Comprehensive, Objective Medical Evidence for Conducted Electrical Weapons and Their Temporal Relationship to Sudden Arrest. *NAME Annual Conference*. 2014;

64. Criscione JC, Kroll MW. Incapacitation recovery times from a conductive electrical weapon exposure. *Forensic Sci Med Pathol*. Jun 2014;10(2):203-7. doi:10.1007/s12024-014-9551-x

65. Panescu D, Nerheim M, Kroll MW. Electrical safety of conducted electrical weapons relative to requirements of relevant electrical standards. *Conf Proc IEEE EMBS*. 2013;35:5342-7.

66. Kroll M. Arrest-Related Death: Evidence Collection. Technical Report. https://www.researchgate.net/publication/262639672_Arrest-Related_Death_Evidence_Collection

67. Kroll MW, Panescu D. Physics of Electrical Injury. In: Ho JD, Dawes DM, Kroll MW, eds. *Atlas of conducted electrical weapon wounds and forensic analysis*. Springer; 2012:25-45.

68. Kroll MW, Dawes DM, Heegaard WG. TASER electronic control devices and eye injuries. *Doc Ophthalmol*. Apr 2012;124(2):157-9. doi:10.1007/s10633-012-9310-9

69. Kroll M. Realities of biomedical product liability suits and the role of junk science: from breast implants to TASER weapons. *IEEE Pulse*. Sep-Oct 2012;3(5):27-32. doi:10.1109/mpul.2012.2205778

70. Ho J, Dawes D, Kroll M. *Atlas of Conducted Electrical Weapons and Forensic Analysis*. Springer; 2012:204.

71. Walcott GP, Kroll MW, Ideker RE. Ventricular fibrillation threshold of rapid short pulses. *Annu Int Conf IEEE Eng Med Biol Soc*. 2011;2011:255-8. doi:10.1109/iembs.2011.6090049

72. Kroll MW, Lakkireddy D, Rahko PS, Panescu D. Ventricular fibrillation risk estimation for conducted electrical weapons: critical convolutions. *Annu Int Conf IEEE Eng Med Biol Soc*. 2011;2011:271-7. doi:10.1109/iembs.2011.6090053

73. Kroll M. TASER® Conducted Electrical Weapons: Clinical Forensic Medicine: A Physician's Guide. In: Stark M, ed. *Clinical Forensic Medicine: A Physician's Guide*. Springer; 2011:233-276.

74. Kroll MW, Panescu D, Hinz AF, Lakkireddy D. A novel mechanism for electrical currents inducing ventricular fibrillation: The three-fold way to fibrillation. *Annu Int Conf IEEE Eng Med Biol Soc*. 2010;2010:1990-6. doi:10.1109/iembs.2010.5627490

75. Dawes DM, Ho JD, Kroll MW, Miner JR. Electrical characteristics of an electronic control device under a physiologic load: a brief report. *Pacing Clin Electrophysiol*. Mar 2010;33(3):330-6.

76. Biria M, Bommana S, Kroll M, Lakkireddy D. Multi-System Interactions of Conducted Electrical Weapons (CEW) – A Review. *Engineering in Medicine and Biology Society Proceedings*. Sept 2010:1266-1270.

77. Kroll MW, Ho JD. *TASER® Electronic Control Devices: Physiology, Pathology, and Law*. Springer; 2009 457.

78. Vanga SR, Bommana S, Kroll MW, Swerdlow C, Lakkireddy D. TASER conducted electrical weapons and implanted pacemakers and defibrillators. *Conf Proc IEEE Eng Med Biol Soc*. 2009;2009:3199-204. doi:10.1109/IEMBS.2009.5333136

79. Panescu D, Kroll MW, Stratbucker RA. Medical safety of TASER conducted energy weapon in a hybrid 3-point deployment mode. *Conf Proc IEEE EMBC*. 2009;31:3191-4. doi:10.1109/IEMBS.2009.5334538

80. Kroll MW, Panescu D, Carver M, Kroll RM, Hinz AF. Cardiac effects of varying pulse charge and polarity of TASER conducted electrical weapons. *Conf Proc IEEE EMBC*. 2009;31:3195-8. doi:10.1109/IEMBS.2009.5333135

81. Kroll MW. Physiology and pathology of TASER electronic control devices. *J Forensic Leg Med*. May 2009;16(4):173-7.

82. Kroll M, Panescu D, Brewer J, Lakkireddy D, Graham M. Meta-Analysis Of Fibrillation Risk From TASER Conducted Electrical Weapons as a Function of Body Mass. abstract. *Heart Rhythm*. 2009;6:AB20-1.

83. Kroll M, Panescu D, Brewer J, Lakkireddy D, Graham M. Weight Adjusted Meta-Analysis of Fibrillation Risk From TASER Conducted Electrical Weapons. *Proceedings of the American Academy of Forensic Science*. Feb 2009:177-177.

84. Kroll M, Luceri R, Calkins H, Lakkireddy D, Ho J. Electrocution Diagnosis Checklist. In: Kroll M, Ho J, eds. *TASER Conducted Electrical Weapons: Physiology, Pathology, and Law*. Springer-Kluwer; 2009:chap Appendix B.

85. Kroll M. TASER® Electronic Control Devices. In: Fish R, Geddes L, eds. *Electrical Injuries: Medical and Bioengineering Aspects*. 2 ed. Lawyers and Judges Publishing Company, Inc.; 2009:455-491:chap 42.

86. Brewer J, Kroll M. Field Statistics Overview. In: Kroll M, Ho J, eds. *TASER Conducted Electrical Weapons: Physiology, Pathology, and Law*. Springer-Kluwer; 2009:chap 24.

87. Panescu D, Kroll MW, Stratbucker RA. Theoretical possibility of ventricular fibrillation during use of TASER neuromuscular incapacitation devices. *Conf Proc IEEE EMBC*. 2008;30:5671-4. doi:10.1109/IEMBS.2008.4650501

88. Lakkireddy D, Biria M, Baryun E, et al. Can Electrical-Conductive Weapons (TASER®) alter the functional integrity of pacemakers and defibrillators and cause rapid myocardial capture? *Heart Rhythm*. June 2008;5(5):S97.

89. Kroll MW, Calkins H, Luceri RM, Graham MA, Heegaard WG. Sensitive swine and TASER

electronic control devices. *Acad Emerg Med*. Jul 2008;15(7):695-6; author reply 696-8.

90. Kroll MW, Calkins H, Luceri RM, Graham MA, Heegaard WG. TASER safety (Review of a review). *Can Med Assoc J*. Sep 23 2008;179(7):677-8.

91. Kroll MW, Calkins H, Luceri RM, Graham MA, Heegaard WG. Electronic control devices (Response to Editorial). *Can Med Assoc J*. Aug 12 2008;179(4):342-3.

92. Kroll M, Panescu D, Ho J, et al. Potential Errors in Autopsy Reports of Custodial Deaths Temporally Associated With Electronic Control Devices: A Cardiovascular Prospective. *Proceedings of the American Academy of Forensic Science*. 2007;XIII:284-285. doi:10.13140/2.1.4550.9923

93. Kroll M, Luceri RM, Calkins H. A very interesting case study involving a TASER Conducted Electrical Weapon (CEW) used on a patient with a pacemaker. *J Cardiovasc Electrophysiol*. Dec 2007;18(12):E29-30; author reply E31.

94. Kroll M. Designing the Waveform of the Electronic Control Device to Replace the Police Club. presented at: The Bioelectromagnetics Society 29th Annual Meeting; June 10-15 2007; Kanazawa, Japan.

95. Kroll M. Potential Autopsy Errors With In-Custody-Deaths: The Ronald Hasse Case Study *Institute for the Prevention of In-Custody-Death:* . 2007:http://ipicd.com/Files/Articles/Panel14/Hasse_Case_Study.pdf. doi:10.13140/2.1.2126.1609

96. Kroll M. Crafting the Perfect Shock. *IEEE Spectrum*. Dec 2007;44(12):27-30.

97. Sweeney J, Kroll M, Panescu D. Analysis of Electrical Activation of Nerve and Muscle by TASERs. *Proceedings of the American Academy of Forensic Science*. 2006;XII:142-143.

98. Stratbucker RA, Kroll MW, McDaniel W, Panescu D. Cardiac current density distribution by electrical pulses from TASER devices. *Conf Proc IEEE Eng Med Biol Soc*. 2006;1:6305-7. doi:10.1109/IEMBS.2006.260374

99. Panescu D, Kroll MW, Efimov IR, Sweeney JD. Finite element modeling of electric field effects of TASER devices on nerve and muscle. *Conf Proc IEEE EMBC*. 2006;28:1277-9. doi:10.1109/IEMBS.2006.260376

100. Kroll M, Swerdlow C, Sweeney J. Scientific Basis for the Cardiac Safety of the TASER Electronic Control Device. *Proceedings of the American Academy of Forensic Science*. Feb 2006;XII:139-140.

101. Kroll M, Panescu D. Theoretical Considerations Regarding The Safety of Law Enforcement Electronic Control Devices. 2006:

102. Mancia G, Parati G, Zanchetti A. Electrical carotid baroreceptor stimulation in resistant hypertension. *Hypertension*. Mar 2010;55(3):607-9. doi:10.1161/HYPERTENSIONAHA.109.147306

103. Saffle JR, Crandall A, Warden GD. Cataracts: a long-term complication of electrical injury. *J Trauma*. Jan 1985;25(1):17-21.

104. Seth RK, Abedi G, Daccache AJ, Tsai JC. Cataract secondary to electrical shock from a Taser gun. *J Cataract Refract Surg*. Sep 2007;33(9):1664-5. doi:S0886-3350(07)00900-5 [pii] 10.1016/j.jcrs.2007.04.037

105. Keunen JE, Delbecq AL, Cruysberg JR, van Meurs JC, Gan IM, Berendschot TT. [Laser pointers are not toys; eye injury with permanent loss of visual acuity]. *Ned Tijdschr Geneeskd*. 2014;158:A7813. Een laserpen is geen speelgoed: oogletsel met blijvend visusverlies.

106. Marshall J, O'Hagan JB, Tyrer JR. Eye hazards of laser 'pointers' in perspective. *Br J Ophthalmol*. May 2016;100(5):583-4. doi:10.1136/bjophthalmol-2016-308798

107. Moseley H, Tulley FM, McGhee CN. The potential hazard of laser pointers. *Lasers Med Sci*. 2003;18(1):63-7. doi:10.1007/s10103-002-0245-3

108. Sethi CS, Grey RH, Hart CD. Laser pointers revisited: a survey of 14 patients attending casualty at the Bristol Eye Hospital. *Br J Ophthalmol*. Oct 1999;83(10):1164-7. doi:10.1136/bjo.83.10.1164

# Medical safety of TASER conducted energy weapon in a hybrid 3-point deployment mode

Dorin Panescu, Ph.D.*, Mark W. Kroll, Ph.D.** and Robert A. Stratbucker, M.D., Ph.D.***

* - NewCardio, Inc., Santa Clara, CA, ** - Cal Poly University, San Luis Obispo, CA, *** - Stratbucker & Assoc

*Introduction:* **TASER conducted energy weapons (CEW) deliver electrical pulses that can temporarily incapacitate subjects. The goal of this paper is to analyze the distribution of TASER CEW currents in the heart and surrounding organs and to understand theoretical chances of triggering cardiac arrhythmias, of capturing the vagus and phrenic nerves and producing electroporation of skeletal muscle structures. The CEW operates in either probe mode or drive-stun (direct contact) mode. There is also a hybrid mode in which current is passed from a single probe to either or both of 2 drive-stun electrodes on the weapon, presumed to be in direct contact with the skin.**

*Methods and Results:* **The models analyzed herein describe strength-duration thresholds for myocyte excitation and ventricular fibrillation (VF) induction. Finite element modeling (FEM) was used to approximate current density in the heart for worst-case TASER electrode placement. The FEMs theoretically estimated that maximum TASER CEW current densities in the heart and in neighboring organs are at safe levels. A 3-point deployment mode was compared to probe-mode deployment. The margins of safety for the 3-point deployment were estimated to be as high as or higher than for the probe-mode deployment.**

*Conclusion:* **Numerical modeling estimated that TASER CEWs were expected to be safe when deployed in 3-point mode. In drive-stun, probe-mode or 3-point deployments, the CEWs had high theoretically approximated safety margins for cardiac capture, VF, phrenic or vagus nerve capture and skeletal muscle damage by electroporation.**

*Keywords* — **Arrhythmia, Modeling, Cardiac, Fibrillation, TASER.**

## I. INTRODUCTION

Less-lethal weapons (LLW) provide military and law enforcement personnel with a tool to resolve conflict with a proportionate, lawful, appropriate and necessary use of force. An increasingly popular LLW is the conducted energy weapon (CEW). These weapons, such as TASER devices, deliver trains of brief, high-voltage but low-charge electrical pulses designed to temporarily incapacitate subjects through strong neuromuscular activation. TASERs utilize compressed nitrogen to project two small probes to distances of 4.5, 6.5, 7.5 or 10.5 m at a speed of over 48 m/s [1]. Paintball guns used for recreational play are metered at around 60 m/s. An electrical signal is transmitted through trailing wires to where the probes make contact with the body, or clothing, resulting in an immediate loss of the person's neuromuscular control, with the initial reaction being a gravitational dysreflexia (i.e. fall to the ground), and loss of ability to perform coordinated action for the duration of the impulse. The method of incapacitation is through electrical activation of skeletal muscle tissue innervated by peripheral nerves within the electric field created by the

TASER device [1]. The stimuli from a TASER will override the motor nervous system and block the command and control of the human body. Conventional stun devices stimulate sensory neurons for pain compliance and can be over-ridden by a focused individual. The TASER devices directly stimulate pre-endplate motor nerve tissue, causing incapacitation regardless of subject's mental focus, training, size, or drug-induced dementia [2]. The most popular TASER CEW models supplied to law enforcement agencies are the M26 and X26. Their typical output waveforms are shown in Figs. 1 and 2, respectively. Table I provides a specification summary for these two devices [3].

**Table I. Specifications of TASER M26 and X26 CEWs.**

| Specification | M26 | X26 |
|---|---|---|
| Open-circuit peak voltage [kV] | 50 | 50 |
| Peak voltage in typical load [kV] | 5 | 1.2 |
| Average output voltage over pulse duration [V] | 3800 | 600 |
| Energy delivered in typical load [J/pulse] | 0.5 | 0.1 |
| Power into typical load [W] | 10 | 1.9 |
| Charge in the main phase [μC] | 85 | 100 |
| Net charge [μC] | 32 | 100 |
| Overall pulse duration [μs] | 40 | 100 |
| Pulse rate [pulse/s] | 20 ± 25% | 19 |
| Total delivery duration [s] | 5 | 5 |
| On-demand delivery termination | Yes | Yes |
| Power source | 8 NiMH rechargeable or Alkaline AA cells | Two 3 V Li CR123 cells |

This study analyzes the theoretical distributions of TASER currents through various tissues and estimates the VF risk.



**M26 Current and Voltage Output**

**Fig. 1.** TASER M26 output for a 400 Ω load.

Authorized licensed use limited to: University of Minnesota. Downloaded on November 30, 2009 at 16:08 from IEEE Xplore. Restrictions apply.

## II. METHODS

We used the strength-duration curve in Fig. 3 to estimate the risk of electrically-induced VF events [4]. Parameter *c* represents the chronaxie of the cardiac myocyte. Based on a literature survey, Sun *et al.* found that the rheobasic current density (i.e. for very long durations – or $d/c > 10$) required to induce VF equals 7 mA/cm² [5, 6].



**Fig. 2.** TASER X26 output for a 400 Ω load.

The longest duration of the main phase TASER current is about 100 μs, for the X26 model. The myocyte chronaxie is 1.2 ms, for a VF induction model [4, 6]. Thus, the corresponding $d/c$ value is 0.08 (for a $c/d$ value of 12).



**Fig. 3.** Strength-duration curves for *I*, *Q* and *U* and the *d/c* ratio and rheobase multiple for X26 waveform parameters.

Therefore, using Fig. 3, the corresponding current density thresholds required to induce VF is 91 mA/cm² (i.e. 91 = 7*(1+12) ). For increased cardiac safety, the CEW current density in the heart volume should be less than 91 mA/cm². Ideker *et al.* indicated even greater chronaxies of 2.5 – 3.5 ms [7]. Use of a greater chronaxie level would result in increased VF induction current density (*J*) threshold and, thereby, an increased margin of safety. We use a VF *J* threshold of 91 mA/cm² that covered worst-case scenario situations. Employing same formulas as above, the resulting theoretical VF induction threshold for a TASER M26 CEW is estimated to be 847 mA/cm². A finite element model (FEM) was used to numerically approximate currents delivered during TASER M26 discharges and then to compare them to this VF current density threshold. The

FEM had the following characteristics (Fig. 4):

- Muscle (neck, shoulder, limbs)
- Bone (spine, ribcage)
- Heart
- Lungs
- Skin/Fat
- Abdomen
- TASER electrodes were located such that to simulate real-life deployment conditions
- Model was 176 cm long and 44 cm wide at shoulder level
- Voltage boundary conditions: 5000 V (TASER M26 peak voltage)
- Models computed steady-state solution

The model consisted of 8460 hexahedral elements. The FE region resistivities were based on previous published reports (Table II) [8].

**Table II.** Finite element model material properties.

| Region | Resistivity [Ω·cm] |
|---|---|
| Skin/Fat | 2200 |
| Lungs | 1100 |
| Bone | 5000 |
| Heart | 450 |
| Abdomen | 200 |
| Muscle | 300 |
| Electrodes | 0.001 |



**Fig. 4.** The FE mesh includes 7 regions.

Since Cosmos, the FE software used in this study [9], solved for steady state, rather than transient solutions, the applied voltage was set at 5000 V, in the range of loaded output peak voltages for TASER M26 devices.

## III. RESULTS

Concerns have been particularly raised about use of TASER CEWs in 3-point deployment mode, with two drive-stun electrodes on a suspect's back and a probe electrode lodged into the suspect's chest. Figure 5 shows the voltage distribution on the surface of such model. As seen, the voltage decreases rapidly with distance away from electrodes. Figure 6 shows a comparison of theoretically estimated current densities delivered by a TASER M26

Authorized licensed use limited to: University of Minnesota. Downloaded on November 30, 2009 at 16:08 from IEEE Xplore. Restrictions apply.

CEW in 3-point vs. probe-mode deployments. In both modes, the current density was significantly attenuated by the time it reached into deep body tissue layers. Current density color maps are plotted through cross sections taken at the heart level. The right chest, back and heart volumes are labeled to help with orientation. The upper parts of the two current-density color maps clearly show that the theoretically estimated current density under the probe-mode electrode (right map) is expected to decrease significantly when the drive-stun electrodes are fully applied to the back of the suspect, as in the case of a 3-point deployment (left map). Similarly, the bottom sections of these maps also show that, for a 3-point deployment, the TASER CEW current is theoretically expected to be shunted between the two drive-stun electrodes and not penetrate deep into tissues. Table III compares the computed current density, electric field and safety margins for these two placements. The electric field and current density values are the maximum values read in and around the volume that modeled the heart. As known from literature, the phrenic and vagus nerves and the diaphragm all reside in very close proximity to the heart volume. Consequently, the numbers in Table III cover maximum theoretical values for the heart, phrenic/vagus nerve and diaphragm. The data theoretically predict that the TASER M26 CEW deployed in probe-mode produces about 50 % higher electric field strength and current densities in the volumes described. Considering the safety thresholds (i.e. for cardiac capture, VF, nerve capture and skeletal muscle damage by electroporation) presented above and in the literature [4-7, 10-12], the FEM analyses above underline the scientific expectation that the TASER M26 CEW electrodes applied in 3-point mode yield higher safety margins.



**Fig. 5.** Theoretical voltage distribution by a TASER M26 deployed in a 3-pt mode.



**Fig. 6.** Cross-sectional current density theoretical distributions by a TASER M26 deployed in 3-point mode vs. probe-mode. With electrodes in 3-pt deployment more than 50% of the current is diverted away from deeper body tissues. A significant percentage of current is shunted between the two drive-stun electrodes.

Authorized licensed use limited to: University of Minnesota. Downloaded on November 30, 2009 at 16:08 from IEEE Xplore. Restrictions apply.

**Table III.** Summary of theoretical estimates for field strength, current density and safety margins for the two placements.

| Configuration | E field [V/m] | Crt. density [mA/cm$^2$] | Safety margin – cardiac capture | Safety margin – VF | Safety margin – phrenic/vagus nerve capture (respiratory arrest) | Safety margin – skeletal muscle electroporation |
|---|---|---|---|---|---|---|
| 3-point | 0.27 | 0.59 | 224 | 1434 | 5.8 | 5907 |
| Probe-mode | 0.39 | 0.85 | 156 | 996 | 4 | 4103 |

## IV. CONCLUSIONS

TASER CEW cartridges carry drive-stun electrodes on them. However, per cartridge specifications, these electrodes are recessed, not even with the cartridge surface [3]. Therefore, it is expected that these drive-stun electrodes carried on the cartridge would not make perfect electrical contact to the suspect's body when the cartridge is pressed against the suspect. The analyses above are limited in the sense that we considered perfect electrical contact made by these drive-stun cartridge electrodes. Accounting for the recessed drive-stun electrodes carried by cartridges, the safety margins associated with 3-point deployment would be theoretically expected to be even higher.

Per theoretical analyses above, we conclude that TASER CEWs are highly likely to be safe when deployed in a 3-point mode. Our previous studies have shown high theoretically estimated safety margins for the drive-stun and probe-mode deployments. With any FEM there are intrinsic inaccuracies associated with estimating actual current flow. Such inaccuracies are typically low and may be caused by the selection of material properties, the location of boundary conditions, the resolution of the FEM, etc. Given that all TASER CEW safety margins numerically estimated above and in previous studies are very large numbers, they mitigate the effects of intrinsic FEM inaccuracies. Even after any reasonable adjustments made to address variations in material properties, location of boundary conditions or the limited resolution of FEMs, the estimated safety margins above still remain high. Consequently, the 3-point mode deployment is expected to be at least as safe as the drive-stun and probe-mode deployments.

## V. REFERENCES

[1] TASER International: *TASER Technology Summary*. Available at http://www.taser.com/facts/qa.htm

[2] Smith PW, Hand-held stun gun for incapacitating a human target, US Patent 6,636,412, October 21, 2003.

[3] TASER International, *M26/X26 E Series Electronic Control Device Specification.* www.taser.com

[4] Geddes LA and Baker LE. Principles of Applied Biomedical Instrumentation, 3rd ed. New York: John Wiley & Sons, 1989.

[5] Sun H. Models of ventricular fibrillation probability and neuromuscular stimulation after Taser® use in humans. PhD thesis: University of Wisconsin, 2007. Available online: http://ecow.engr.wisc.edu/cgi-bin/get/ece/762/webster/

[6] Sun H, Wu JY, Abdallah R, and Webster JG. Electromuscular incapacitating device safety. *Proc IFMBE, 3rd EMBE Conference, Prague* 2005; 11(1).

[7] Walcott GP, KenKnight BH, Smith WM and Ideker RK, "Strength-Duration Curves for Ventricular Pacing and Defibrillation," *Proc NASPE, PACE,* Vol. 18, Part II, April 1995.

[8] Panescu D, Webster JG, W. Tompkins WJ and Stratbucker RA. Optimization of cardiac defibrillation by three-dimensional finite element modeling of the human thorax. *IEEE Trans Biomed Eng* 1995; 42(2); 185–192.

[9] Structural Research & Analysis Corporation (SRAC), division of SolidWorks Corporation, COSMOS/M: http://www.cosmosm.com/pages/products/cosmosm.html

[10] Gehl J, Sorensen TH, Nielsen K, Raskmark P, Nielsen SL, Skovsgaard T, and Mir LM. In vivo electroporation of skeletal muscle: threshold, efficacy and relation to electric field distribution. *BBA-General Subjects* 1999; 1428(2-3); 233-240.

[11] Panescu D, Kroll MW and Stratbucker RA. Theoretical possibility of ventricular fibrillation during use of TASER neuromuscular incapacitation devices. *Conf Proc IEEE Eng Med Biol* Soc 2008; 2008: 5671-4.

[12] Panescu D, Kroll MW, Efimov IR and Sweeney JD. Finite element modeling of electric field effects of TASER devices on nerve and muscle. *Conf Proc IEEE Eng Med Biol* Soc 2006; 1: 1277-9.

Authorized licensed use limited to: University of Minnesota. Downloaded on November 30, 2009 at 16:08 from IEEE Xplore. Restrictions apply.

Downloaded from http://ahajournals.org by on January 15, 2025

# Electrical Carotid Baroreceptor Stimulation in Resistant Hypertension

Giuseppe Mancia, Gianfranco Parati, Alberto Zanchetti

Resistant hypertension, as identified when administration of a thiazide diuretic plus $\geq 2$ other antihypertensive drugs, all at full doses, fails to control an elevated blood pressure, is by no means a minor clinical problem. According to recent publications,[1] the number of individuals falling into this category is ≈15% to 20% of the overall hypertensive population. Given the high prevalence of hypertension, this translates into a figure of several million patients per major country and of more than a hundred million patients worldwide.

Several therapeutic approaches have been proposed to enhance the size of blood pressure reduction in resistant hypertension and possibly to achieve, in a noticeable fraction, blood pressure control. One approach is to add to the existing multidrug regimen an antialdosterone agent,[2] thereby more effectively blocking the sodium-retaining properties of this hormone, the release of which escapes to a significant degree the effect of the blockers of the renin-angiotensin system (angiotensin-converting enzyme inhibitors and angiotensin receptor antagonists) presently available.[3] Another approach is to complement the usual multipharmacological treatment strategy with the vasodilator influence of the antagonists of endothelin receptors, which, indeed, seems capable of adding a further blood pressure reduction to any previous therapeutic effect.[4]

A third approach is to resort to invasive procedures that can reduce the pressor or increase the depressor influences that physiologically modulate blood pressure. The invasiveness of this approach is ethically justified by the very high cardiovascular risk that characterizes the resistant hypertension condition.[5] A reduction of the pressor influences can be obtained by denervating the kidneys through a radiofrequency generator positioned in the renal arteries through a percutaneously inserted catheter,[6] because afferent fibers originating in the kidney exert sympathoexcitatory effects that can increase blood pressure,[7] and removal of efferent sympathetic influences lowers overall total body norepinephrine spillover[6] and reduces vasoconstriction in a region that accounts for a considerable proportion of systemic vascular resistance. An enhancement of the depressor influences can be obtained via the sympathoinhibitory effects of continuous "field" electric stimulation of the carotid baroreceptors via devices permanently placed around the carotid bifurcations.[8] For either approach, the pathophysiological rationale is made even more compelling by the evidence that sympathetic activity increases progressively with the increase in the severity of hypertension[9] and that a sympathoexcitatory state is especially pronounced in individuals in whom blood pressure control is particularly difficult, such as in isolated systolic hypertension,[10] and in hypertension associated with obesity,[11] particularly when obesity is accompanied by obstructive sleep apnea.[12] Furthermore, use of electric baroreceptor stimulation is supported by the evidence that, in hypertension, the baroreflex undergoes a "resetting" that avoids baroreceptor saturation, thus preserving the reflex ability to cause vasodilatation and decrease blood pressure in response to an increase in its activity. This can be appreciated in the Figure, left panel, which shows the pressor and depressor responses (intra-arterial blood pressure measurements) to carotid baroreceptor deactivation and stimulation, respectively, obtained via the neck chamber technique in normotensive, moderate, and severe hypertensive patients.[13] It can be further appreciated in the Figure, middle panel, which shows the sympathetic responses (microneurography) to arterial baroreceptor deactivation and stimulation obtained, in the same 3 conditions, by reducing and increasing blood pressure with vasoactive drug infusions.[9]

Evidence that field electric stimulation of carotid baroreceptors can lower blood pressure on a chronic basis has been provided in dogs,[14] and observations are available that a blood pressure reduction can also be obtained in resistant hypertensive patients after a use that spans over several months.[15] This background information is expanded by the data reported in the article by Heusser et al[16] published in this issue of *Hypertension*. Several findings of this article deserve to be emphasized. First, continuous electric stimulation of carotid baroreceptors over several months was accompanied by a reduction in 24-hour mean blood pressure. This expands on previous data regarding the persistent effectiveness of this stimulation procedure, the failure of which was responsible for the abandonment of this approach decades ago when it was first used for the treatment of resistant hypertension or intractable angina.[17] It also provides evidence of a chronic depressor response on a variable such as daily life blood pressure that has special importance for patient prognosis.[18] The size of the reduction ($-10/-6$ mm Hg systolic/diastolic blood pressure) was only apparently small if one considers that treatment-induced changes in 24-hour mean blood pressure are normally much smaller than the corresponding

The opinions expressed in this editorial are not necessarily those of the editors or of the American Heart Association.

From the Department of Clinical Medicine and Prevention (G.M., G.P.), University of Milan-Bicocca, Milan, Italy; Department of Cardiology (G.P., A.Z.), Istituto Di Ricovero e Cura a Carattere Scientifico Istituto Auxologico Italiano, Milan, Italy.

Correspondence to Giuseppe Mancia, Clinica Medica, Università Milano-Bicocca, Ospedale San Gerardo, via Pergolesi 33, 20052 Monza, Italy. E-mail giuseppe.mancia@unimib.it

(*Hypertension*. 2010;55:607-609.)

© 2010 American Heart Association, Inc.

*Hypertension* is available at http://hyper.ahajournals.org

DOI: 10.1161/HYPERTENSIONAHA.109.147306

Downloaded from http://ahajournals.org by on January 15, 2025



**Figure.** Left, Progressive reductions and increases in mean arterial pressure (MAP; intra-arterial measurements) in response to progressive increases and reductions in carotid transmural pressure (CTP) obtained via a neck chamber device. The central and right panels show the reductions and increases in muscle sympathetic nerve activity (MSNA) and heart rate (HR) in response to increases and reductions in MAP obtained via infusion of phenylephrine and nitroprussiate. Data refer to mean regression line or mean values (±SE) from normotensive subjects (N), moderate essential hypertensive subjects (MH), and severe essential hypertensive subjects (SH). Data are from References 10 and 13 by permission (modified).

changes in clinic blood pressure.[19] Second, the chronic blood pressure effect was related to the acute blood pressure fall obtained by electrical baroreceptor stimulation at a much earlier time, which gives hope that one might predict the long-term success of the procedure by earlier laboratory testing. Third, repeated acute stimulations, delivered 1 month after implantation of the devices, caused a clear-cut blood pressure reduction, as well as a marked inhibition of the outgoing sympathetic activity, as directly quantified in a peroneal nerve by microneurography. This is a relevant result because it shows that the surgical procedure by which the stimulating device is bilaterally implanted does not impair, through scarring, inflammation, or direct baroreceptor damage, the ability of the reflex to exert its sympathetic and vasomotor modulation. Additional support for this conclusion comes from the data provided by the sequence technique that, 1 month after the device implantation, the baroreflex was capable of modulating heart rate in response to spontaneous blood pressure changes, thereby subserving its role as a blood pressure stabilizer.

The study of Heusser et al[16] has 2 additional intriguing results, as well as some limitations. It is intriguing that, although significant, the relationship between the reduction in blood pressure and the reduction in sympathetic activity induced by acute baroreceptor stimulation showed a relatively low correlation coefficient ($r^2$=0.42; $P$<0.05). This might mean that the sympathetic activity recorded in the peroneal nerve does not precisely represent the overall sympathetic influences of the baroreceptors. It may also mean, however, that nonsympathetic influences are involved in the blood pressure reduction. What these influences could be, however, it is not easy to imagine, because acute baroreceptor stimulation was associated with only a modest bradycardia and no significant changes in the spectral indices of heart rate variability, suggesting that a reduction in cardiac

output was unlikely. There was, on the other hand, a significant, albeit not marked, reduction in plasma renin concentration, which is compatible with the possibility that a deactivation of the renin-angiotensin system plays a role. It is also intriguing that the baroreceptor stimulation had a much greater effect on sympathetic drive than on cardiac functions. As discussed by the authors,[16] this may reflect an impairment of the baroreflex ability to modulate cardiac vagal, although not sympathetic, control. Indeed, this is supported by studies in experimental and human hypertension. Compared with Wistar Kyoto rats, in spontaneously hypertensive rats, an increase in blood pressure induced by infusion of norepinephrine was found to cause an equally marked sympathetic inhibition but a much smaller bradycardia.[20] Similarly, compared with normotensive subjects, in moderate and severe essential hypertensive patients, increases and reductions in blood pressure induced by infusion of, respectively, vasopressor and vasodepressor drugs were found to be accompanied by progressively smaller changes in heart rate, whereas the changes in sympathetic activity were superimposable in the 3 conditions[9] (Figure, middle and right panels). Incidentally, the reduced cardiac response to baroreflex stimulation is clinically advantageous, because a reduced cardiac output (eg, what happens with β-blockers) is associated with adverse effects, such as fatigue and limited exercise tolerance.[21]

The limitations of the study by Heusser et al[16] concern its small size and the timing of the acute baroreflex testing. Because the study included only 12 patients, generalization of the results to the effect of electrical baroreceptor stimulation in the large number of individuals with resistant hypertension is difficult. This is even more the case because the characteristics of the patients with resistant hypertension are extremely heterogeneous and, within the small group of patients included in the study, the responses to baroreceptor stimulation were so different as to range from a marked reduction to

Downloaded from http://ahajournals.org by on January 15, 2025

an increase in blood pressure and sympathetic activity. Furthermore, because the baroreflex was not tested immediately after implantation of the stimulating devices, the study lacks a "control" response and, thus, cannot exclude that, although qualitatively preserved, the baroreflex function was somewhat quantitatively altered by the surgical procedure. Finally, because the baroreflex was not acutely tested after the electric stimulus had been applied for months, the study cannot provide information on whether a prolonged intense stimulation may not ultimately result in, via receptor desensitization, alterations in the central integrating processes and/or reduced responsiveness of efferent neurons or effectors in deterioration and loss of its homeostatic role. It will be important to obtain this information in future studies that quantify the responses to acute baroreceptor stimulation before and at various times during the chronic stimulation procedure.

## Disclosures

None.

## References

1. Sarafidis PA, Bakris GL. Resistant hypertension: an overview of evaluation and treatment. *J Am Coll Cardiol*. 2008;52:1749–1757.
2. Chapman N, Dobson J, Wilson S, Dahlöf B, Sever PS, Wedel H, Poulter NR; for the Anglo-Scandinavian Cardiac Outcomes Trial Investigators. Effect of spironolactone on blood pressure in subjects with resistant hypertension. *Hypertension*. 2007;49:839–845.
3. Gumieniak O, Williams GH. Mineralocorticoid receptor antagonists and hypertension: is there a rationale? *Curr Hypertens Rep*. 2004;6:279–287.
4. Weber MA, Black H, Bakris G, Krum H, Linas S, Weiss R, Linseman JV, Wiens BL, Warren MS, Lindholm LH. A selective endothelin-receptor antagonist to reduce blood pressure in patients with treatment-resistant hypertension: a randomized double-blind placebo-controlled trial. *Lancet*. 2009;374:1423–1431.
5. Mancia G, De Backer G, Dominiczak A, Cifkova R, Fagard R, Germanò G, Grassi G, Heagerty AM, Kjeldsen SE, Laurent S, Narkiewicz K, Ruilope L, Rynkiewicz A, Schmieder RE, Boudier HA, Zanchetti A. 2007 Guidelines for the Management of Arterial Hypertension: the Task Force for the Management of Arterial Hypertension of the European Society of Hypertension (ESH) and of the European Society of Cardiology (ESC). *J Hypertens*. 2007;25:1105–1187.
6. Krum H, Schlaich M, Whitbourn R, Sobotka PA, Sadowski J, Bartus K, Kapelak B, Walton A, Sievert H, Thambar S, Abraham WT, Esler M. Catheter-based renal sympathetic denervation for resistant hypertension: a multicentre safety and proof-of-principle cohort study. *Lancet*. 2009; 373:1275–1281.
7. Calaresu FR, Stella A, Zanchetti A. Haemodynamic responses and renin release during stimulation of afferent renal nerves in the cat. *J Physiol*. 1976;255:687–700.
8. Mohaupt MG, Schmidli J, Luft FC. Management of uncontrollable hypertension with a carotid sinus stimulation device. *Hypertension*. 2007;50: 825–828.
9. Grassi G, Cattaneo BM, Seravalle G, Lanfranchi A, Mancia G. Baroreflex control of sympathetic nerve activity in essential and secondary hypertension. *Hypertension*. 1998;31:68–72.
10. Grassi G, Seravalle G, Bertinieri G, Turri C, Dell'Oro L, Stella ML, Mancia G. Sympathetic and reflex alterations in systo-diastolic and systolic hypertension in the elderly. *J Hypertens*. 2000;18:587–593.
11. Grassi G, Seravalle G, Dell'Oro R, Turri C, Bolla GB, Mancia G. Adrenergic and reflex abnormalities and obesity-related hypertension. *Hypertension*. 2000;36:538–542.
12. Grassi G, Facchini A, Quarti Trevano F, Dell'Oro R, Arenare F, Tana F, Bolla GB, Monzani A, Robuschi M, Mancia G. Obstructive sleep apnea-dependent and – independent adrenergic activation in obesity. *Hypertension*. 2005;46:321–325.
13. Mancia G, Ludbrook J, Ferrari AU, Gregoriani L, Zanchetti A. Baroreceptor reflexes in human hypertension. *Circ Res*. 1978;43:170–177.
14. Lohmeier TE, Irwin ED, Rossing MA, Serdar DJ, Kieval RS. Prolonged activation of the baroreflex produces sustained hypotension. *Hypertension*. 2004;43:306–311.
15. Scheffers IJ, Kroon AA, Tordoir JH, de Leeuw PW. Rheos Baroreflex Hypertension Therapy System to treat resistant hypertension. *Expert Rev Med Devices*. 2008;5:33–39.
16. Heusser K, Tank J, Engeli S, Diedrich A, Menne J, Eckert S, Peters T, Sweep FCGJ, Haller H, Pichlmaier AM, Luft FC, Jordan J. Carotid baroreceptor stimulation, sympathetic activity, baroreflex function, and blood pressure in hypertension. *Hypertension*. 2010;55:619–626.
17. Brest AN, Wiener L, Bachrach B. Bilateral carotid sinus nerve stimulation in the treatment of hypertension. *Am J Cardiol*. 1972;29:821–825.
18. Sega R, Facchetti R, Bombelli M, Cesana G, Corrao G, Grassi G, Mancia G. Prognostic value of ambulatory and home blood pressures compared with office blood pressure in the general population. follow-up results from the Pressioni Arteriose Monitorate e Loro Associazioni (PAMELA) Study. *Circulation*. 2005;111:1777–1783.
19. Mancia G, Parati G. Office compared with ambulatory blood pressure in assessing response to antihypertensive treatment: a meta-analysis. *J Hypertens*. 2004;22:435–444.
20. Ricksten SE, Thoren P. Reflex control of sympathetic nerve activity and heart rate from arterial baroreceptors in conscious spontaneous hypertensive rats. *Cli Sci (Lond)*. 1981;61:169s–172s.
21. Ko DT, Hebert PR, Coffey CS, Sedrakyan A, Curtis JP, Krumholz HM. β-Blocker therapy and symptoms of depression, fatigue, and sexual dysfunction. *JAMA*. 2002;288:351–357.

0022-5282/85/2501-0017$02.00/0
THE JOURNAL OF TRAUMA
Copyright © 1985 by The Williams & Wilkins Co.

Vol. 25, No. 1
*Printed in U.S.A.*

# Cataracts: A Long-term Complication of Electrical Injury

JEFFREY R. SAFFLE, M.D., ALAN CRANDALL, M.D., AND GLENN D. WARDEN, M.D.

The development of cataracts, a well-known complication of electrical injury, remains poorly understood. We reviewed 113 patients suffering major electrical injuries and identified seven patients who suffered 13 cataracts, an incidence of 6.2%. Six of the seven patients were injured with high (>1,000-v) voltage current, while one man was injured by a 440-v source. All patients suffered true 'entrance and exit' wounds, but only three such injuries involved the head or neck. Cataracts first presented as decreased visual acuity 1 to 12 months postinjury. Ten of the 13 cataracts progressed to a point where surgery was required, from 3 to 27 months postinjury. Surgical therapy resulted in excellent return of vision in every case, although one patient was lost to followup and developed a late retinal detachment.

Electrical cataracts remain a serious potential complication of electrical injury. Awareness by burn team members is essential in providing optimal treatment to victims of electrical injury.

Cataracts are an infrequent but well-known complication of electrical injury. St. Yves first described cataract formation following lightning injury in 1722 (9). Cataracts accompanying injury from technical electricity were not reported until 1905, but constitute the majority of reports since that time (1, 6, 7, 9). The etiology, pathology, and clinical characteristics of electrical cataracts have been described in detail in the ophthalmologic literature (1, 4, 6, 7, 9, 10). Reported series of electrical injuries have mentioned a varying incidence of cataract occurrence, but have not described them otherwise (2, 3, 4, 12). The purpose of this report was to review the incidence and characteristics of cataracts in a large population of patients with electrical injuries.

## MATERIALS AND METHODS

**Patient Population.** All patients admitted to the burn center from 1 January 1975 to 30 June 1983 were reviewed. One hundred thirty-four patients were identified who sustained electrical injuries. Of these, 15 patients suffered only flash burns, and six patients died during or shortly following hospitalization. The remaining 113 patients were considered to be at risk for cataracts. Followup of each patient by chart review, mail, and telephone was performed. Seven patients with documented cataracts were discovered, an incidence of 6.2%.

**Electrical Injuries.** Patients who developed cataracts were all male, with a mean age of 24.7 years (Table I). Industrial accidents accounted for the majority of injuries; one adolescent was injured climbing an electrical pole, and one adult was

Presented at the Sixteenth Annual Meeting of the American Burn Association, 11–14 April 1984, San Francisco, California.

From the Departments of Surgery and Ophthalmology, and the Intermountain Burn Center, University of Utah School of Medicine, Salt Lake City.

Address for reprints: Jeffrey R. Saffle, M.D., Department of Surgery, 3B-304, University of Utah Medical Center, 50 North Medical Drive, Salt Lake City, UT 84132.

injured following a motor vehicle accident (MVA) in which his car struck a power pole. All patients but one were injured with high (>1,000-v) voltage current. The exception was an 18-year-old roofer who contacted a transformer with his head while climbing a ladder. Current was believed to be 440 v.

Patients suffered a mean burn size of 17.6% of the total body surface area (TBSA), of which a mean of 12.6% TBSA was full-thickness injury. All patients suffered true 'entrance and exit' type wounds indicative of transmission of electrical current through the body. Only two of the patients, however, suffered such a wound on the head or neck. One man suffered extensive arc or 'splatter' burns from a 69,000-v source. While his head and neck were involved with full-thickness injury, discrete entrance and exit wounds could not be identified.

All these patients were severely injured. Mean hospitalization was 33 days (range, 23–50 days). All patients required multiple surgical procedures to attain wound closure. A total of five amputations was required in three patients. In the other four patients, primary closure and/or excision and split-thickness autografting of burn wounds was necessary.

**Cataracts.** Cataracts were bilateral in six of the seven patients; thus 13 eyes were affected. Cataracts were detected when complaints of decreased visual acuity prompted ophthalmologic consultation. This occurred at a mean time of 3.85 months postinjury (range, 1–12 months).

On initial ophthalmologic exam, cataracts were visible as collections of opacities located primarily in the anterior subcapsular area of the lens. In six of the 13 eyes, posterior subcapsular opacities were also noted (46%). When initially seen, cataracts were usually not dense, and visual acuity was only moderately impaired. Cataracts were followed conservatively for a mean of 10 months (range, 2–25 months). During this period ten of the cataracts demonstrated progressive consolidation and thickening of opacities, and gradually deteriorating vision which were judged to require surgical repair (Fig. 1). Three eyes showed only minimal initial changes which failed to progress, and surgery was not performed.

Surgical repair of cataracts was performed in nine eyes (one patient is awaiting repair of his second eye). In six cases, extracapsular extraction with lens implantation was performed, while three cataracts were treated by phakoemulsification

TABLE I
Characteristics of electrical cataracts

| Patient No. | Age (yrs) | Etiology of Injury | Voltage | Burn Size (% TBSA) | | Entrance and Exit Wounds | Length of Stay (days) | Surgery | Location of Cataracts | Interval | | Visual acuity | |
| | | | | Total | 3rd deg. | | | | | Injury/dx | Injury/surg. | Before Repair | After Repair |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 13 | Climbing electric pole | 7,200 | 21 | 4 | Shoulder/feet face; flash only | 24 | E/G only[1] | OD[2]-ASC/PSC[3] OS-ASC/PSC | 12 mo | 20 mo, not repaired | 3/400 20/25 | 20/20 |
| 2 | 22 | Industrial | "high" | 17.5 | 8.5 | Elbow/knees, face; flash only | 24 | E/G only | OD-ASC OS-ASC | 1 mo | 9 mo, pending | 20/60 20/40 | 20/20 — |
| 3 | 25 | Industrial | 69,000 | 42 | 42 | Diffuse arc; head involved | 50 | E/G only | OD-ASC OS-none | 8 mo | 15 mo — | 20/70 — | 20/25 — |
| 4 | 18 | Industrial | 440 | 3.5 | 2.5 | Occiput/feet | 26 | E/G, closure | OD-ASC OS-ASC/PSC | 1 mo | Not repaired, 5 mo | 20/30 20/200 | — 20/30 |
| 5 | 19 | MVA | 14,000 | 8.5 | 1.5 | Cheek/foot | 23 | E/G, BKA[4] | OD-ASC OS-ASC | 1 mo | 5 mo, 3 mo | 20/80 20/100 | 20/25 20/25 |
| 6 | 39 | Industrial | 32,000 | 16 | 9 | Left hand/left foot. Head not involved | 30 | Forearm amputation, BKA | OD-ASC/PSC OS-ASC/PSC | 2 mo | 27 mo, 19 mo | 20/80 20/80 | 20/20 20/20 |
| 7 | 37 | Industrial | 32,000 | 15 | 11 | Right hand/right foot. Head not involved | 49 | Forearm amputation, BKA | OD-ASC OS-ASC/PSC | 2 mo | Not repaired, 14 mo | 20/25 20/60 | — 20/15 |
| | 24.7 | | | 17.6[5] | 12.6[5] | | 33.6[5] | | ASC-7 ASC/PSC-6 | 3.85 mo[5] | 11.9 mo[5] | | |

[1] E/G—excision and split-thickness autografting
[2] OD—right eye; OS—left eye
[3] ASC—cataract involved anterior subcapsular area of lens; PSC—cataract involved posterior subcapsular area of the lens
[4] BKA—below-knee amputation
[5] Numbers represent mean values



FIG. 1. Typical electrical cataract viewed under the slit lamp. Collections of whitish opacities are apparent within the anterior subcapsular area of the lens, and are most dense centrally.

alone. Initial results were excellent in every case, with corrected vision of 20/15 to 20/30. One patient redeveloped opacities in the posterior capsule 2 weeks following his repair; these were treated by ocutome removal, and his vision has since remained good.

The insertion of an intraocular lens (I.O.L.) in the age groups most frequently encountered, i.e., under 40 years, remains controversial and was based on many factors. Often the eyelids develop cicatrization which precludes the use of a contact lens, and therefore an I.O.L., especially in a unilateral case, represents the only effective means of optical recovery.

Long-term followup revealed continued good vision in every case but one. This 13-year-old boy initially underwent repair of a right eye cataract with good results, but was then lost to followup. He apparently refused to wear his contact lens and, because his left eye had only a minimal cataract and did not require repair, the coincidental development of a retinal detachment went unnoticed until he presented approximately a year later with near complete blindness in the eye.

## DISCUSSION

Although cataracts have been a recognized complication of electrical injury for 250 years, they remain a poorly understood phenomenon. The propensity for cataract formation appears to depend partially on the magnitude of the initial electrical injury, a fact which helps explain the wide variation in incidence reported from burn centers. Skoog reported one patient with cataracts of 141 patients with electrical injuries, an incidence of 0.7%. However, 40% of these injuries were from sources of 280 v or less (11). Baxter observed a 27% incidence of cataract formation in 25 patients injured by currents in excess of 5,000 v (2). The present study reviewed patients with wounds from a wide range of voltages, although most were in excess of 1,000 v. The incidence of cataracts that we found was identical to that of Solem et al., who noted cataracts in four of 64 similar patients (12). The best known example of voltage-related damage is lightning injuries, in which millions of volts of direct current are produced. Some form of eye damage can be found in up to 50% of survivors of lightning strikes (4). However, high voltage is not always necessary to induce electrical

cataracts. In experimental studies, Long was able to produce cataracts consistently in rabbits by the application of as little as 14 volts directly across the globe, with relatively high current flow (approximately 145 ma). Clinically, cataracts have been described following contact with as little as 220 volts. In every such instance, the electrical contact produced true entrance and exit wounds, indicating passage of current through the body, frequently with other extensive damage as was the case in one of our patients (9). The occurrence of such electrical transmission appears to be the one invariable prerequisite for cataract formation. High resistance to electrical current transmission occurs primarily at the skin; once skin resistance is overcome, current flow through the rest of the body is relatively unimpeded, and high amperage can be observed (8, 11). It may be, therefore, that the high voltages usually associated with electrical cataracts are necessary only to overcome skin resistance and permit current flow through the eye. Injuries from current sources below 500 v rarely produce this effect and thus rarely cause cataracts.

Previous reports have also emphasized the association between entrance wounds of the head and neck and subsequent development of cataracts. In a review of 70 early case reports, such injuries were almost invariably present (9). Baxter also noted this relationship, but stated that head or neck entrance wounds were not necessary for cataract formation (2). The patients reviewed here all suffered extensive injuries as the result of electrical contact, but only three patients had full-thickness injuries of the head or neck. While such wounds would increase the likelihood of current transmission across the eye, the path taken by current is often not a direct one, and significant flow of current through the eye can apparently occur even with distant entrance and exit wounds.

The above information suggests that any patient who suffers a 'true' electrical injury should be considered at risk for subsequent cataract formation. What other factors influence cataract development remain unclear. In reviewing 113 apparently 'high-risk' patients (high-voltage injuries, many with head or neck wounds), we were unable to identify other factors which appear to predispose to or protect from cataract formation. Cataracts have not been described as a complication of electroconvulsive therapy, despite the use of voltages similar to those in Long's experiments, and obvious direct transmission of current through the head. Why cataracts do not develop in these patients remains unclear.

In the present series, six of seven patients developed bilateral cataracts, a frequency which has been observed previously. This does not appear to be a sympathetic effect, since in animal experiments, cataracts developed only in those eyes actually exposed to current transmission (9).

The morphologic changes which evolve in the lens and capsule following exposure to electrical current have been

described from both experimental and clinical material (1, 8, 9). Within hours of injury, collections of small vacuoles appear in the subcapsular area, often in the midperiphery. These collections are always present in the anterior subcapsular area, and show no apparent relationship to lens fiber configuration. In cases in which there is an adjacent entry wound, vacuoles are sometimes isolated to that area of the lens nearest the wound. Over a variable period of time ranging from weeks to months, these vacuoles are replaced with flakelike opacities which coalesce and migrate into the line of vision. In animal experiments this process was essentially complete within 2 months of injury, but in clinical reports the maturation of cataracts, and the progression of visual loss, are more variable. Most patients develop initial loss of vision within 12 months of injury, with progressive worsening over the subsequent 1 to 3 years. Cataract formation as long as 11 years following injury has been reported (11).

The changes described above are usually limited to the anterior subcapsular area of the lens, but many injured eyes develop similar findings in the posterior portion of the lens as well. It has previously been suggested that posterior subcapsular cataracts are found primarily following lightning injuries, possible representing reaction to the extremely high voltage of lightning, or response to direct current, which is known to be more damaging to the eye (9, 10). In our patients, posterior subcapsular cataracts were seen in six of the 13 eyes. Their presence did not appear to relate to the magnitude of the injury, nor to the severity of the cataract formation.

Three of the 13 cataracts reviewed here did not progress to a point at which surgery was required. It is unknown what the true incidence of these minor abnormalities may be, since it is unlikely that such patients would ordinarily seek medical attention. Long (9) reported clinical and experimental examples in which cataract maturation does not progress following the initial appearance of vacuoles. However, most of the 64 rabbit eyes subjected to electrical current did develop cataracts. Fraunfelder and Hanna (6) reported 17 cases in which subcapsular opacities were observed shortly following electrical injuries. Fourteen of these developed clinical cataracts which required repair (82%). It appears likely, then, that most electrically injured eyes do go on to develop mature cataracts.

Despite the above studies, the exact pathophysiology of electrical cataracts remains obscure. Tissue damage from electricity is postulated to be due to heat generated by the passage of current through tissues which have electrical resistance. This could well contribute to cataract formation, but does not appear to be necessary, since Long was able to produce cataracts consistently in rabbits without changing the measured temperature within the globe (9). His experimental model also produced no radiation, which has been implicated as a causative mechanism for cataracts. Electrical current can cause damage to the cornea (7), but this would not explain the

consistent appearance of lesions within the lens. In electron micrographs of electrical cataracts, Hanna and Fraunfelder noted that cataracts begin as an area of cell division and mitosis, similar to that observed in traumatic cataracts, and likened by the authors to neoplasms (7).

The clinical significance of electrical cataracts is obviously great. Visual disturbances persisting or presenting after electrical injury can be a major source of morbidity and disability which is initially overlooked, but which returns to plague the patient. While surgical correction of electrical cataracts is highly successful, the tragic case of monocular blindness in this series emphasizes the need for conscientious followup of all patients. In compiling data for this report, we found that visual difficulties were rarely mentioned in charts, even in those patients with cataracts. Many patients contacted in our review were surprised to learn that cataracts could arise following electrical injury, and several patients requested followup eye exams. This lack of awareness on the part of burn team members and patients alike might partially explain the great discrepancy in observed frequency of this complication in large series. Continued awareness of this potential complication is essential to the appropriate followup of all patients with electrical injury.

## CONCLUSIONS

Based on this review, the following conclusions can be drawn:

1) Cataracts have the potential to develop in any patient who suffers 'true' electrical injury, regardless of voltage. Patients injured from extremely high voltages, or lightning, and patients whose entrance wounds are adjacent to the eye, may be at increased risk for cataract formation.

2) The true incidence of electrical cataracts is unknown, but probably varies between 5 and 20% of high-risk patients.

3) Before the development of clinical cataracts, changes are present within the eye which predict their development. Routine screening of high-risk patients should be considered.

4) Cataracts are frequently bilateral.

5) Cataracts may become clinically significant at any time from days to years following electrical injury.

6) Response to surgical repair of electrical cataracts is almost uniformly good.

7) Continued awareness of this complication by all members of the burn team is essential in assuring prompt diagnosis and treatment of electrical cataracts. Education of patients and their families should be a routine part of the care of electrical injuries.

REFERENCES

1. Adam, A. L., Klein, M.: Electrical cataract: Notes on a case and review of the literature. *Br. J. Ophthalmol.,* **29:** 169–175, 1945.

2. Baxter, C. R.: Present concepts in the management of major electrical injury. *Surg. Clin. No. Amer.*, **50:** 1401–1408, 1970.

3. Burke, J. F., Quinby, W. C., Bondoc, C., et al.: Patterns of high tension electrical injury in children and adolescents and their management. *Am. J. Surg.*, **133:** 492–497, 1977.

4. Castren, J. A., Kytila, J.: Eye symptoms caused by lightning. *Acta Ophthalmol.*, **41:** 139–143, 1963.

5. DiVicenti, F. C., Moncrief, J. A., Pruitt, B. A.: Electrical injuries: A review of 65 cases. *J. Trauma*, **9:** 497–507, 1969.

6. Fraunfelder, F. T., Hanna, C.: Electric cataracts: I. Sequential changes, unusual and prognostic findings. *Arch. Ophthalmol.*, **87:** 179–183, 1972.

7. Hanna, C., Fraunfelder, F. T.: Electric cataracts: II. Ultrastructural lens changes. *Arch. Ophthalmol.*, **87:** 184–191, 1972.

8. Hunt, J. L., Mason, A. D., Masterson, T. S., et al.: The pathophysiology of acute electrical injuries. *J. Trauma*, **16:** 335–340, 1976.

9. Long, J. C.: A clinical and experimental study of electrical cataract. *Trans. Am. Ophthalmol. Soc.*, **60:** 471–516, 1962.

10. Noel, L. P., Clarke, W. N., Addison, D.: Ocular complications of lightning. *J. Pediat. Ophthalmol. Strabismus*, **17:** 245–246, 1980.

11. Skoog, T.: Electrical injuries. *J. Trauma*, **10:** 816–830, 1970.

12. Solem, L., Fischer, R. P., Strate, R. G.: The natural history of electrical injury. *J. Trauma*, **17:** 487–491, 1977.

# Cataract secondary to electrical shock from a Taser gun

Rajeev K. Seth, MD, Gelareh Abedi, MD, MS, Armand J. Daccache, MD, James C. Tsai, MD

A 35-year-old man presented with traumatic iritis, angle-recession glaucoma, and a retinal dialysis secondary to blunt trauma from a Taser gun in the right eye and a unique electrical cataract in the left eye. Taser guns, which can also function as stun guns, can lead to electrical cataract formation. Given the increasing use of Taser guns by law enforcement and citizens, blunt mechanical and electrical sequelae of Taser gun injuries should be recognized.

*J Cataract Refract Surg 2007; 33:1664–1665 © 2007 ASCRS and ESCRS*

Taser and stun guns are used increasingly by law enforcement and citizens to restrain a violent or aggressive person. They can be carried legally (concealed or open) without a permit in 43 states in the United States and are not available for private citizen defense in several states (District of Columbia, Hawaii, Massachusetts, Michigan, New Jersey, New York, Rhode Island, and Wisconsin). We report a case of a patient who sustained blunt trauma to the right eye and an electrical cataract in the left eye from injuries caused by a Taser gun.

## CASE REPORT

A 35-year-old man presented with decreased visual acuity in both eyes. Six days before the initial evaluation, he was "Tasered" in the face and forcefully restrained by the police. The best corrected visual acuity was 20/50 in the right eye and 20/100 in the left eye. Pupil reactions, confrontational visual field, and ocular motility were within normal limits. The intraocular pressure (IOP) was 48 mm Hg in the right eye and within normal limits in the left eye. Periocular ecchymosis was present on the right eye, and minor skin burns were noted on the left upper eyelid.

Slitlamp examination revealed subconjunctival hemorrhage and significant anterior chamber reaction in the right eye; the lens was clear. The left lens had an anterior subcapsular opacity (Figure 1); there were also significant anterior and posterior cortical changes, with a posterior subcapsular component best visualized on retroillumination (Figure 2). Gonioscopy revealed angle recession in the right eye. A localized retinal dialysis extending from 11 o'clock to 1 o'clock was seen in the right eye, with adjacent retinal hemorrhage. Ultrasound examination of the left eye, performed because of a dense cataract, showed an intact globe with clear vitreous and a flat retina. The retinal dialysis in the right eye was successfully repaired with pneumatic retinopexy and cryotherapy; the final visual acuity was 20/20. The IOP was controlled with timolol, dorzolamide, and brimonidine drops. The patient was lost to follow-up before cataract extraction could be performed in the left eye.

## DISCUSSION

A Taser gun fires 2 probes that are connected to the weapon by a conductive wire and deployed from a cartridge at the end of the gun. When these probes make contact with skin or clothing, they transmit short-duration (fraction of a millisecond) electrical

Accepted for publication April 19, 2007.

From the Department of Ophthalmology and Visual Science, Yale University School of Medicine, New Haven, Connecticut, USA.

No author has a financial or proprietary interest in any material or method mentioned.

Supported by an unrestricted grant from Research to Prevent Blindness, Inc., New York, New York, USA.

Corresponding author: James C. Tsai, MD, Yale Eye Center, PO Box 208061, New Haven, Connecticut 06520-8061, USA. E-mail: james.tsai@yale.edu.



**Figure 1.** Photograph of the left lens showing an anterior subcapsular opacity with visible anterior cortical changes.

0886-3350/07/$—see front matter
doi:10.1016/j.jcrs.2007.04.037



**Figure 2.** Retroillumination of the left lens showing significant anterior and posterior cortical changes with a posterior subcapsular component.

pulses of 50000 volts through the conductive wire and into the target's body through up to 2 inches of clothing for up to 5 seconds. The guns can project the probes up to 25 feet at a speed of up to 160 ft/s. The high-voltage, low-current electrical pulse incapacitates the target by causing uncontrollable skeletal muscle contraction along with the effects of pain and exhaustion. The gun can be used as a stun gun if the cartridge containing the probes is disconnected from the end of the Taser gun or if direct contact is made with the target once the probes have been deployed.[1,2]

Ocular findings associated with electrical injury include damage to almost any part of the eye. Findings include eyelid injury, mydriasis, iritis, cataract, macular cysts, and optic neuritis.[3] Cataract formation is known to be a common result of severe electric shock, occurring in as many as 5% of patients with injuries above the neck.[4] Electric cataracts have been described as initially presenting with fine subcapsular vacuoles that over time become fine linear opacities that migrate toward the visual axis.[3]

Injuries reported to be secondary to the effects of Taser guns include skin lacerations, mild rhabdomyolisis, testicular torsion, and miscarriage.[5,6] To our knowledge, there have been 2 reports of ocular injuries directly related to Taser guns.[2,7] Both reports involve penetrating injuries secondary to the probes that are discharged from the end of the gun and, therefore, a mechanical injury. The findings in the right eye were suggestive of blunt trauma; ie, periorbital bruises, angle-recession glaucoma, traumatic iritis, and a retinal dialysis. However, the left eye exhibited the cataract and a linear burn across the left eyelid, suggesting that this was the result of an electrical injury. To our knowledge, this is the first case of an injury potentially related to the electrical effects of a Taser or stun gun.

## REFERENCES

1. Bleetman A, Steyn R, Lee C. Introduction of the Taser into British policing. Implications for UK emergency departments; an overview of electronic weaponry. Emerg Med J 2004; 21:136–140
2. Chen SL, Richard CK, Murthy RC, et al. Perforating ocular injury by Taser [letter]. Clin Exp Ophthalmol 2006; 34:378–380
3. Miller BK, Goldstein MH, Monshizadeh R, et al. Ocular manifestations of electrical injury; a case report and review of the literature. CLAO J 2002; 28:224–227
4. Martinez JA, Nguyen T. Electrical injuries. South Med J 2000; 93:1165–1168
5. Mehl LE. Electrical injury from Tasering and miscarriage. Acta Obstet Gynecol Scand 1992; 71:118–123
6. Ordog GJ, Wasserberger J, Schlater T, Balasubramanium S. Electronic gun (Taser®) injuries. Ann Emerg Med 1987; 16:73–78
7. Ng W, Chehade M. Taser penetraing ocular injury. Am J Ophthalmol 2005; 139:713–715



First Author:
Rajeev K. Seth, MD

*Department of Ophthalmology and Visual Science, Yale University School of Medicine, New Haven, Connecticut, USA*

International Journal of Legal Medicine
https://doi.org/10.1007/s00414-021-02648-2



# Police shootings after electrical weapon seizure: homicide or suicide-by-cop

Mark W. Kroll[1] · Darrell L. Ross[2] · Michael A. Brave[3] · Howard E. Williams[4]

Received: 27 May 2021 / Accepted: 18 June 2021
© The Author(s), under exclusive licence to Springer-Verlag GmbH Germany, part of Springer Nature 2021

## Abstract

**Purpose** Risks of handheld electrical weapons include head impact trauma associated with uncontrolled falls, ocular probe penetration injuries, thermal injuries from the ignition of volatile fumes, and weapon confusion police-involved shooting. There is also an uncommon but critical risk of a shooting after a subject gained control of an officer's electrical weapons.

**Methods** The authors searched for police shooting incidents involving loss of control of TASER® weapons via open-source media reports, crowd-sourced internet sites, litigation filings, and a survey of Axon law-enforcement master instructors.

**Results** The authors report 131 incidents of subjects attempting to or gaining control of an officer's electrical weapon from 2004 to 2020, 53 of which resulting in a shooting. These incidents demonstrated a risk of 11.8 shootings per million electrical weapon discharges (95% confidence limits of 9.0 to 15.1 per million by Wilson score interval).

**Conclusions** The use of electrical weapons presents a rare but real risk of injury and death from a shooting following a subject's attempts to gain control of the weapon.

**Keywords** CEW · Electrical weapon · Firearm · Gunshot injury · TASER · Weapon retention

## Introduction

Conducted electrical weapons (CEWs) are the most used law-enforcement intermediate-force options. The use of CEWs reduces the rate of subject injury requiring medical attention by about 80% and subject fatalities by about 2/3 [1–3]. Engineers designed the short-duration pulses to stimulate motor neurons, to cause loss of regional muscle control, and, thus, to facilitate capture, control, and restraint of subjects perceived as an immediate threat or flight risk [4–6]. Although researchers have examined the physiological risks of CEWs for about 20 years, recent research has begun to focus more on the physical risks. As with the use of any force option, there are risks associated with the use of CEWs. These risks include fatalities and serious head injuries from falls, fatalities and serious injuries from volatile fume ignition, and blindness from probe penetrations of the globe of the eye [7–11]. Additionally, there are reports of officers mistakenly discharging their firearms when they intended to deploy their CEWs [12, 13]. This paper explores officer-involved shootings (OIS) that occur after a subject attempts to or gains control of an officer's CEW, a risk thrust conspicuously into public attention following the June 2020 shooting death of Mr. Rayshard Brooks in Atlanta after he gained control of an officer's TASER® X2 CEW, and attempted to flee.

For background, the US statistics are as follows. In 2018, about 61.5 million persons age 16 or older had at least one contact in the prior 12 months with police [14]. From 1990 to 2019, officers on average made about 12,500,000 arrests, decreasing consistently from a high of 14.4 million in 2006 to a low of 10.1 million in 2019 [15]. Research reveals that officers threaten or use force, including pushing, grabbing, handcuffing, hitting, kicking, using chemical or pepper spray, using an electrical weapon, or pointing a gun, in 2.0% of all contacts [14]. Officers use force in response to greater than unresisting handcuffing once in ≈ 1000 officer-civilian

✉ Mark W. Kroll
mark@kroll.name

1. California Polytechnic Institute, San Luis Obispo, CA, USA
2. Valdosta State University, Valdosta, GA, USA
3. LAAW International, LLC, Scottsdale, AZ, USA
4. School of Criminal Justice & Criminology, Texas State University, San Marcos, TX, USA



contacts or calls for service, and discharge a CEW once in ≈ 3250 cases [16]. Furthermore, research shows that an officer uses a force option in response to the type of subject resistance encountered [17, 18].

Over 2004–2019, 774 officers per year were feloniously killed in the USA; 97.8% were killed with a firearm and 42 (5.4%) were killed when subjects overcame them and shot the officers with their own firearms. During that same period, on average, about 55,800 US officers were assaulted annually while performing their duties (a rate of approximately 10.6 assaults per 100 officers). On average each year, about 15,600 of those assaults, or 28%, resulted in officers sustaining injuries. During assaults that resulted in injuries to these officers, subjects used knives or other cutting instruments in 1.8%, firearms in 4%, and other dangerous weapons in 15%. In approximately 80% of assaults resulting in injuries to officers the subject used personal weapons, such as hands or feet [19].

These statistics demonstrate why, to protect themselves and others, officers are trained to approach subjects cautiously, and assess their surroundings and the subject, and employ tactics appropriate to the potentially changing dynamics of the situation. The incidents reported in this study underscore the importance of understanding force option capabilities and risks, the significance of weapon retention regardless of the nature of the contact, and the potential dangers officers face during confrontations with non-cooperative subjects, and demonstrate how rapidly a situation can escalate to an aggravated assault against officers and innocents.

## Methods

We constructed a database of CEW retention incidents by searching open-source media reports, crowd-sourced internet sites, and court filings. Additionally, we surveyed all 1112 master instructors in the Axon Enterprise, Inc. (né TASER) database, and 363 returned the survey. The responding instructors covered more than 33% of CEW-adopting law enforcement agencies as many smaller agencies share the same master instructors. We believe these responders had knowledge of most of the dramatic incidents in their agencies. The survey results were cross-referenced to the database to eliminate duplications. Although the survey results added some case details (not available in open-source research), it revealed no previously unknown incidents. We located 131 reports of subjects attempting to or seizing officers' CEWs: 124 in the USA, 2 in Australia, 2 in England, 2 in Wales, and 1 in Canada. A total of 53 of those incidents

led to an OIS (See Table 1, Summary of incidents, for a brief synopsis of the incidents).

## Results

From 2004 to 2020, we confirmed 53 cases of CEW weapon-retention shootings. During the same time, there were 4.5 million law-enforcement CEW field discharges worldwide, yielding a demonstrated risk of 11.8 OIS per million CEW discharges (95% confidence limits of 9.0–15.1 per million by Wilson score interval) [20]. There were 48 *fatal* injuries suggesting a risk of approximately 10.6 per million (confidence limits of 8.0–14.1 per million). We found 5 *non-fatal* injury cases giving a risk of 1.1 per million (confidence limits of 0.5–2.6 per million).

All of the shooting cases were from the USA.

These calculations used a denominator of total field CEW *discharges*, but those discharges represent the minority of field CEW uses. The majority of field uses are in non-discharge presentation compliance mode (e.g., drawing, pointing, "red-dotting," LASER painting, arcing, or mere presentation) [21].

Of course, it is not necessary for an officer to discharge a CEW for a subject to attempt to seize or gain control of the officer's CEW. In 9 cases, the officers' CEWs were seized from their holsters. In 17 cases (including the 9 holstered CEWs), the officers did not discharge the CEWs. In 3 events, we were unable to ascertain whether a CEW discharge had occurred. Thus, the denominator universe is not a perfect match for the numerators used. Consequently, the risks listed above may be overstated, but to what degree we cannot discern. Using the more conservative *numerator* of 33 OIS after a subject attempted to or gained control of a discharged CEW (the 53 discovered incidents minus the 20 incidents in which no CEW discharge occurred or we do not know whether there was a discharge) yields a risk of 7.3 OIS per million CEW discharges (confidence limits of 5.2 to 10.3 per million). Perhaps, a more accurate risk assessment would be calculated with a numerator of all incidents where a subject attempted to or gained control of an officer's CEW followed by an OIS and the denominator of all subject contacts when an officer was equipped with a CEW. However, data to estimate that denominator do not exist. In the USA and Canada, there is 1 CEW discharge per 3300 civilian contacts or calls for service [16].

The subject (person the officer was attempting to control) age was 33.4 ± 9.2 years. The age distribution overlaps the typical CEW-force recipient according to Strote (32.0 ± 10.7) [22]. There were 2 female and 51 male subjects. Twenty-one subjects were White, 16 were Black, 14 were Hispanic, 1 was Oriental, and 1 was Native American. Author HEW maintains a database of fatal OIS from



**Table 1** Summary of incidents

| # | Year | LE agency | State | Age | Sex | Ethnicity | Fatal? | Officer charged | Officers present | Location of CEW | Officer's use | Suspect's use |
|---|------|-----------|-------|-----|-----|-----------|--------|-----------------|------------------|-----------------|---------------|---------------|
| 1 | 2004 | Colorado Springs PD | CO | 19 | M | W | Y | N | 3 | Hand | Deployed | Shocked 2 officers |
| 2 | 2004 | Orange Co SO | FL | 24 | M | B | Y | N | | Hand | Deployed | Struck |
| 3 | 2004 | Florala PD Covington Co SO | AL | 47 | M | B | Y | N | 4 | Hand | Deployed | Shocked |
| 4 | 2006 | Williams PD | AZ | 39 | M | W | Y | N | 1 | Hand | Deployed | None |
| 5 | 2006 | Michigan SP | MI | 28 | M | W | N | N | 1 | Hand | Deployed | None |
| 6 | 2009 | Houston PD | TX | 39 | M | W | Y | N | 1 | Holster | None | Pointed |
| 7 | 2010 | Dallas PD | TX | 19 | M | H | Y | N | 4 | Hand | Drive-stun | Pointed |
| 8 | 2010 | Tucson PD | AZ | 30 | M | H | Y | N | 2 | Hand | Deployed | Shocked |
| 9 | 2010 | Orange Co SO | FL | 28 | M | H | Y | N | 1 | Hand | Deployed | Shocked |
| 10 | 2011 | Harris Co SO | TX | 33 | M | B | Y | N | 1 | Hand | Deployed | None |
| 11 | 2011 | Las Vegas PD | NV | 35 | M | H | Y | N | 3 | Hand | Deployed | None |
| 12 | 2012 | Oklahoma City PD | OK | 28 | M | W | Y | N | 1 | Hand | Deployed | Shock attempted |
| 13 | 2012 | Grayson County SO | TX | 32 | M | W | Y | N | 1 | Holster | None | None |
| 14 | 2013 | San Diego Co SO | CA | 20 | M | H | N | N | 1 | Hand | Deployed | Deployed |
| 15 | 2013 | Brooklyn Center PD | MN | 24 | M | B | Y | N | 2 | Hand | Deployed | Shocked 2 officers |
| 16 | 2013 | Mobile PD | AL | 37 | M | B | Y | N | 3 | Ground | Deployed | Shocked 2 officers |
| 17 | 2013 | Anderson Co SO | SC | 24 | M | W | Y | N | 2 | Ground | None | None |
| 18 | 2013 | Plumas Co SO | FL | 53 | M | W | Y | N | 1 | Holster | None | Pointed |
| 19 | 2013 | Weed PD Siskiyou Co SO | CA | 32 | M | W | Y | N | 2 | Ground | Deployed | Tried to shock canine |
| 20 | 2013 | Dallas PD | TX | 22 | M | H | Y | N | 2 | Hand | None | Pointed |
| 21 | 2014 | Lexington Metro PD Madison Co SO Kentucky SP | KY | 29 | M | W | Y | N | 8 | Floorboard of suspect's vehicle | None | Pointed |
| 22 | 2014 | Citrus Co SO | FL | 46 | F | W | Y | N | 1 | Holster | None | Pointed |
| 23 | 2014 | Jacksonville SO | FL | 33 | M | B | Y | N | 1 | Hand | Deployed | Pointed |
| 24 | 2014 | Dothan PD | AL | 30 | M | W | Y | N | 3 | Hand | Deployed | None |
| 25 | 2015 | North Charleston PD | SC | 50 | M | B | Y | Y | 1 | Hand | Deployed | Shocked |
| 27 | 2017 | Montville PD | CT | 53 | M | W | Y | N | 2 | Holster | None | Deployed probes |
| 28 | 2017 | Dallas PD | TX | 46 | M | H | N | N | 3 | Hand | Deployed | None |
| 29 | 2017 | Jackson County SO | MO | 31 | M | W | Y | N | 1 | Hand | Deployed | Shocked |
| 30 | 2017 | Volusia Co SO | FL | 37 | M | H | Y | N | 1 | Hand | Deployed | None |
| 31 | 2017 | Homewood PD | AL | 32 | M | W | Y | UNK | 2 | Unknown | Unknown | Shocked |
| 32 | 2017 | Las Vegas PD | NV | 31 | M | W | Y | N | 1 | Equipment bag | None | Pointed |
| 33 | 2018 | Harrison Co SO | TX | 61 | M | B | N | N | 1 | Hand | Deployed | None |
| 34 | 2018 | Miami-Dade PD | FL | 29 | M | B | N | N | 2 | Holster | None | Pointed |
| 35 | 2018 | Volusia Co SO | FL | 29 | M | H | Y | N | 1 | Hand | Deployed | Pointed |



**Table 1** (continued)

| # | Year | LE agency | State | Age | Sex | Ethnicity | Fatal? | Officer charged | Officers present | Location of CEW | Officer's use | Suspect's use |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 2018 | Los Angeles PD | CA | 30 | M | B | Y | N | 2 | Hand | Deployed | Struck |
| 37 | 2018 | Toledo PD | OH | 23 | M | W | Y | N | 2 | Holster | None | None |
| 38 | 2019 | Citrus Co SO | FL | 41 | M | W | N | N | 3 | Hand | None | Shocked |
| 39 | 2019 | Baytown PD | TX | 44 | F | B | Y | Y | 1 | Hand | Deployed | Shocked |
| 40 | 2019 | Dalton PD | GA | 32 | M | W | Y | N | 1 | Hand | Deployed | Shock attempted |
| 41 | 2019 | Dayton PD | OH | 29 | M | B | Y | N | 1 | Hand | Unknown | Unknown |
| 42 | 2019 | Knoxville PD | TN | 33 | M | O | Y | N | 1 | Hand | None | Deployed |
| 43 | 2019 | Los Angeles Co SO | CA | 35 | M | H | Y | P | 1 | Holster | None | Deployed |
| 44 | 2019 | Eugene PD | OR | 41 | M | H | Y | N | 1 | Hand | Deployed | Shocked |
| 45 | 2019 | Arizona DPS | AZ | 25 | M | B | Y | P | 1 | Hand | Deployed | Struck |
| 46 | 2019 | Newport News PD | VA | 43 | M | W | Y | Y | 4 | Hand | Deployed | Deployed |
| 47 | 2020 | Manila PD | AR | 37 | M | W | Y | N | 1 | Holster | None | None |
| 48 | 2020 | Winchester PD | TN | 36 | M | W | Y | P | | Unknown | Unknown | Deployed |
| 49 | 2020 | Houston PD | TX | 27 | M | H | Y | P | 28 | Ground | Deployed | None |
| 50 | 2020 | San Antonio PD | TX | 20 | M | H | Y | P | 1 | Hand | Deployed | Shocked |
| 51 | 2020 | Atlanta PD | GA | 27 | M | B | Y | Y | 2 | Hand | None | Deployed |
| 52 | 2020 | Bexar Co SO | TX | 31 | M | B | Y | P | 3 | Hand | Deployed | None |
| 53 | 2020 | Wolfe City PD | TX | 31 | M | B | Y | Y | 1 | Hand | Deployed | None |



the years 2014–2020 and these were used as a baseline to compare the demographics in this study. There was no statistically significant difference between the race/ethnicity of the subjects shot in our study and OIS fatalities from 2014 through 2020. The Pearson's chi-square with Yates' correction for continuity results are shown in Table 2.

Due to the presence of multiple officers at several incidents and the lack of available officer descriptions in many reports, we were unable to calculate meaningful demographics for the involved officers. For example, although 28 officers were reported present in case #49, demographic information was available for only 4 officers, and that information did not include their ages.

In 35 cases, the subjects wrestled the CEWs from the officers' hands; in 9 cases, the CEW was taken from a holster (8 in belt holsters and 1 in a tactical vest holder); in 5 incidents, the subject picked up the CEW after the officer had dropped it (4 from the ground and 1 from the floorboard of a vehicle); 1 was taken from an unattended equipment bag; and the location was not identified in 3 cases. In 32 incidents, the officer was in the process of attempting to or was using the CEW either by deploying probes or by attempting a drive (contact or touch)-stun.

Having gained control of the CEW, subjects deployed probes toward officers in 9 cases, delivered or attempted to deliver a drive-stun in 5 cases, and aimed a CEW at officers in 10 incidents. In one unusual incident, the subject attempted to drive -stun a police canine. In the remaining 28 cases, the subject did not, or was unable to, use the CEW.

In 42 of the incidents, prosecutors declined to prosecute the officers involved (37 fatal and 5 non-fatal OIS). As of the writing of this paper, 6 incidents were pending criminal charging decisions. In 5 incidents (all fatal OIS), prosecutors brought criminal charges against the officers. In 2 of those cases, the subject seized the CEW but did not use it; in 2 incidents, the subject deployed the weapon but missed the officers; and in a single incident, the subject shocked the officer. To date, only a single incident resulted in a criminal

conviction, a federal civil rights conviction. The other 4 criminal prosecutions were pending disposition.

Due to the sensationalistic nature and litigation potential of such incidents, we do not believe there was significant underreporting of weapon-retention OIS injuries related to CEWs. All of the incidents found involved TASER® brand CEWs. In 3 of the cases, the model number was disclosed: #9 and #25 involved the X26 model and #29 involved the X2. The first 3 cases (#1–3) are presumed to be the M26 model based on the incident dates. Based on the timeframe covered by the other incidents, we estimate that 2/3 of these other cases involved the X26 and X26P models while the remainder were the X2 model.

## Discussion

Officers are often equipped with intermediate-force weapons, commonly referred to as less-lethal weapons, including batons, chemical irritants (usually oleoresin capsicum aerosols), and CEWs. Intermediate-force options potentially can cause serious bodily injuries, and, when used against officers, can render them vulnerable to further assault.

Emerging from these 53 incidents are several components worthy of consideration to enhance weapon retention and, thus, officer safety. "Weapon retention" is the process by which officers secure and maintain possession of their weapons, including items on their duty belts, whether holstered or drawn [23]. Officers are encouraged to expand their thinking about weapon retention to a comprehensive system perspective and not focus exclusively on firearms or CEWs [24]. Officers carry several weapons, restraint implements, and communication devices on their duty belts or vests, and these items often accompany officers in every subject contact. Most agencies require officers to carry CEWs on the side opposite their firearms (contralateral carry), which, during the stress of assault encounters, may reduce accidental draws of firearms [25].

A weapon-retention threat represents a dynamic, rapidly evolving, and potentially violent situation that poses significant risk of harm to officers and others. Maintaining physical and psychological preparedness is vital to officers' survival, and they are encouraged to practice defensive tactics and mental preparation techniques [26].

Officers are taught to be aware of proxemics. The incidents reported in this study demonstrate that a subject can quickly penetrate the distance between the officer and the subject. In cases when an officer is attempting to handcuff or to drive-stun a subject, there is essentially no distance between them. The officer often endeavors to maintain a field interviewing distance of about 2–2.5 m (6–8 ft) from the subject to increase time to potentially recognize and respond to spontaneously developing threats. When subjects attack,

**Table 2** Demographics of cases versus US baseline fatal officer-involved shootings

|  | Overall fatal OIS 2014–2020 | Fatal cases in study | *p* value by chi-square |
| --- | --- | --- | --- |
| White | 3552 | 21 | 0.25 |
| Black | 1832 | 16 | 0.48 |
| Hispanic | 1383 | 14 | 0.22 |
| Other | 274 | 2 | 0.29 |
| UNK | 293 | 0 | 0.29 |
| Male | 7016 | 51 | 0.89 |
| Female | 318 | 2 | – |



officers are hindered by their reaction times, and increasing the distance from the subjects may provide officers more time to respond [26, 27]. Simultaneously, officers are taught to maintain awareness of their stance, the positions of their hands, and what behavioral cues they may be signaling to the subject. Using the field interview stance and keeping their hands near their belt lines and their elbows near their firearms and CEWs as they interact with subjects may increase their ability to protect their weapons and enhance their safety.

Officers are instructed to be alert to pre-assault indicators including subjects' body dynamics [23, 28, 29]. Contextual assault cues can include subjects making overt glances at the officers' belts and weapons, a shift in the subject's stance and shoulders, non-compliance to officers' commands and directions, scanning the surroundings, changes in facial expressions, positioning of hands, clenching fists, bracing, positioning to attack or flee, and moving closer to the officers' position, to mention a few.

Officers have many choices of holsters, and higher retention levels may make it more difficult for subjects to disarm them. However, often, the trade-off for higher retention is increased time to draw the weapon from the holster. Regardless of the holster choice, officers are encouraged to consistently practice drawing their weapons, weapon transitioning, and maintaining weapon awareness [22, 30].

An officer's force response technique [22, 30] is often premised on the perceived dynamics of the subject's attack. Many current training programs instruct officers on how to retain their weapons. Traditional tactics of protecting firearms may assist in also protecting the CEW: (1) using the non-dominant hand to deflect the subject's attempt to grab a weapon, (2) covering the weapon with the elbow, (3) creating distance from the subject, (4) using the dominant hand to stabilize the weapon, and (5) aggressive delivery of kicks and strikes. Officers are often instructed to turn their bodies so their weapons are away from the subject. That tactic is often not viable, to protect CEWs, which officers often carry on the side opposite their firearms, because to do so would expose the firearm to possible attack.

## Legal implications

Officers are required to employ force in strict adherence to well-established frameworks of law, policy, training, warnings, standards, and accountability oversight. They cannot use deadly force once a threat has abated [31]. Subjects who attempt to or who gain access to or control of officers' intermediate weapons, including CEWs, are not bound by such restrictions. Unfortunately, court decisions on officers' use of deadly force—once a subject has gained possession of a CEW—are often confusing and contradictory.

Officers are well-trained on the CEW risks by manufacturer's warnings, explained and demonstrated in training, and guided by policy. They are well aware of significant risks to the trained officer — even without probes — such as shocking sensitive areas of the body and serious eye injury, including permanent vision loss from the 2 LASER sights [32]. Officers also know that they — as opposed to the usually drug-anesthetized subjects — will experience the full pain of any CEW discharge which they recall from their training.

We did not find any court decisions, on this issue, from the UK, Canada, or Australia, and thus the following are all from US courts. In *State v. Carter*, the Kansas Supreme Court ruled that a woman who had brandished a handheld stun gun to commit an aggravated robbery employed a deadly weapon, even though she did not discharge the weapon or use it on anyone [33]. In *Eberhart v. State*, the Georgia Supreme Court ruled that the repeated use of a TASER CEW in drive-stun mode, even absent visible wounds at autopsy, constitutes the use of deadly force [34]. However, officers cannot reliably depend on justifying their use of deadly force by claiming that the subjects' use of the CEW against them invariably constitutes the use of deadly force. Of course, law and judicial interpretation of law fluctuate depending on jurisdiction.

In *State v. Copeland* [35], the Georgia Supreme Court clarified its position:

> As we have previously held, a TASER can be considered a deadly weapon in certain circumstances, see *Eberhart v. State*, 307 Ga. 254, 261 (2) (a) (835 SE2d 192) (2019), and whether the use of a TASER (or, for that matter, any other object or device) constitutes a use of force that is intended or likely to cause death is a case-by-case determination that must account for how the device is used, how many times and for what duration, and under what circumstances. Even common objects that are not normally considered to be weapons (much less deadly weapons) can be employed in such a manner as to make them lethal. See, e.g., *Ballin v. State*, 307 Ga. 494, 495 (837 SE2d 343) (2019) (defendant used decorative statue to bludgeon victim to death); *Dasher v. State*, 285 Ga. 308, 311 (3) (676 SE2d 181) (2009) (evidence was sufficient to show that defendants' hands and feet were used as deadly weapons).

In a ruling denying of a defendant county's motion for summary judgement, a Texas federal district court found that a deputy was trained on the use of a TASER CEW only once, 6 years before a fatal OIS incident, and that his lack of training led to his misunderstanding that the subject's use against him of his CEW in drive-stun mode could lead to his incapacitation. The court ruled that a reasonable jury



could conclude that the deputy's decision to shoot the subject was based on his lack of training. Additionally, the court ruled that the deputy was not equipped with other less-lethal weapons, such as a baton or mace, and that it was highly predictable that a deputy will sometimes lose a CEW in a struggle with a subject. A reasonable jury could find that it was predictable that if a deputy loses control of a CEW and does not fully understand how it could be used against him, that he will mistakenly resort to the use of a firearm to protect himself [36].

Thus, the courts have given some guidance to officers and law enforcement administrators how to approach these incidents. First, in weapon retention and other deadly force incidents, officers must have probable cause to believe that the subject poses a threat of serious physical harm to officers or others. Officers must give the subject a warning before using deadly force, if feasible [37]. Second, law enforcement executives should consider arming officers with several intermediate-force options so they have alternatives available should they lose an intermediate weapon in a struggle. Third, officers need training in the foreseeable effects of intermediate weapons (including CEWs), the manner that intermediate weapons could be used against them, and what constitutes serious physical harms from or related to the use of intermediate weapons. Such training should be incorporated into officers' initial training and into all subsequent training sessions involving intermediate weapons. Fourth, officers must recognize that it is highly predictable that they occasionally will lose their intermediate weapons in a struggle with someone they are trying to subdue. They must also realize that, if they lose their intermediate weapons and do not fully understand how intermediate weapons can be used against them, that the courts will hold that resorting to the use of their firearms to protect themselves from the subject's use of the officer's intermediate weapon is not a reasonable use of force. That decision will be based not on the fact alone that the subject possessed the intermediate weapon, but on how the subject used that weapon, and, consequently, what threat of serious physical harm they generated.

## Limitations

A prospective experimental study would generate superior data compared to our use of retrospective data. However, a relevant experiment would have difficulty obtaining ethical approvals.

There is no national or international database that collects data in such incidents, and primary sources of data, such as law enforcement reports, are not available in all states and countries, depending on their public information laws. Additionally, law enforcement reports can be subject to bias and sensationalism. Medical records are usually protected by privacy laws. Consequently, secondary sources are the primary sources of information available to identify relevant incidents. Admittedly, however, media reports can also be subject to editorial bias and sensationalism.

Due to extensive media coverage law enforcement temporal arrest-related catastrophic injuries, we are confident that we have missed few, if any, TASER weapon-retention OIS incidents. However, we recognize that some instances might have escaped our discovery, especially older events, and incidents from countries other than the USA, the UK, Australia, and Canada. There are other brands of CEWs sold outside of the English-speaking countries, particularly in Brazil and we do not have statistics on their field usages [38].

We also note that the sampling frame is less rigorous than we would prefer. However, there is no practical alternative. We invested significant time searching open-record sources to identify incidents for this study. We focused our examination on those incidents that resulted in a fatal or non-fatal OIS. Those instances are very rare, but they are critically important to understanding the risks of equipping officers with CEWs, and other intermediate-force options. Medical and other records are not available to us to study the effects of this force on people who suffered minor or no injuries, and the effects on people who had such injuries add little to the understanding of the risks of firearm injury once the rates are calculated, as we did.

## Conclusions

We report 53 cases of weapon-retention officer-involved shootings (OIS) in conducted electrical weapon (CEW) law-enforcement field deployments or discharges. There were 48 fatal injuries out of 4.51 million CEW field deployments or discharges, giving a demonstrated deployment and discharge risk of approximately 10.6 fatal (OIS) per million CEW discharges (confidence limits of 8.0 to 14.1 per million by Wilson score interval). We found 5 non-fatal OIS incidents giving a risk of 1.1 per million (confidence limits of 0.5 to 2.6 per million). The mean subject age was $33.4 \pm 9.3$ years, and there was no statistically significant difference between the ethnicity of these subjects and that of all OIS fatalities from 2014 to 2020.

**Acknowledgements** We wish to thank Lamar Cousins, AXON Training Manager, for his help with the survey.

**Author contribution** MWK and MAB were primary writers. HEW collected the data. DLR edited.

**Data availability** Raw data at: https://www.dropbox.com/s/i30yw plog16ioto/Grab%20then%20Shooting%20Worksheet%2019%20Jan%202021.xlsx?dl=0



**Code availability** NA

## Declarations

**Ethics approval** NA

**Consent to participate** NA

**Consent for publication** NA

**Conflict of interest** MWK is a member of the Axon Enterprise, Inc. (Axon) Corporate Board and their Science & Medical Committee, owns stock and has been an expert witness for them. MAB is an Axon employee and legal advisor to the SMAB, has been an expert witness for them, and has stock options. HEW is a retired police chief. MWK, MAB, DLR, and HEW have been expert witnesses in other use-of-force involved incidents and legal proceedings.

## References

1. Taylor B, Woods DJ (2010) Injuries to officers and suspects in police use-of-force cases: a quasi-experimental evaluation. Police Q 13(3):260–289
2. F. V. Ferdik, R. J. Kaminski, M. D. Cooney, and E. L. Sevigny. The influence of agency policies on conducted energy device use and police use of lethal force. Police Quarterly, vol. 17, pp. 328–358, Dec 2015 2014. https://doi.org/10.1177/1098611114548098.
3. Kroll M, Brave M, Pratt H, Witte K, Kunz S, Luceri R (2019) Benefits, risks, and myths of TASER® handheld electrical weapons. Hum Factors Mechanical Eng Defense Safety. 3, no. 1, 7
4. Criscione JC, Kroll MW (2014) Incapacitation recovery times from a conductive electrical weapon exposure. Forensic Sci Med Pathol 10(2):203–207. https://doi.org/10.1007/s12024-014-9551-x
5. Ho J, Dawes D, Miner J, Kunz S, Nelson R, Sweeney J (2012) Conducted electrical weapon incapacitation during a goal-directed task as a function of probe spread. Forensic Sci Med Pathol 8(4):358–366. https://doi.org/10.1007/s12024-012-9346-x
6. J. Ho et al (2020) A comparative study of conducted electrical weapon incapacitation during a goal-directed task Forensic Sci Med Pathol. 1-9
7. Kroll MW, Adamec J, Wetli CV, Williams HE (2016) Fatal traumatic brain injury with electrical weapon falls. J Forensic Leg Med 43:12–19. https://doi.org/10.1016/j.jflm.2016.07.001
8. Kroll M, Ritter M, Williams H (2017) Fatal and non-fatal burn injuries with electrical weapons and explosive fumes. J Forensic Leg Med. 50:6–11
9. Kroll MW et al (2018) Eye injuries from electrical weapon probes: incidents, prevalence, and legal implications. J Forensic Leg Med 55:52–57. https://doi.org/10.1016/j.jflm.2018.02.013
10. Kroll MW et al (2019) Eye injury from electrical weapon probes: mechanisms and treatment. Am J Emerg Med 37(3):427–432. https://doi.org/10.1016/j.ajem.2018.06.004
11. Clarke C, Andrews SP (2014) The ignitability of petrol vapours and potential for vapour phase explosion by use of TASER(R) law enforcement electronic control device. Sci Justice 54(6):412–420. https://doi.org/10.1016/j.scijus.2014.04.004
12. J. A. Martin, Applied human error theory: a police taser-confusion shooting case study, in Proceedings of the Human Factors and Ergonomics Society Annual Meeting, 2016, vol. 60, no. 1: SAGE Publications Sage CA: Los Angeles, CA, pp. 475–479.
13. Farber B (2012) Weapon confusion and civil liability. AELE Monthly Law J 6:101–111
14. Harrell E, Davis E (2020) Contacts between police and the public, 2018 - statistical tables, US Department of Justice Office of Justice Programs Bureau of Justice Statistics Special Report. NCJ 255730. pp. 1–14
15. Duffin, Number of arrests for all offenses in the United States from 1990–2019, Statista, 2020. [Online]. Available: www.statista.com/statistics/191267/arrest-rate-for-all-offenses-in-the-us-since-1990/. Accessed 29 June 2021
16. Brave M (2020) Law enforcement use-of-force "standards," degrees of certainties, and scientific reliabilities. Government liability, for the defense vol. June, Table 1. Comparative Use-of-Force Frequencies, pp. 24–30
17. Ross DL (2011) Myths and realities of the police use of force. Law Enforcement Exec Forum J. 1–28, 2011.
18. Hickman MJ, Strote JN, Scales RM, Parkin WS, Collins PA (2020) Police use of force and injury: multilevel predictors of physical harm to subjects and officers. Police Q. 1098611120972961
19. FBI Law enforcement officers killed and assaulted in the line of duty. Criminal Justice Information Services, 2019. [Online]. Available: https://www.fbi.gov/services/cjis/ucr/leoka. Accessed 29 June 2021
20. Brewer J, Kroll M (2009) Field statistics overview IN TASER conducted electrical weapons: physiology, pathology, and law, M. Kroll and J. Ho Eds. New York City: Springer-Kluwer, ch. 24.
21. Stevenson R, Drummond-Smith I (2020) Medical implications of conducted energy devices in law enforcement J Forensic Leg Med. 101948
22. Strote J, Walsh M, Angelidis M, Basta A, Hutson HR (2010) Conducted electrical weapon use by law enforcement: an evaluation of safety and injury. J Trauma 68(5):1239–1246. https://doi.org/10.1097/TA.0b013e3181b28b78
23. Bennet J (2018) Weapon retention and disarming in *I*ntegrated Force Options. Charleston, IL. , 2018, ch. 12.
24. Harbison J (2009) Real world weapon retention. PoliceMag.com
25. Siegfried M (2008) TASER defense. PoliceMag.com
26. Siddle BK (2017) Weapon retention/disarming in Threat pattern recognition, use of force manual. Millstadt, IL: Human Factor Research Group, Inc, ch. 11
27. Callahan JM (2015) Lethal force and the objective reasonable officer: law, liability, policy, tactics, and survival. Looseleaf Publisher, Flushing, NY
28. Use of force and de-escalation options for gaining compliance, Georgia Public Safety Training Center Bulletins, 2017. [Online]. Available: https://www.gapost.org/pdf_file/Use_Force_De-escal_POI_021717.pdf. Accessed 29 June 2021
29. Weapon retention—are you prepared?, Florida sheriffs risk management find safety bulletins, 2016. [Online]. Available: https://fsrmf.org/wp-content/uploads/2017/05/FSRMF-1263-Weapon-Retention-Hot-Topic-Flyer-v4.pdf. Accessed 29 June 2021
30. Bragg B (2003) Disarming. Police Mag.com
31. Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)," ed.
32. TASER handheld CEW warnings, instructions, and information: law enforcement. Axon Enterprise, Inc. October 30, 2018.
33. State v. Carter, 311 Kan. 206, 459 P.3d 186 (2020). ed.
34. Eberhartv. State, 307 Ga. 254, 835 S.E.2d 192 (2019). ed.
35. State v. Copeland, No. S20A0820, 2020 WL 6385798 (Ga. Nov. 2, 2020). ed.
36. Harper v. McAndrews, No. 2:18-CV-00520-RSP, 2020 WL 6545134 (E.D. Tex. Nov. 6, 2020). ed.
37. Cantu v. City of Dothan, Alabama, 974 F.3d 1217 (11th Cir. 2020). ed
38. Goncalves R (2016) Test report of electroshock weapon, SPARK. Federal testing Laboratory WTL, https://www.dropbox.com/s/ipwa9316vtsfjnq/Goncalves%20Bench%20Test%20report%20on%20Condor%20Spark%202016.pdf?dl=0. Accessed 29 June 2021

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

