# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Demetria Brooks, Individually and as next of kin and Independent Administrator of the Estate of RODERICK BROOKS, deceased, | § § § § § § | Civil Action No. 4:22-cv-3322 |
| Plaintiff, | § § | |
| v. | § § | |
| GARRETT W. HARDIN, Individually and as an agent and/or employee of HARRIS COUNTY SHERIFF'S OFFICE, HARRIS COUNTY et. al. | § § § § § | |
| Defendants. | § § § § § § | |

---

## PLAINTIFF'S OBJECTION AND RESPONSE TO DEFENDANT GARRETT W. HARDIN'S MOTION FOR SUMMARY JUDGMENT

---

**STAFFORD MOORE, PLLC**
Justin A. Moore
State Bar No. 24088906
justin@staffordmoore.law
www.staffordmoore.law
325 N. St. Paul Street, Suite 2210
Dallas, Texas 75201
Telephone (Main):    214-764-1530
Telephone (Direct):    214-764-1531
Facsimile:    214-580-8104
**ATTORNEYS FOR PLAINTIFF**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ..........................................................................ii

I.   NATURE AND STAGE PROCEEDINGS ...........................................1

II. STATEMENT OF FACTS ......................................................................2

    A.  Summary Judgment Record ...........................................................2

    B.  Overview of The Incident...............................................................3

    C.  TASER function, What Video Evidence Shows and Officer
       Reasonableness.................................................................................5

III. ISSUES PRESENTED ........................................................................10

IV. STANDARD OF REVIEW: QUALIFIED IMMUNITY AT SUMMARY
JUDGMENT ..............................................................................................11

V. ARGUMENT .........................................................................................13

    A.  Qualified Immunity Prong 1: Defendant Hardin Violated Roderick
       Brooks Fourth Amendment Rights.............................................13

       1.   General Principles For Excessive Force Under the Fourth
          Amendment .................................................................................13

          a.  Taser Deployment.........................................................14

          b.  The Tackle.....................................................................15

          c.  The Punch ......................................................................16

          d.  Deadly Force .................................................................17

    B.  Qualified Immunity Prong 2 Defendant Hardin Violated Roderick
       Brooks' Clearly Established Fourth Amendment Rights.....................19

VI. RELIEF SOUGHT ...............................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                 **Pages**

*Boyd v. McNamara,*
    74 F.4th 662 (5th Cir. 2023) ............................................................... 12

*Brown v. Callahan,*
    623 F.3d 249 (5th Cir. 2010) ............................................................... 12

*Bush v. Strain,*
    513 F.3d 492 (5th Cir. 2008) ......................................................... 14, 18

*Crane v. City of Arlington,*
    50 F.4th 453 (5th Cir. 2022) ............................................................... 13

*Darden v. City of Fort Worth,*
    880 F.3d 722 (5th Cir. 2018) ......................................................... 14, 17

*Deville v. Marcantel,*
    567 F.3d 156 (5th Cir. 2009) ............................................................... 14

*Garcia v. Orta,*
    47 F.4th 343 (5th Cir. 2022) ............................................................... 12

*Graham v. Connor,*
    490 U.S. 386 (1989) ...............................................................12–18, 20

*Gutierrez v. City of San Antonio,*
    139 F.3d 441 (5th Cir. 1998) ............................................................... 13

*Lytle v. Bexar County,*
    560 F.3d 404 (5th Cir. 2009) ...........................................14, 16, 18–20

*Newman v. Guedry,*
    703 F.3d 757 (5th Cir. 2012) ......................................................... 14, 17

*Pena v. City of Rio Grande City,*
    879 F.3d 613 (5th Cir. 2018) ............................................................... 13

*Ramirez v. Martinez,*
    716 F.3d 369 (5th Cir. 2013) .................................................. 14, 16, 20

*Rubin v. De La Cruz,*
    — F.4th — (5th Cir. 2025) ............................................................. 19–20

*Sam v. Richard,*
  887 F.3d 710 (5th Cir. 2018) ........................................................... 14, 17

*Scott v. Harris,*
  550 U.S. 372 (2007) ............................................................................ 14

*Taylor v. Hartley,*
  488 F. Supp. 3d 517 (N.D. Tex.) ..................................................14, 17

*Tennessee v. Garner,*
  471 U.S. 1 (1985) ...........................................................................14, 18

*Tolan v. Cotton,*
  572 U.S. 650 (2014) ..................................................................14, 16, 18

*Tucker v. City of Shreveport,*
  998 F.3d 165 (5th Cir. 2021) .............................................................. 13

## **RULES & STATUTES**

42 U.S.C. § 1983 ..................................................................................... 2

U.S. Const. amend. IV ....................................................... 2, 11–12, 14–21

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| Demetria Brooks, Individually and as next of kin and Independent Administrator of the Estate of RODERICK BROOKS, deceased, | § § § § § | Civil Action No. 4:22-cv-3322 |
| Plaintiff, | § § § | |
| v. | § § | |
| GARRETT W. HARDIN, Individually and as an agent and/or employee of HARRIS COUNTY SHERIFF'S OFFICE, HARRIS COUNTY et. al. | § § § § § | |
| Defendants. | § § § § § § | |

**PLAINTIFF'S OBJECTION AND RESPONSE TO DEFENDANT GARRETT W. HARDIN'S MOTION FOR SUMMARY JUDGMENT**

## I. NATURE AND STAGE OF PROCEEDINGS

Plaintiff Demetria Brooks, as representative of the Estate of Roderick Brooks, brings this action under 42 U.S.C. § 1983 for the use of excessive and unreasonable force that resulted in Mr. Brooks's death on July 8, 2022. Plaintiff alleges that Defendant Sergeant Garrett Hardin escalated a limited investigatory encounter into a physical confrontation, departed from widely accepted police practices, and ultimately used deadly force against an unarmed man who did not pose an immediate threat, in violation of the Fourth Amendment.

Hardin moves for summary judgment on qualified immunity. His motion depends on accepting his narrative of the encounter, his reading of the video, and his claim that Mr.

1

Brooks "grabbed," "tased," and threatened him with a TASER. Those points are materially disputed. Plaintiff has submitted testimony, physical evidence, and the expert report of police-practices specialist Nicholas G. Bloomfield showing that Hardin's account is incomplete, inconsistent with accepted police standards, and contradicted by parts of the record. That evidence creates genuine disputes of material fact that preclude summary judgment.

Hardin filed his motion for summary judgment on October 30, 2025. This response is timely under the Court's scheduling order as extended by leave of Court.

## II. STATEMENT OF FACTS

1.    **A.    Summary Judgment Record**

Plaintiff opposes Sergeant Hardin's motion with competent summary-judgment evidence, including:

- Hardin's sworn statements and investigative interviews, including materials in Harris County Sheriff's Office Incident Packet No. 2207-02922 considered by Plaintiff's expert, Nicholas G. Bloomfield.

- Body-worn camera footage from Hardin, including native files, synchronized video, and still frames analyzed in Bloomfield's report.

- TASER-related materials, including X26P event logs, pulse logs, and documentation referenced in the declarations of Axon engineer Bryan Chiles and Dr. Mark Kroll.

- Autopsy materials from the Harris County Institute of Forensic Sciences relating to Mr. Brooks's death.

- Bloomfield's expert report, which relies on the above, Harris County Sheriff's Office's Reenactment of the incident associated with the parallel criminal cause in Harris County and on generally accepted policing sources, including IACP guidance

on foot pursuits and use of force, Stoughton, Noble and Alpert's *Evaluating Police Uses of Force* (2020), AXON TASER X26P operational guidance, and other professional publications.

- All exhibits contained in Plaintiff's Appendix, filed concurrently with this response.

## B.    Overview of The Incident

On July 8, 2022, Sergeant Garrett Hardin responded to a reported Dollar General robbery. Dispatch did not indicate the use of a weapon or an immediate threat of armed violence. Upon arrival near 15000 Kuykendahl Road, Hardin saw Roderick Brooks walking away and activated his lights. Body-camera footage shows Hardin exiting his patrol unit as Brooks moved away on foot. Before assessing threat level or waiting for backup, Hardin initiated a solo foot pursuit. The video shows no weapon, threats, or assaultive behavior by Brooks at that time.

As the pursuit crossed a gas-station lot, Hardin drew his taser. Brooks collided with a vehicle, then moments later Hardin deployed the taser. Although the probes did not penetrate Brooks's skin, the video shows Brooks react and slow enough for Hardin to close distance. Hardin then tackled Brooks; still without support units on scene. Nothing in the footage indicates that Brooks attempted to strike Hardin, seize a weapon, or threaten others at that moment.

Rather than reassess, Hardin executed an improvised tackle that drove both men to the asphalt. Plaintiff's expert, Nicholas Bloomfield, identifies this maneuver as contrary to accepted foot-pursuit practices, which caution against closing distance alone while holding a weapon. Entering a ground fight in this posture, he explains, predictably increases risk to the officer and creates the very entanglement Hardin later claimed justified lethal force.

3

Once on the ground, a close-quarters struggle ensued. The video shows Hardin still holding the taser as they fell, reducing his ability to control it. The taser slipped from his hand and came to rest between the two men, an outcome Bloomfield describes as foreseeable and tactically unsound because it left a loose weapon within reach of the person being detained. Both men remained on the ground as Hardin attempted to reach his radio. Brooks shifted, and Hardin delivered a single punch.

The synchronized footage shows that at the moment Hardin claims the encounter became "deadly," Brooks was largely prone with Hardin straddling his back in a dominant position. Although Hardin asserts that Brooks picked up and "activated" the taser, the video does not show manipulation capable of producing neuromuscular incapacitation. Bloomfield, relying on AXON guidance, autopsy findings, taser data, and the HCSO reenactment, explains that once a cartridge has discharged its probes, the device cannot incapacitate anyone and functions only in drive-stun mode. Drive-stun requires direct pressure into the officer's body and generates localized pain, not motor lockup.

Nothing in the footage reflects Brooks achieving or attempting drive-stun contact. The taser appears amid loose wires beneath both men, while Hardin maintains top control. Hardin claimed he "felt" the taser, but Bloomfield notes that incidental contact with loose leads may cause momentary discomfort, not incapacitation. The reenactment performed during the parallel criminal case confirmed that such contact produces brief localized pain only and does not impair an officer's motor function.

The video further shows Hardin never loses physical control. He does not slump, collapse, or exhibit any sign of neuromuscular incapacitation; he continues shifting his

4

weight and draws his firearm immediately after allegedly being "shocked." These movements are inconsistent with incapacitation and consistent with Bloomfield's opinion that Hardin retained full physical capability.

Hardin also asserts he twice warned Brooks to drop the taser and that Brooks "rearmed" it. But the taser event logs confirm the cartridge had already fired before Brooks ever touched it, meaning no reasonable officer could believe the device remained capable of incapacitating him. The red aiming laser visible on the pavement signifies only that the weapon was in drive-stun mode, not that it posed a risk of serious bodily injury.

Based on the discharged cartridge, the lack of any drive-stun contact, Hardin's maintained physical control, AXON's manufacturer guidance, and the reenactment findings, Bloomfield concludes that no reasonable officer could have perceived an imminent threat of death or serious bodily harm. The record shows the taser was physically incapable of incapacitation, and Hardin's movements show he was never impaired.

## C.     TASER function, What Video Evidence Shows and Officer Reasonableness

Hardin asserts that after the brief TASER cycle ended, he believed he remained in contact with probes or wires and that Brooks could deliver a "more powerful" shock, blind him by drive-stunning his eyes, or incapacitate him through the wires themselves. The record does not support these assertions.

First, the body-camera footage does not depict Brooks attempting to drive-stun Hardin, moving the TASER toward Hardin's face, or making any physical motion consistent with seeking out Hardin's eyes or neck. Instead, the synchronized video shows Brooks restrained under Hardin's body weight in a prone or semi-prone position. Hardin

retains a dominant physical position throughout this sequence, never losing control of his posture, balance, or motor functions. His ability to shift his weight, draw his firearm, and reorient his upper body contradicts any claim that he was at risk of immediate incapacitation.

Second, Bloomfield's expert analysis, grounded in TASER manufacturer AXON's guidance, Hardin's own recorded statements, autopsy evidence, and the Harris County Sheriff's Office training-division reenactment from the parallel criminal case, establishes that the TASER was physically incapable of causing neuromuscular incapacitation once its cartridge had already discharged the probes. In this discharged-cartridge condition:

- A TASER can only function in drive-stun mode, which AXON states is *not designed to incapacitate* and is limited to pain compliance.

- Drive-stun requires firm, direct pressure of the device against the target's skin or clothing to have any effect at all.

- Even then, the effect is momentary pain, not incapacitation.

Bloomfield also details that contact with loose TASER wires can cause a fleeting pain sensation but cannot produce incapacitation, a conclusion supported by the Sheriff's Office reenactment that reproduced the conditions of Hardin's encounter. That reenactment showed that lightly insulated TASER wires, such as those visible in the body-camera frames, do not transmit incapacitating current.

The video footage confirms that no drive-stun contact occurred. The TASER is visible beneath both men, entangled in wires, with no moment in which Brooks places the

TASER against Hardin's face, neck, or body in a manner consistent with AXON's required method for a drive-stun.

Third, nothing in the record supports Hardin's assertion that Brooks could have "completed the circuit" and immobilized him simply by drive-stunning his body. To the contrary, Bloomfield concludes that completing an incapacitating circuit is impossible once the TASER's probes have been discharged, and AXON explicitly states that neuromuscular incapacitation requires two embedded probes completing a circuit across the target's body, conditions that did not exist here. The reenactment further showed that a person lying across discharged probes or loose wires does not become incapacitated.

Finally, the video shows Hardin quickly rising to his feet, drawing his firearm, aiming, issuing commands, and firing a shot to Brooks's neck within seconds. At no point does the footage depict hesitation, disorientation, collapse, or any physical manifestation of Hardin experiencing imminent incapacity or losing control of his weapon.

Hardin's claim that deadly force was a "last resort" is contradicted by the fact that he remained upright, armed, mobile, and in control, while Brooks remained on the ground in a compromised physical position. The available evidence does not show Brooks attempting to blind Hardin, attempting to drive-stun him, or engaging in conduct consistent with an imminent threat of serious bodily injury. Rather, the evidence shows Hardin in a tactically superior position with clear opportunities to disengage, create distance, or await backup without resorting to deadly force.

The operation and limitations of the TASER X26P are addressed in the expert report of Nicholas G. Bloomfield, who reviewed body-worn camera footage, AXON

manufacturer materials, investigative statements, and the reenactment conducted by the Harris County Sheriff's Office Tactical Training and Officer Safety Unit during the related criminal investigation.

Bloomfield confirms that once a TASER cartridge has discharged its probes, the device is no longer capable of delivering neuromuscular incapacitation. A TASER in that condition functions only in "drive-stun" mode, which AXON, the manufacturer, identifies as a pain-compliance measure rather than an incapacitating force option. AXON's guidance explains that a drive-stun requires the officer to push the front of the device firmly against a person's body; mere contact or touching is insufficient. The device must remain pressed against the body for any effect to occur, and any effect ceases immediately once the device is withdrawn. As Bloomfield notes, AXON indicates that the *only* theoretical way a TASER might induce incapacitation in drive-stun mode is if (1) probes have already lodged into a subject's body and (2) the officer then applies a second drive-stun to a distant part of the body to complete a circuit. Even this scenario, AXON notes, might only *possibly* induce incapacitation.

In this case, the medical examiner found no probe penetration to Brooks's body. That finding is consistent with the body-worn footage and with the absence of probe wounds on autopsy. Because the probes never made contact with Brooks' body, the device could not create the electrical circuit that AXON identifies as necessary for neuromuscular incapacitation.

Bloomfield reviewed Hardin's statement to investigators that he "felt the effects of the TASER" when Brooks cycled the device. According to Bloomfield, this sensation is

consistent with a pain-compliance surge, akin to a drive-stun effect when a person incidentally contacts a conductive point during a brief activation. The sensation Hardin described is not consistent with incapacitation.

Bloomfield's evaluation is reinforced by the reenactment conducted by the Harris County Sheriff's Office Tactical Training and Officer Safety Unit on July 11, 2022. In that demonstration, investigators placed one probe on a training dummy and a second probe on the ground several feet away to replicate the conditions seen in the body-worn camera footage. A deputy lay across the dummy's back, and the TASER was activated for approximately one second. The deputy reported feeling a drive-stun-like pain, not incapacitation.

A second reenactment simulated the loose wire that Hardin reported touching his firearm. Investigators wrapped the deputy's wrist in TASER wire without contacting the probe. When the TASER was activated again, the deputy felt no effects. According to the investigators, this demonstrated that the TASER wires are lightly insulated and do not transmit electrical effects through incidental contact.

Bloomfield notes that the body-worn camera footage shows no attempt by Brooks to apply a drive-stun to Hardin's face, neck, or any part of his body. Nor does the footage show the positioning or pressure necessary for a drive-stun application. Rather, the footage depicts Hardin maintaining physical control in a dominant, top-mounted position, with Brooks largely prone or grounded. Nothing in the video shows Hardin experiencing motor control loss or involuntary muscular override. His ability to reposition, draw his firearm,

issue verbal commands, and fire within seconds reflects continuous physical control and stability.

Based on the totality of this information, including AXON's operational guidance, the criminal-case reenactment, the autopsy findings, and the body-worn camera footage, Bloomfield concluded that a reasonable officer would have known that the TASER could not incapacitate anyone once the probes had already been discharged. Under the conditions visible on the video, the device was limited to producing only temporary pain consistent with a drive-stun effect and incapable of producing neuromuscular incapacitation.

## III. ISSUES PRESENTED

This motion asks whether the summary-judgment record permits a jury to find that Sergeant Hardin violated the Fourth Amendment and is not entitled to qualified immunity. Under the first prong, the question is whether a reasonable officer in Hardin's position would have understood that escalating a solo foot pursuit into a ground fight, punching a prone suspect, and then using deadly force on an unarmed man who was largely controlled on the ground was unnecessary or disproportionate. Although Brooks briefly handled a discharged TASER, the record, including expert testimony grounded in the body-camera footage, AXON guidance, forensic findings, and the Sheriff's Office reenactment, supports an inference that a reasonable officer would have known the device could not incapacitate or cause serious bodily injury.

Under the second prong, the question is whether clearly established Fourth Amendment principles already provided fair warning that using escalating levels of force

against a prone, largely restrained, and unarmed person, followed by deadly force in the absence of an imminent threat, was unconstitutional. The record allows a finding that every reasonable officer in 2022 would have recognized those limits. To the extent Hardin invokes substantive due process, the Court must evaluate the claim under the Fourth Amendment, which governs uses of force during a seizure.

## IV. STANDARD OF REVIEW: QUALIFIED IMMUNITY AT SUMMARY JUDGMENT

Qualified immunity is evaluated under a familiar two-step inquiry. The Court asks first whether, viewing the facts in the light most favorable to the plaintiff, the officer's conduct violated the Fourth Amendment. It asks second whether the right at issue was clearly established at the time, such that a reasonable officer would have understood the conduct to be unlawful. *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021*); Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). The plaintiff bears the burden to defeat the defense, but all reasonable inferences must be drawn in the plaintiff's favor. *Brown*, 623 F.3d at 253.

At summary judgment, the Court does not weigh evidence, resolve factual disputes, or make credibility determinations. Id. Those limits apply fully in the qualified-immunity context. Where material facts remain genuinely disputed, the defense cannot be resolved as a matter of law.

Hardin relies on body-worn camera footage, TASER logs, and his own testimony to argue that no reasonable jury could find a constitutional violation. Video evidence does

not alter the summary-judgment standard unless it "blatantly contradicts" the plaintiff's account. *Scott v. Harris,* 550 U.S. 372, 380 (2007). The Fifth Circuit has cautioned that courts must view such evidence in context and avoid treating it as conclusive where it does not actually resolve the disputed facts. *Boyd v. McNamara*, 74 F.4th 662, 665 (5th Cir. 2023). And while *Scott* has been applied to records such as TASER logs, those materials must utterly discredit the plaintiff's evidence to have dispositive effect. *Garcia v. Orta*, 47 F.4th 343, 350 n.2 (5th Cir. 2022).

Here, the video and electronic logs do not resolve the central disputes. Plaintiff's expert testimony supports a finding that a reasonable officer would have understood that the TASER could not incapacitate Hardin, that the footage shows no signs of neuromuscular incapacitation, and that Hardin's tactics, including his tackle, departed from generally accepted police practices. Those points go directly to the *Graham v. Connor* factors and support a finding that Hardin's conduct was objectively unreasonable. They also create genuine disputes of material fact that the Court cannot resolve at this stage.

The clearly established law prong also favors denying the motion. As *Crane v. City of Arlington* explains, the law is clearly established when existing precedent gives officers fair warning that their conduct is unlawful. 50 F.4th 453, 462 (5th Cir. 2022). A jury could find on this record that Hardin used force against a suspect who posed no immediate threat and lacked any realistic capacity to incapacitate him. That principle was settled well before July 2022.

Taken together, the factual disputes, the competing expert analyses, and the limits of the video and TASER records preclude resolving qualified immunity as a matter of law.

When the record is viewed in the light most favorable to Plaintiff, a reasonable jury could find that Hardin violated clearly established Fourth Amendment limits under both prongs.

## V.    ARGUMENT

### A. Qualified Immunity Prong 1: Defendant Hardin Violated Roderick Brooks Fourth Amendment Rights.

#### 1.    General Principles For Excessive Force Under the Fourth Amendment

The Fourth Amendment requires that any force used by law-enforcement officers be "objectively reasonable" in light of the facts and circumstances known to the officer at the time. *Graham v. Connor*, 490 U.S. 386, 396 (1989). That standard directs courts to consider the severity of the crime, the immediacy of any threat to officers or others, and whether the individual was resisting or attempting to flee. Id.; *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998). The focus is on what the officer actually confronted, not a hindsight reconstruction. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985); *Graham,* 490 U.S. at 396.

The Fifth Circuit has made clear that this is a fact-driven inquiry, often unsuitable for summary judgment when the evidence allows more than one reasonable view of the threat or the officer's perception of it. Disputes about the immediacy or magnitude of danger are material and must be resolved by a jury, particularly where expert testimony undercuts the officer's justification or offers a competing account of sound police practice. *Lytle v. Bexar County*, 560 F.3d 404, 410–12 (5th Cir. 2009); *Ramirez v. Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013). The Supreme Court underscored in *Tolan v. Cotton* that

courts may not credit the officer's account or weigh evidence at this stage; they must accept the plaintiff's version where a reasonable jury could do so. 572 U.S. 650, 656–57 (2014).

Deadly force sits at the narrowest end of this spectrum. An officer may resort to it only when the individual poses an immediate threat of death or serious bodily injury at the moment force is used, and the question is always objective: whether a reasonable officer in those circumstances would have believed deadly force necessary. *Garner,* 471 U.S. at 11–12; Graham, 490 U.S. at 396–97. Force used against a suspect who is not posing a danger, not resisting, or no longer resisting violates the Fourth Amendment. See *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018); *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012); *Taylor v. Hartley*, 488 F. Supp. 3d 517; *Sam v. Richard*, 887 F.3d 710 (5th Cir. 2018); *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008). As *Deville v. Marcantel* explains, the plaintiff must show injury directly resulting from force that was clearly excessive and clearly unreasonable—elements that merge into a single, fact-intensive question of objective reasonableness. 567 F.3d 156, 167 (5th Cir. 2009); *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018). Where disputes exist about the degree of threat, the suspect's movements, the officer's control, the adequacy of alternatives, or the necessity of force, whether non-deadly or deadly, those questions belong to the jury, not the court.

a. *Taser Deployment.* The taser deployment is not the centerpiece of Plaintiff's claim, but it still presents fact disputes that preclude summary judgment. Hardin frames the deployment as reasonable because Brooks was fleeing and suffered only minimal physical effect. But the Fourth Amendment does not turn on whether a taser successfully

incapacitates a suspect; it asks whether the decision to deploy it was proportionate to the threat as understood at the time. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The video shows Brooks jogging away, not behaving aggressively, not threatening bystanders, and not displaying a weapon. Hardin escalated to taser use within seconds, without backup and without assessing threat level. Plaintiff's expert notes that while taser use is sometimes appropriate in foot pursuits, Hardin's immediate escalation and absence of any tactical reassessment raise clear concerns about necessity. That testimony, paired with the body-camera footage, creates a dispute about whether the taser was justified at all.

The Fifth Circuit has repeatedly held that disputes over immediacy of threat, availability of alternatives, or an officer's tactical choices cannot be resolved as a matter of law where the record supports more than one interpretation. *Lytle v. Bexar County*, 560 F.3d 404, 410–12 (5th Cir. 2009). And when video evidence is susceptible to differing reasonable views, courts may not credit the officer's narrative at summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). While this moment of force may not carry the same weight as Hardin's later actions, a reasonable jury could still conclude that his immediate escalation to a taser was unnecessary. Because the Graham reasonableness analysis hinges on disputed facts about timing, threat perception, and tactical necessity, Hardin is not entitled to summary judgment on this use of force.

B. *The Tackle.* The takedown cannot be resolved as a matter of law because the record permits a jury to conclude that Brooks was no longer fleeing and did not pose an immediate threat when Hardin tackled him. After Brooks collided with a vehicle and paused following the taser discharge, the video allows a reasonable finding that Hardin had

15

the opportunity to reassess rather than initiate a physical takedown. Graham requires proportionality and consideration of available alternatives. 490 U.S. at 396. A jury could view Hardin's decision to close distance and tackle—rather than continue verbal commands or wait for backup—as unnecessary under the circumstances.

Bloomfield's expert opinion underscores this point: tackling a suspect while holding a taser is inconsistent with accepted foot-pursuit tactics because it places the officer in an unstable position and unnecessarily creates a ground fight. Under Lytle and Ramirez, such expert disagreement about threat perception and tactics creates a fact issue that defeats summary judgment. 560 F.3d at 410–12; 716 F.3d at 378–79. And under Tolan, the Court may not adopt Hardin's preferred reading of the video where it supports more than one reasonable interpretation. 572 U.S. at 656–57.

On this record, a reasonable jury could conclude that Brooks had halted, was not attacking, and posed no immediate threat when Hardin made the tackle—rendering the force excessive under Graham and Gutierrez. Because disputes remain regarding threat level, the availability of safer alternatives, and the reasonableness of Hardin's tactical choices, qualified immunity cannot attach at this stage.

C. *The Punch*. Hardin describes the punch as a brief, glancing strike delivered while Brooks was resisting. But whether Brooks was resisting at that moment is disputed, and that dispute is material. The video permits a finding that Brooks was already face-down on the asphalt with Hardin straddling him in a superior position of control. A jury could reasonably infer that Brooks was not presenting a meaningful threat when the punch was thrown.

The Fifth Circuit has made clear that striking a suspect who is not resisting or no longer resisting may violate the Fourth Amendment. See *Newman*, 703 F.3d 757; *Sam v. Richard*, 887 F.3d 710; *Bush v. Strain*, 513 F.3d 492. District courts applying the same principles have held similarly where a suspect is prone and controlled. See *Taylor v. Hartley*, 488 F. Supp. 3d 517. These cases do not resolve the issue here, but they reinforce that when the record allows a finding that the suspect was subdued, the reasonableness of additional force is a question for the jury. *Darden,* 880 F.3d 722.

This moment of force may not drive the broader constitutional inquiry, but it cannot be removed from the case at summary judgment. Because the record permits competing interpretations of Brooks's resistance level and Hardin's need to strike, a jury—not the Court—must decide whether the punch was objectively reasonable.

D. *Deadly Force*. The constitutional limits on deadly force are exacting. An officer may use lethal force only when the suspect poses an immediate threat of death or serious bodily injury at the precise moment the shot is fired. *Tennessee v. Garner*, 471 U.S. 1, 11–12. The inquiry is objective and turns on what a reasonable officer would have perceived, not on post hoc descriptions of fear. *Graham v. Connor*, 490 U.S. 386, 396–97. And because this analysis is fact-driven, summary judgment is improper when the record permits competing accounts about proximity, control, or the suspect's actual ability to cause harm. *Lytle v. Bexar County*, 560 F.3d 404, 410–13. Courts may not credit the officer's narrative or weigh expert disputes at this stage. *Tolan v. Cotton*, 572 U.S. 650, 656–57.

Hardin's justification for shooting Brooks depends entirely on the claim that Brooks, while prone, could incapacitate him with the TASER and seize his weapon. The record does not establish that proposition as a matter of law. Once the probes discharged, the TASER could operate only in drive-stun mode, which AXON materials describe as a pain-compliance tool rather than a means of neuromuscular incapacitation. Plaintiff's expert, Nicholas Bloomfield, relying on TASER data, AXON guidance, and the reenactment conducted by Harris County, concludes that the device in Brooks's hand could not incapacitate a reasonable officer under these conditions. A jury crediting that testimony could reject Hardin's asserted fear of imminent incapacitation.

The record also permits a finding that Hardin retained control. The body-camera footage, viewed in Plaintiff's favor, shows Hardin straddling Brooks's back as Brooks lies face-down on the pavement. Bloomfield identifies Hardin's tackle as tactically unsound because it created the very ground entanglement Hardin later characterized as life-threatening. Whether Hardin maintained positional dominance or instead confronted an imminent, life-threatening assault is a genuine factual dispute, and under Lytle, that dispute alone precludes summary judgment.

Hardin's reliance on *Rubin v. De La Cruz* is misplaced. Rubin involved a suspect who had already delivered a drive-stun directly to the officer's testicles, causing immediate physiological shock; who faced the officer while attempting to rise; and who remained entangled in live wires delivering current. None of those facts is present here. There is no evidence Hardin sustained incapacitation, that the TASER remained capable of neuromuscular lockup, that Brooks was rising to attack, or that he was attempting to seize

18

Hardin's weapon. Moreover, unlike in *Rubin*, Bloomfield's expert opinion directly contradicts the officer's asserted perception of deadly danger. These distinctions foreclose any argument that Rubin "squarely governs" this encounter.

Under *Tolan*, the record must be viewed with all reasonable inferences drawn for Plaintiff. Doing so permits a finding that the TASER lacked incapacitating capability; that Hardin maintained positional superiority; that Brooks was not capable of inflicting serious bodily harm at the moment of the shot; and that any perceived threat was speculative, not immediate as Garner requires. Because a reasonable jury could conclude that Hardin's resort to deadly force was objectively unreasonable, he is not entitled to qualified immunity at summary judgment.

**B.    Qualified Immunity Prong 2 Defendant Hardin Violated Roderick Brooks' Clearly Established Fourth Amendment Rights.**

Hardin's Prong Two argument leans almost entirely on *Rubin v. De La Cruz*—a 2025 case that cannot define what was clearly established in July 2022. By that time, the rule was settled: under *Garner* and *Graham*, deadly force is lawful only when the suspect poses an immediate threat of serious bodily harm at the moment the shot is fired. And Fifth Circuit cases such as *Lytle, Ramirez*, and *Tolan* made clear that where factual disputes exist about immediacy, threat capability, or officer control, qualified immunity cannot be granted at summary judgment.

Rubin is non-retroactive and materially different. There, the officer had been directly tased, remained wrapped in live wires, and faced a suspect rising with an operable incapacitating device. Here, the TASER had already discharged its probes, and AXON

19

guidance, TASER data, reenactment evidence, and Bloomfield's expert testimony show it could not produce neuromuscular incapacitation. A reasonable officer in 2022 would have understood that a drive-stun device capable only of localized pain does not constitute an immediate deadly threat under *Garner*.

Because clearly established law required an immediate threat—and the record contains genuine disputes on that point—Hardin cannot satisfy Prong Two.

## VI. RELIEF SOUGHT

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendant Hardin's motion for summary judgment in its entirety. Genuine disputes of material fact preclude the entry of judgment as a matter of law, and clearly established Fourth Amendment precedent forecloses qualified immunity at this stage. Plaintiff therefore asks that all claims against Hardin proceed to trial, together with any further relief—legal or equitable—to which Plaintiff is entitled.

Respectfully Submitted,

**STAFFORD MOORE, PLLC**

*/s/ Justin A. moore*
Justin A. Moore
State Bar No. 24088906
justin@staffordmoore.law
www.staffordmoore.law
325 N. St. Paul Street, Suite 2210
Dallas, Texas 75201
Telephone (Main):        214-764-1530
Telephone (Direct):      214-764-1531
Facsimile:               214-580-8104
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF WORD COUNT

Pursuant to the Court's Procedure 18(c), I certify this motion contains 4,987 words.

*/s/ Justin A. Moore*
Justin A. Moore

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2025 a true and correct copy of the above and foregoing was served via email on Defendant's counsel of record in accordance with the Federal Rules of Civil Procedure.

***Counsel for Garrett Hardin:***
Ray Viada    rayviada@viadastrayer.com

***Counsel for Harris County***
James Butt    james.butt@harriscountytx.gov

*/s/ Justin A. Moore*
Justin A. Moore

21